1  BRANCART & BRANCART
       Christopher Brancart (SBN 128475)
2      Liza Cristol-Deman (SBN 190516)
   Post Office Box 686
3  Pescadero, CA 94060
   Tel:    (650) 879-0141
4  Fax:    (650) 879-1103
   cbrancart@brancart.com
5  lcristoldeman@brancart.com

6  Attorneys for Plaintiffs

7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10 **GREATER NAPA FAIR HOUSING**          ) Case No. C07-3652 MEJ
   **CENTER, a California Not for Profit** )
11 **Corporation, doing business as**      ) **NOTICE OF MOTION AND MOTION**
   **FAIR HOUSING NAPA VALLEY, as**        ) **FOR ISSUANCE OF PRELIMINARY**
12 **an individual entity only; RUBY**     ) **INJUNCTION; MEMORANDUM OF**
   **DUNCAN, an incompetent adult, by**    ) **POINTS AND AUTHORITIES IN**
13 **and through her Guardian Ad Litem,**  ) **SUPPORT OF PLAINTIFFS' MOTION**
   **M. LOUISE WHITAKER; and EVA**         )
14 **NORTHERN, an incompetent adult,**     )
   **by and through her Guardian ad**      )
15 **Litem, NANCY NORTHERN,**              )
   **each individually and on behalf of**  )
16 **individuals similarly situated;**     ) **HEARING:**
   **NANCY NORTHERN, in her**              ) Date: September 6, 2007
17 **individual capacity only; and M.**    ) Time: 10:00 a.m.
   **LOUISE WHITAKER, in her**             ) Place: 450 Golden Gate Ave.,
18 **individual capacity only,**           )        Courtroom B, 15th Floor
                                            )
19              **Plaintiffs,**            )
                                            )
20      **vs.**                            )
                                            )
21 **HARVEST REDWOOD**                     )
   **RETIREMENT RESIDENCE, L.L.C.,**       )
22 **doing business as Redwood**           )
   **Retirement Residence; REDWOOD**       )
23 **RETIREMENT RESIDENCE L.L.C.;**        )
   **and HOLIDAY RETIREMENT CORP.,**       )
24                                          )
              **Defendants.**             )
25 _____)

26 ///

27 ///

28 ///

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

1

# **<u>TABLE OF CONTENTS</u>**

2

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

3

Notice of Motion and Motion for Issuance of Preliminary Injunction . . . . . . . . . . . . . . 1

4

Memorandum of Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6

II.     Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7

     A.      Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8

     B.      Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9

     1.      Plaintiffs Eva Northern and Nancy Northern . . . . . . . . . . . . . . . . . . . . . 5

10

     2.      Plaintiffs Ruby Duncan and Mae Louise Whitaker . . . . . . . . . . . . . . . . 9

11

     3.      Other Evidence of Defendants' Discriminatory Housing Practices
            and the Likely Hardships on Putative Class Members . . . . . . . . . . . . 11

12

13

     4.      Plaintiff Greater Napa Valley Fair Housing Center . . . . . . . . . . . . . . . 13

III.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

14

     A.      Plaintiffs Meet the Requirements for Granting a Preliminary
            Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

15

16

     1.      Plaintiffs are Likely to Succeed on the Merits of Their Claims . . . . . . . 14

17

          a.      Redwood's Eviction Notices Deny Housing to Residents
                  Based on Disability in Violation of the Fair Housing Act . . . . . . . 16

18

          b.      Redwood's "Active" or "Independent Living" Requirements
                  and Mealy Tray Policy are Illegal Conditions of Tenancy

19

                  that Discriminate on the Basis of Disability . . . . . . . . . . . . . . . . . 18

20

          c.      Redwood Discriminatory Statements Violate the
                  Fair Housing Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

21

22

     2.      Plaintiffs also are Likely to Succeed on State Law Claims . . . . . . . . . . 22

23

     B.      Plaintiffs Suffer Irreparable Injury that Continues to Mount, and
            the Balance of Hardships Tilts in Their Favor . . . . . . . . . . . . . . . . . . . . 23

24

IV.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;**
**CASE NO. C 07-3652 MEJ**

# TABLE OF AUTHORITIES

**Federal Cases**

Association for the *Advancement of the Mentally Handicapped v.
City of Elizabeth*, 876 F.Supp. 614 (D.N.J. 1994) . . . . . . . . . . . . . . . . . . . . . 23

*Briggs v. Sullivan*, 886 F.2d 1132 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Cason v. Rochester Housing Authority*, 748 F. Supp. 1002 (W.D.N.Y. 1990) . . . 18, 20

*Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir. 1984) . . . . . . . . *14, 23*

*Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . . 24

*Housing Rights Center v. Donald Sterling Corp.*, 284 F.Supp. 2d. 1129
(C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988), *cert. denied*, 493 U.S. 813 (1989) . . . . 15

*Llanos v. Estate of Anthony Coehlo*, 24 F.Supp 2d 1057 (E.D. Cal. 1998) . . . . . . . 21

*Niederhauser v. Independence Square Housing*, 4 Fair Housing - Fair Lending
(Aspen Law & Bus.) ¶16,305 (N.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . 18,19, 20

*Nike, Inc. v. McCarthy*, 379 F.3d 576 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pfaff v. HUD*, 88 F.3d 739 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ragin v. New York Times Co.*, 923 F.2d 995 (2nd. Cir. 1991) . . . . . . . . . . . . . . . 21-22

*Samuelson v. Mid-Atlantic Realty Co., Inc.*, 947 F. Supp. 756 (D. Del. 1996) . . . . . . 18

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d. 814
(9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Topic v. Circle Realty Co.*, 377 F.Supp. 111 (C.D. Cal. 1974),
*rev'd. on other grounds*, 532 F.2d 1273 (9th Cir. 1975),
*cert. denied*, 429 U.S. 859 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. American Institute of Real Estate Appraisers*, 442 F. Supp. 1072
(N.D. Ill. 1977), *appeal dismissed*, 590 F. 2d 242 (7th Cir. 1978) . . . . . . . . 16, 20

*United States v. California Mobile Home Park Management Co.*, 29 F.3d 1413
(9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974),
*cert. denied*, 422 U.S. 1042 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. City of Parma*, 494 F. Supp. 1049, 1053 (N.D. Ohio 1980),
*aff'd.*, 661 F.2d 562 (6th Cir. 1981), *cert. denied* 465 U.S. 926 (1982) . . . . . . . 15

*United States v. Forest Dale, Inc.*, 818 F.Supp. 954 (N.D. Tex 1993) . . . . . . . . . . . 18

*Walczak v. EPL Prolong, Inc.*, 198 F.3d 725 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . 14

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORADUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

ii

*Warsoldier v. Woodford*, 489 F.3d 989 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 14

**State Cases**

Marina Point, Ltd. v. Wolfson, 30 Cal.3d 721 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Federal Statutes**

The Fair Housing Amendments Act, 42 U.S.C. section 3601 *et seq.*
    42 U.S.C. § 3604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    42 U.S.C. § 3604(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21
    42 U.S.C. § 3604(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18
    42 U.S.C. §3613(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

**State Statutes**

The Fair Employment and Housing Act,
    California Government Code § 12900 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . 22

Unruh Civil Rights Act,
    California Civil Code § 51 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

California Civil Code § 54 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Other Material**

U.S. House of Representatives, Committee on the Judiciary, Report No. 711:
    the Fair Housing Amendments Act of 1988, 100th Cong., 2d Sess. (1988) . . . 15

24 CFR § 100.75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

iii

## NOTICE OF MOTION AND MOTION FOR ISSUANCE OF
## PRELIMINARY INJUNCTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 6, 2007, at 10:00 a.m. or as soon thereafter as counsel may be heard, in Courtroom B, 15th floor, United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA, the named plaintiffs in this action, through their attorneys of record herein, will move the Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rules 65-2 and 7-2 of the Local Civil Rules, for an order issuing a preliminary injunction immediately enjoining the defendants and their successors, agents, officers, servants, employees, attorneys and representatives and all persons acting in concert or participating with them by:

(A) requiring defendants to formally withdraw any pending eviction notices against class members who have disabilities, or who are perceived as having disabilities, or who have a record of having a disability;

(B) requiring that defendants eliminate any written or oral policies requiring that Redwood residents be able to maintain an "active" lifestyle or be "independent" and any other written or oral policies limiting tenancy or any program at Redwood Retirement Residence, L.L.C. (Redwood) based on residents' disabilities;

(C) requiring that defendants eliminate the "meal tray" policy and any other charges or penalties that Redwood applies to residents with disabilities who use the services of caregivers; and

(D) requiring defendants to refrain from making any discriminatory statements relating to the disabilities of residents or prospective residents.

This motion will be made on the ground that immediate and irreparable injury will result to plaintiffs unless the activities described above are enjoined pending trial of this action.  It will be based on the declarations, exhibits, and memorandum of points and

///

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

1

1
2   authorities filed concurrently herewith, and upon such oral and written argument as may
3   be presented at the hearing on this motion.
4           Dated: August 2, 2007.
5                                       Respectfully submitted,
6                                       BRANCART & BRANCART
7
8                                       _____
                                        Liza Cristol-Deman
9                                       Attorneys for Plaintiffs
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Redwood Retirement Residence ("Redwood") is an upscale apartment building in Napa, California for seniors aged 55 years or older.  Redwood also offers special services for its tenants, including an on site dining facility, housekeeping services, and social activities.  Since October 2006, defendants, who own and manage Redwood, have engaged in a campaign with the purpose or effect of getting rid of tenants whose physical and cognitive disabilities do not comport with Redwood's discriminatory policy of limiting tenancy to "active and independent seniors."  Redwood residents with disabilities live in an environment filled with fear and open hostility from the management.  Those without disabilities worry that a single medical problem could lead to eviction or other consequences.

Defendants' written and oral statements in marketing brochures and to residents and their families leave no doubt that defendants wish to rent only to "active" and "independent" seniors, not seniors with disabilities.  Defendants' have implemented this policy at Redwood by :

- Evicting numerous residents based solely on their status as persons with disabilities;

- Informing other residents or their family members that they will be asked to move out sooner or later because of their disabilities;

- Ordering tenants to pay extra fees if they cannot eat in the communal dining room and need their own, privately-paid health care aides to bring meal trays from the communal dining hall to their apartments, even though meals are included in the rent;

- Creating a hostile environment for people with disabilities at Redwood.

For many of the residents at Redwood who are at or near 100 years of age and have serious mobility limitations, the continued prospect of living in this kind of environment or being forced to move out of their apartments will be devastating to their physical and

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

1  emotional health.

2  Plaintiffs, therefore, move for a preliminary injunction, pursuant to Rule 65,

3  Federal Rules of Civil Procedure, to require Defendants to cease their discriminatory

4  policies, evictions, and harassment of Redwood Residents with disabilities and their

5  families.  Specifically, this Court shall enjoin defendants by:

6  (A) requiring defendants to formally withdraw any pending eviction notices

7  against class members who have disabilities, or who are perceived as having

8  disabilities, or who have a record of having a disability;

9  (B) requiring that defendants eliminate any written or oral policies requiring that

10 Redwood residents be able to maintain an "active" lifestyle or be "independent" and any

11 other written or oral policies limiting tenancy or any program at Redwood based on

12 residents' disabilities;

13 (C) requiring that defendants eliminate the "meal tray" policy and any other

14 charges or penalties that Redwood applies to residents with disabilities who use the

15 services of private care givers; and

16 (D) requiring defendants to refrain from making any discriminatory statements

17 relating to the disabilities of residents or prospective residents.

## II. STATEMENT OF FACTS

### A.    PROCEDURAL BACKGROUND.

20 This class action was filed on July 16, 2007.  (Document 1.)  Defendants were

21 served with the summons and complaint on July 19, 2007 (Documents 7-8), but have

22 not yet filed a responsive pleading or made an appearance.  The initial case

23 management conference is scheduled for October 25, 2007.  (Document 2.)

24 The facts alleged in plaintiffs' complaint, which are supported by declarations

25 accompanying this motion, demonstrate that defendants' practices and policies

26 discriminate against people with disabilities in violation of the Fair Housing Act and

27 related state laws.   Defendants' discriminatory practices and policies include:

28 •      Evicting residents with disabilities or otherwise making housing

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ**

unavailable to people with disabilities;

• Requiring all residents to satisfy "active" or "Independent Living" requirements;

• Charging extra fees for residents who cannot eat in the communal dining room although those residents pose no extra burden or cost on defendants;

• Making statements indicating a preference, limitation or discrimination against people with disabilities;

• Refusing to make reasonable accommodations rules and policies on behalf of residents with disabilities;

• Questioning and examining residents regarding their disabilities.

**B.    PLAINTIFFS' CLAIMS.**

Plaintiffs Eva Northern and Louise Whitaker, as the successor in interest to Ruby Duncan, seek to represent a class of past, present and future residents of Redwood Retirement Residence, all of whom have been or are likely to be injured by defendants' discriminatory practices and policies. Fair Housing of Napa Valley also has suffered damages and will continue to suffer as a result of the discrimination.

**1.    Plaintiffs Eva Northern and Nancy Northern.**

Plaintiff and putative class representative Eva Northern is a former resident of Redwood Retirement Residence. Ms. Northern is 87 years old. (Declaration of Nancy Northern, filed concurrently herewith ["Northern Dec."], ¶ 3.) She was a resident of apartment 112 at Redwood from approximately March 1, 2001 until March 15, 2007. (Northern Dec. ¶¶ 5, 18.) She is substantially impaired in one or more of her major life activities, including the ability to communicate, due to dementia and a previous stroke. (Northern Dec. ¶ 6.) Thus, she qualifies as a person with a disability or handicap within the meaning of the federal Fair Housing Act and the California Fair Employment and Housing Act. She seeks to represent the class of persons who has resided or will reside at Redwood at any time between October 2006 and the present.

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION; CASE NO. C 07-3652 MEJ**

1    In or about January 2001, Eva Northern signed a rental agreement for apartment
2    112 at the Redwood Retirement Residence.  The monthly rent  included three meals a
3    day, light housekeeping, social programs for the residents, and a variety of other
4    amenities.  (Northern Dec. ¶ 5.)

5    Soon after Eva Northern moved into Redwood Retirement Residence, her
6    daughter, Nancy Northern, hired home health care aides from a private agency run by
7    Priscilla Valencia to assist her mother with daily activities such as taking medications
8    and getting dressed.  A home health care aide assisted Eva Northern for several hours
9    each day throughout her tenancy at Redwood.  Eva and Nancy Northern paid the home
10   health care aides directly for their services. (Northern Dec. ¶ 7.)

11   Eva Northern's medical and cognitive impairments made it difficult and
12   uncomfortable to eat in the communal dining room at Redwood.  For most meals, her
13   home health care aide went to the Redwood kitchen at meal times to pick up meal
14   trays.  She would then bring the meal trays to Ms. Northern to eat in her apartment.
15   (Northern Dec. ¶ 8.)

16   In or about the fall of 2006, Redwood management distributed a notice to
17   residents regarding a new meal tray policy (hereafter, "Meal Tray Policy").  (Northern
18   Dec. ¶ 9.)  Several copies of the notice regarding the meal tray policy were first left in
19   the lobby area.  Later, copies were distributed to residents.  The notice stated, in
20   pertinent part,

21   With few exceptions, meal trays will be permitted only for residents who
22   are temporarily ill or who are rehabilitating and cannot come to the dining
23   room due their short-term condition where full or near full recovery is
24   existed.

25   ...

26   If the temporary illness or rehabilitation lasts longer than 3 days, the
27   Redwood will charge the resident a $10.00 per day meal tray preparation
28   fee commencing on the 4th day trays are being delivered to the resident.

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ**

1   The same notice also stated, "please keep in mind that the Redwood is a retirement

2   community designed for active and independent seniors." A true and correct copy of

3   the Redwood Meal Tray Policy is attached to the declaration of Nancy Northern as

4   Exhibit 6.

5       After she first learned of the Meal Tray Policy, Nancy Northern contacted the

6   managers at Redwood to complain. In the following months, and until December 31,

7   2006, Eva Northern's home health care aide continued to pick up meals for Eva

8   Northern. Redwood did not send any bills to Eva or Nancy Northern or otherwise

9   attempt to collect any fees for the meal trays during this period. (Northern Dec. ¶ 10.)

10      That changed on December 31, 2006. On the morning of New Years' Eve 2006,

11  Redwood staff informed Eva Northern's home health care aide that she could no longer

12  pick up any meal trays for Eva Northern. Redwood staff refused to provide a breakfast

13  tray. That decision jeopardized Eva Northern's health, because she has diabetes and

14  must eat regularly to prevent her blood sugar from dropping dangerously low. Eva

15  Northern's aide found a holiday gift basket in the lobby and took some fruit for Eva

16  Northern to eat. She then called Nancy Northern to report what had happened.

17  (Northern Dec. ¶ 11.)

18      Nancy Northern then drove to Redwood. She met with the managers and

19  explained to them that it was uncomfortable for Eva Northern to eat in the dining room

20  because of her communication impairments. She reminded them that her mother had

21  eaten her meals in her room since she moved in without any problems. The managers

22  agreed to permit the home health care aides to pick up additional food trays for a fee of

23  $5.00 per tray.[1] Nancy Northern reluctantly agreed to pay the charges because the

24  managers stated that her mother's meal trays would be discontinued if she did not

25

26  _____

27      [1]Redwood's Meal Tray Policy notice initially stated a cost of $10 for meal trays.
    *See* Exh. 12 to the Whitaker Dec. Redwood also issued a notice stating a cost of $5
28  per tray. *See* Exh. 6 to the Northern Dec. The notices are otherwise identical. It is
    unclear which notice is current and how much Redwood is currently charging.

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

1   agree to pay.  She reiterated to the resident managers that she disagreed with the meal

2   tray policy.  The resident managers stated that implementing the meal tray policy was

3   not their decision.  (Northern Dec. ¶ 12.)

4         Three days later, on January 3, 2007, Nancy Northern received a phone call

5   from Tom Ahrens, who identified himself as a regional manager for Holiday Retirement

6   Company.  Ms. Northern described the reasons that her mother ate her meals in her

7   room, including her medical conditions and cognitive impairment.  Mr. Ahrens stated

8   that Redwood is an "independent living facility," and that people who cannot eat their

9   meals in the dining room "do not belong at Redwood," or words to that effect.  Mr.

10  Ahrens stated that Redwood was "not intended" for people who could not make it to the

11  dining room.  Mr. Ahrens stated that he would permit Eva Northern to continue to

12  receive meal trays in her room free of extra charges until January 8, 2007, but no

13  longer.  (Northern Dec. ¶ 13.)

14        As a result of the discriminatory Meal Tray Policy, Nancy Northern purchased a

15  small freezer and placed it in Eva Northern's room to store pre-cooked meals to be

16  reheated and served to Eva Northern.  For three months, Eva Northern did not take any

17  meals from Redwood, even though three meals per day were included in the rent;

18  instead, Nancy Northern purchased or made food for her mother, which was reheated

19  and served by the home health care aids.  Redwood did not reduce the rent or refund

20  any money for the missed meals.  (Northern Dec. ¶ 14.)

21        Nancy Northern was upset about the discriminatory fees and the extra measures

22  she had to take to ensure that her mother received food.  (Northern Dec. ¶ 14.)  At the

23  same time, she knew that Redwood had asked a number of residents to move out

24  because they required assistance and could not live independently.  (Declaration of

25  Priscilla Valencia, filed concurrently herewith, ["Valencia Dec."], ¶ 7; Northern Dec. ¶

26  15.)  She  worried that her mother would be asked to move out next.  As a result of all

27  of the changes at Redwood – the new Meal Tray Policy, 30-day eviction notices for

28  those who could not live without help, and Mr. Ahrens' comments indicating that people

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;**
**CASE NO. C 07-3652 MEJ**

8

1   with disabilities were not welcome at Redwood – she felt she had no choice but to find

2   a new residence for her mother.  (Northern Dec. ¶ 15.)

3        Eva Northern vehemently opposed moving and became very depressed and

4   anxious.  She was prescribed medication for depression and anxiety.  She moved out

5   of Redwood to Aegis, an assisted living facility, on or about March 15, 2007. She cried

6   and did not want to get into the car to leave Redwood.  She initially refused to get out of

7   the car when she arrived at her new residence.  (Northern Dec. ¶ 18.)

8        The monthly cost of Aegis far exceeded the cost of Redwood, even when the

9   cost of the private health care aide at Redwood is included.  (Northern Dec. ¶ 16.)

10       After she moved to Aegis, Eva Northern's mental condition rapidly declined.

11  While living at Redwood, she became confused and disoriented only occasionally.  In

12  contrast, after she moved, she was constantly confused and disorientated.  (Northern

13  Dec. ¶ 19.)   She continued to cry frequently about her move from Redwood.  She

14  expressed a desire to end her life in June 2007 while hospitalized for an infection.

15  (Northern Dec. ¶ 20.) Nancy Northern believes that the stress of the discriminatory

16  policies at Redwood and the ensuing move hastened her mother's mental and physical

17  decline. (Northern Dec. ¶ 21.)

18        **2.**    **Plaintiffs Ruby Duncan and Mae Louise Whitaker.**

19       Ruby Duncan was a resident of Redwood Retirement Residence from May 1991

20  to June 2002 and again from Summer 2003 until July 11, 2007, when she passed

21  away.[2]   (Declaration of Mae Louise Whitaker, filed concurrently herewith ["Whitaker

22  Dec."], ¶¶ 5-6.)  Ms. Duncan was 100 years old when she died.  (Whitaker Dec. ¶ 4.)

23  Her daughter, Mae Louise Whitaker, is her successor in interest, as well as a plaintiff in

24  this matter.

25

26       [2]Plaintiffs' counsel did not learn of her death until after the complaint – which

27  named Ms. Duncan as a plaintiff – was prepared.  Plaintiffs will file a substitution
    naming Ms. Whitaker as Ms. Duncan's successor in interest.  (Declaration of Liza

28  Cristol-Deman, filed concurrently herewith, ["Cristol-Deman Dec."] ¶ 2.)

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;**
**CASE NO. C 07-3652 MEJ**

1    Ms. Duncan had difficulty walking and hearing loss.  She also had been

2   diagnosed with dementia, making it difficult for her to communicate and concentrate.

3   (Whitaker Dec.  ¶ 4.)  She was substantially impaired in more than one life activity, and

4   as such, qualifies as a person with a disability under the Fair Housing Act and FEHA.

5    Ms. Duncan hired a private, home health care aide from Ms. Valencia's agency

6   starting in approximately June 2003.  Ms. Duncan and Ms. Whitaker paid the home

7   health care aide directly for her services.  The home health care aide assisted Ms.

8   Duncan with daily activities such as taking medications and ambulating.  Frequently,

9   Ms. Duncan did not feel well enough to dress and leave her apartment because of her

10   health and the effects of age.  The home health care aide picked up meal trays for Ms.

11   Duncan from the Redwood kitchen so that Ms. Duncan could eat in her apartment

12   instead of going to the communal dining room.  (Whitaker Dec. ¶ 8.)

13    In late 2006, Ms. Whitaker learned of the new Redwood Meal Tray Policy.  The

14   new meal tray policy indicated that the management would assess extra charges for in-

15   home meal service with very limited exceptions.  The limited exceptions – short term

16   illness such as the flu, or short term recuperation from injury or illness with full recovery

17   expected – did not cover Ms. Duncan's situation.  (Whitaker Dec. ¶ 10.)

18    At around the same time that she became aware of the Meal Tray Policy, other

19   Redwood residents told Ms. Whitaker that Redwood had ordered some residents to

20   move out if they could no longer use the communal dining room or did not otherwise fit

21   within the definition of an "active, independent" senior.  (Whitaker Dec. ¶ 13.)

22    In December 2006, Ms. Whitaker contacted the managers of the Redwood and

23   asked about the Meal Tray Policy.  One of the resident managers, Denise Hall,

24   informed Ms. Whitaker that her mother would have to move out if she could not eat her

25   meals in the dining room.  (Whitaker Dec. ¶ 13.)

26    Shortly thereafter, Ms. Whitaker provided a letter to Redwood from Ms. Duncan's

27   physician verifying that Ms. Duncan should be permitted to take her meals in her

28   apartment due to her physical condition.  To date, neither Ms. Duncan nor Ms. Whitaker

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ**

1    has received any response to the physician's letter.  (Whitaker Dec. ¶ 12.)

2         In December 2006, Ms. Whitaker also inquired about the move-out notices that

3    had been served on some disabled residents.  Denise Hall stated that Ms. Duncan was

4    not on "the list" of residents who were being asked to move out, but that she would be

5    asked to move out "soon," or words to that effect.  The managers stated that they

6    wanted Redwood to be a retirement home, like it used to be, rather than an "old folks'

7    home," or words to that effect.  They stated that they were "weeding out" the

8    wheelchairs and walkers because they gave Redwood "a bad impression," or words to

9    that effect.  They added that Ms. Whitaker should start looking for another home for her

10   mother, Ruby Duncan.  (Whitaker Dec. ¶ 13.)

11        Ms. Whitaker took the advice of the Redwood managers and began looking

12   throughout Napa and Sonoma Counties for a new residence for Ms. Duncan.  Ms.

13   Duncan was aware that she would have to move and became extremely upset.  She did

14   not want to leave Redwood, which had been her home for more than fifteen years.  Ms.

15   Whitaker did not want to have to move Ms. Duncan, because she feared the upheaval

16   and stress of moving would be very hard on her.  (Whitaker Dec. ¶ 14.)

17   **3.    Other Evidence of Defendants' Discriminatory Housing**

18        **Practices and the Likely Hardships on Putative Class**

19        **Members.**

20        Many other residents of Redwood have witnessed the discriminatory housing

21   practices.  All have suffered harm as a result of those practices, or are likely to suffer

22   harm in the future.  Home health care aides who work at Redwood confirm that some of

23   their clients were being evicted and that others were living in fear of eviction because

24   they were "too disabled."  (Valencia Dec. ¶ 4; Declaration of Salve Penales, filed

25   concurrently herewith ["Penales Dec."], ¶ 5.)

26        Bill Nye is one such resident.  Mr. Nye was 92 years old in April 2007 when

27   Redwood managers served one of his daughters, Celestia Amberstone, with a 30-day

28   notice to move out. (Declaration of Celestia Amberstone, filed concurrently herewith,

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ**

["Amberstone Dec."], ¶¶ 4, 10.)  The notice did not allege that Mr. Nye had violated the rental agreement; rather, the notice alleged that Redwood "could no longer meet [his] needs." (Amberstone Dec. ¶ 10, Exhibit 3.) The attached "incident notes summary" cited infractions such as Mr. Nye's inability to keep track of time and falling asleep in the dining room.  It concluded by stating, "It is for these reasons and many others that Redwood management feels that Bill [Nye] is no longer defined as independent living eligible."  (Amberstone Dec. ¶ 12, Exhibit 3.)

Mr. Nye had a heart condition and was diagnosed with dementia after moving into Redwood.  (Amberstone Dec. ¶ 4.)  He needed help to take his medication, bathe, and ambulate, so his daughters hired home health care aides who assisted him for several hours every day.  (Amberstone Dec. ¶ 5.)  Redwood's 30-day notice and the explanations that accompanied it demonstrate that Redwood took the drastic action of evicting Mr. Nye solely because of these disabilities.  Mr. Nye passed away less than one month after moving out of Redwood.  (Amberstone Dec. ¶ 16.)

Bernice Thornton is another resident who was ordered to move out as a result of her disabilities.  Redwood first served her with an eviction notice in October 2006. (Declaration of Thomas Thornton, filed concurrently herewith ["Thornton Dec."], ¶ 8.) The letter that accompanied that eviction notice stated that Ms. Thornton's "needs" could not be met at Redwood, "an independent living community for seniors able to maintain an active lifestyle." (Thornton Dec. ¶ 8, Exhibit 7.)  Ms. Thornton's son, Thomas Thornton, advocated on behalf of his mother with Redwood managers, and Redwood agreed to rescind the eviction notice.  (Thornton Dec. ¶ 9.)

Despite that agreement, however, Mr. Thornton quickly realized that his mother was no longer welcome at Redwood because of her disabilities.  First, Mr. Thornton learned of the new Meal Tray Policy.  As a result of that policy, Mr. Thornton received a letter from Redwood demanding payment of $870 in meal tray fees in March 2007. (Thornton Dec. ¶ 10.)  Redwood demanded this extra fee even though Ms. Thornton's meals were included in her rent, and the meal trays were picked up and returned to the

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION; CASE NO. C 07-3652 MEJ**

1    kitchen by Ms. Thornton's private health care aide. (Thornton Dec. ¶¶ 4, 7.) Mr.

2    Thornton's explicit request for a reasonable accommodation went unanswered.

3    (Thornton Dec. ¶ 11.)

4         Next, in April 2007, Redwood served Mr. Thornton with a new 30-day eviction

5    notice for his mother. The attached "resident summary" indicated that Redwood

6    believed Ms. Thornton must move out because "she is completely dependent upon

7    others for her care and well-being and requires 24 hour care and supervision."

8    (Thornton Dec. ¶ 14, Exh. 10.) Ms. Thornton's needs were being met, however, by her

9    24 hour health care aide. (Thornton Dec. ¶ 7.) Moreover, Ms. Thornton's son did not

10   believe it was in his mother's best interests to move out of Redwood. That belief was

11   based at least in part on Ms. Thornton's physician's recommendation: ensure that she

12   is in a stable, familiar living environment with opportunities for social interaction.

13   (Thornton Dec. ¶¶ 18-19.)

14        After Redwood was served with a letter stating that the 30-day notice was

15   improper under the California Civil Code, Redwood served a new, 60-day eviction

16   notice ordering Ms. Thornton to move out. As a direct result of that notice, Bernice

17   Thornton moved out of Redwood on July 15, 2007. (Thornton Dec. ¶ 16.)

18        **4.    Plaintiff Greater Napa Valley Fair Housing Center**.

19        Plaintiff Greater Napa Valley Fair Housing Center, doing business as Fair

20   Housing Napa Valley ["FHNV"], is a non-profit agency with a mission to promote the

21   eradication of housing discrimination throughout Napa County. It provides counseling,

22   investigation, and educational services regarding fair housing to residents and housing

23   providers. (Declaration of Kathryn J. Winter, filed concurrently herewith, ["Winter Dec."]

24   ¶ 3.)

25        FHNV suffered damages when Redwood committed discriminatory housing

26   practices. As a direct result of those discriminatory practices, Nancy Northern and

27   Louise Whitaker both lodged complaints with FHNV. At least six other residents of

28   Redwood or their next of kin have made similar complaints to FHNV between October

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;**
**CASE NO. C 07-3652 MEJ**

2006 and the present.  (Winter Dec. ¶ 7.)  FHNV diverted resources from other

programs and activities, including staff time and financial resources, in order to

investigate and address the allegations.  (Winter Dec. ¶ 8.)  FHNV also expects to incur

costs on future activities devised to counteract the effects of the discrimination on

FHNV's mission.  (Winter Dec.  ¶ 9.)

### III. ARGUMENT

### A.    PLAINTIFFS MEET THE REQUIREMENTS FOR GRANTING A PRELIMINARY INJUNCTION.

To obtain a preliminary injunction plaintiffs must show either (1) a combination of

probable success on the merits and the possibility of irreparable injury, or (2) the

existence of serious questions going to the merits and the balance of hardships tipping

in plaintiffs' favor.  *Warsoldier v. Woodford*, 489 F.3d 989, 993-4 (9th Cir. 2005) (quoting

*Nike, Inc. v. McCarthy*, 379 F.3d 576, 580 (9th Cir. 2004)).  "These two alternatives

represent extremes of a single continuum rather than two separate tests.  Thus, the

greater the relative hardship to [plaintiffs], the less probability of success must be

shown."  *Id.* (quoting *Walczak v. EPL Prolong, Inc.* 198 F.3d 725, 731(9th Cir.

1999)(internal quotations omitted)).  When plaintiffs are able to demonstrate such a

probability of harm, the Court may grant an injunction "even though the questions raised

are only serious enough to require litigation."  *See Briggs v. Sullivan*, 886 F.2d 1132,

1143 (9th Cir. 1989).

In the context of a motion for preliminary injunction based on alleged violations of

the Fair Housing Act, "Irreparable injury may be presumed from the fact of

discrimination and violation of fair housing statutes."  *Gresham v. Windrush Partners,*

*Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984); *Silver Sage Partners, Ltd. v. City of Desert*

*Hot Springs*, 251 F.3d. 814, 826-827 (9th Cir. 2001); *Housing Rights Center v. Donald*

*Sterling Corp.*, 284 F.Supp. 2d. 1129 (C.D. Cal. 2003).  The federal fair housing laws

expressly authorize the issuance of an injunction "if the court finds that a discriminatory

housing practice has occurred or is about to occur."  42 U.S.C. §3613(c)(1).  No

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION; CASE NO. C 07-3652 MEJ**

14

additional showing of injury is required.

>    **1.    Plaintiffs are Likely to Succeed on the Merits of Their Claims.**

The federal Fair Housing Act is intended to "[e]nsure the removal of artificial, arbitrary and unnecessary barriers [in housing] when barriers operate invidiously to discriminate on the basis of impermissible characteristics." *United States v. City of Parma*, 494 F. Supp. 1049, 1053 (N.D. Ohio 1980), *aff'd.*, 661 F.2d 562 (6th Cir. 1981), *cert. denied* 465 U.S. 926 (1982); *see also United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975). The Fair Housing Act reaches actions that have a discriminatory effect as well as those that are intentionally discriminatory. *E.g. Keith v. Volpe*, 858 F.2d 467, 482-84 (9th Cir. 1988) *cert. denied*, 493 U.S. 813 (1989); *Pfaff v. HUD*, 88 F.3d 739, 745-46 (9th Cir. 1996).

In 1988, Congress enacted the Fair Housing Amendments Act (FHAA), amending the Fair Housing Act to include people with disabilities among the groups protected from discrimination in housing.

> The [FHAA] . . . is a clear pronouncement of a national commitment to end the
> unnecessary exclusion of persons with handicaps from the American
> mainstream. It repudiates the use of stereotypes and ignorance, and mandates
> that persons with handicaps be considered as individuals. Generalized
> perceptions about disabilities and unfounded speculations about threats to safety
> are specifically rejected as grounds to justify exclusion.

H. Rep. No. 711, 100th Cong., 2d Sess. 18 (1988).

Here, Redwood's Management violated the Fair Housing Act by: (1) evicting and attempting to evict residents based on conduct, physical limitations, or conditions directly relating to their disabilities in violation of 42 U.S.C. § 3604(f)(1); (2) imposing illegal "occupancy conditions" on tenancy that discriminate on the basis of disability in violation of § 3604(f)(2); and, (3) making discriminatory statements against residents

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;**
**CASE NO. C 07-3652 MEJ**

1   and prospective residents with disabilities in violation of § 3604(c).[3]

2           **a.    *Redwood's Eviction Notices Deny Housing to Residents based***

3           ***on Disability in Violation of the Fair Housing Act.***

4           Under the FHAA, it is unlawful "[t]o discriminate in the sale or rental, or otherwise

5   make unavailable or deny," a dwelling to any buyer or renter on the basis of disability.

6   42 U.S.C. § 3604(f)(1).  Cases applying the "otherwise make unavailable or deny"

7   language under the Fair Housing Act, 42 U.S.C. § 3604(a), which is virtually the same

8   language added through the FHAA in section 3604(f)(1) with respect to disability

9   discrimination, have construed the phrase broadly to prohibit any practices which have

10  the effect of denying a dwelling on prohibited grounds.  *See, e.g. United States v.*

11  *American Institute of Real Estate Appraisers*, 442 F. Supp. 1072, 1079 (N.D. Ill. 1977),

12  *appeal dismissed*, 590 F. 2d 242 (7th Cir. 1978).

13          Here, Redwood served multiple eviction notices to tenants whose disabilities

14  disqualified them from Redwood's "Independent" or "Active Living" requirements.  Each

15  of these notices explicitly state that Redwood "can no longer meet (the resident's)

16  needs," and all of them include attachments documenting "incidents" which

17  demonstrate how the resident, due to conditions or behaviors resulting from disabilities,

18  no longer meets Redwood's "independent" living requirements. (*See, e.g.*, Amberstone

19  Dec. ¶¶ 10-12, Exh. 3.)  The discriminatory motives for the evictions are also evident in

20  nearly every conversation Redwood's managers had with tenants and their families

21  surrounding the eviction notices.  (*See* Whitaker Dec. ¶ 13; Northern Dec. ¶¶  10, 13;

22  Amberstone Dec. ¶ 10.)

23          **October 2006 Eviction Notices**.  Redwood served an unknown number of

24  eviction letters and 30-day eviction notices in October 2006.  Each eviction notice

25  included some language describing how the resident being evicted did not meet

26  Redwood's "Independent Living" requirements.  For example, in an October 28, 2006,

27  _____

28          [3]Plaintiffs' complaint includes other allegations, including failure to reasonably
accommodate, but those allegations are not the subject of this motion.

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

1   letter from Redwood to Thomas Thornton, which accompanied the 30-day notice

2   served on his mother, Bernice Thornton, Redwood management wrote, "[t]his decision

3   is entirely based on Bernice's needs and the health and safety of our facility.  As you

4   know, the Redwood is an independent living community for seniors able to maintain an

5   active lifestyle."  (Thornton Dec. ¶ 8; Exh. 7.)

6          When residents and their families confronted Redwood about the notices,

7   Redwood management repeatedly stressed the connection between the evictions and

8   behaviors and conditions resulting from disability.  For example, when Mr. Thornton

9   confronted Redwood manager David Hall about the 30-day notice served on his

10  mother, Mr. Hall stated that Ms. Thornton was being asked to move out because ". . .(1)

11  she is incontinent; and (2) on one occasion she momentarily left her apartment half-

12  dressed."  (Thornton Dec. ¶ 9.)  Both of these behaviors resulted from Ms. Thornton's

13  cognitive and physical disabilities.

14         Mr. Thornton was able to negotiate for the withdrawal of the October 2006 30-

15  day eviction notice.  Other residents were not as fortunate.  Health care aides report

16  that Redwood issued other eviction notices during this period, and that residents did

17  indeed move out.  (Valencia Dec. ¶ 4; Penales Dec. ¶ 5.)

18         **April 2007 Eviction Notices**.  Redwood continued its attempts to force out

19  residents with disabilities by issuing a second round of eviction notices to residents with

20  disabilities in April 2007.  Like the first round of notices, these notices attached letters

21  detailing Redwood's stated reasons for the evictions.  Examples include the April 5,

22  2007 letter from Redwood to Bill Nye, which includes a list of "incidents" relating to Bill's

23  lack of independence, among them  the assertion that Bill has "no concept of time" and

24  a statement that, " . . . Bill is no longer independent living eligible."  (Amberstone Dec. ¶;

25  Exh. 3.)   Mr. Nye moved out in late April 2007 and passed away less than one month

26  later.  (Amberstone Dec. ¶ 16.)

27         Thomas Thornton's mother, Bernice Thornton, also received a new 30-day

28  notice.  The "Resident Summary" attached to the 30-day notice, which purports to

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;**
**CASE NO. C 07-3652 MEJ**

1  describe the reasons Ms. Thornton is being evicted, leads with the assertion that,

2  "Bernice is incapable of providing for her own healthcare and personal needs."

3  (Thornton Dec. ¶ 14; Exh. 10.)   The second reason provided in the Resident Summary

4  is that she "is completely dependent upon others for her care and well-being and

5  requires 24 hour care and supervision." (*Id.*)  Rather than fight the latest eviction

6  notice, Ms. Thornton moved out of Redwood on July 15, 2007.  (Thornton Dec. ¶ 16.)

7       Plaintiff FHNV also received complaints from other residents with disabilities who

8  received 30-day notices during this period. (Winter Dec. ¶ 7.)

9                    *b.*      *Redwood's"Active" or "Independent Living"*

10                         *Requirements and Meal Tray Policy are Illegal*

11                         *Conditions of Tenancy That Discriminate on the Basis of*

12                         *Disability.*

13       The FHAA makes it unlawful, "[t]o discriminate against any person in the terms,

14  conditions, or privileges of sale or rental of a dwelling, or in the provision of services or

15  facilities in connection with such dwelling . . ." based on disability.  42 U.S.C. §

16  3604(f)(2).  Conditions for tenancy that discriminate on the basis of disability are

17  unlawful terms or conditions of a rental within the meaning of section 3604(f)(2). *See,*

18  *e.g., Samuelson v. Mid-Atlantic Realty Co., Inc.*, 947 F. Supp. 756, 761 (D. Del. 1996).

19       **Active or Independent Living Requirements**.  Courts have interpreted the

20  FHAA's ban on discriminatory terms and conditions to specifically prohibit housing

21  providers from requiring tenants to be capable of "independent living."  *See Cason v.*

22  *Rochester Housing Authority*, 748 F. Supp. 1002, 1008-09 (W.D.N.Y. 1990);

23  *Niederhauser v. Independence Square Housing*, 4 Fair Housing - Fair Lending (Aspen

24  Law & Bus.) ¶16,305.2-.6 (N.D. Cal. 1998) (attached as Exhibit 5 to the Cristol-Deman

25  Dec.); *see also United States v. Forest Dale, Inc.*, 818 F.Supp. 954 (N.D. Tex 1993)(the

26  Fair Housing Act prohibits public housing for the elderly from excluding elderly

27  applicants with disabilities).

28       In *Niederhauser*, the management company at a government-funded housing

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION; CASE NO. C 07-3652 MEJ**

complex for seniors and persons with disabilities maintained written occupancy conditions requiring that all tenants be able to meet their personal care, financial, and other needs independently.  *See Niederhauser*, 4 Fair Housing - Fair Lending at 16,305.6.  Despite the fact that the plaintiffs in the case were never denied housing as a result of these conditions, the court found that the threat of enforcement of such conditions was enough to make them unlawful under the FHAA.  *Id.*

Defendants explicit oral and written statements and its actions echo the same theme: that Redwood is an "independent" living community limited to seniors who are "able to maintain an active lifestyle."  Since at least late 2006, Redwood has taken every step to ensure that those seniors whose disabilities disqualify them from this category know that they are not welcome.  These policies include:

Redwood's Print Advertising.  In its marketing brochures and print advertisements, Redwood tells potential residents to "see how wonderful active, independent, retirement can be." (Cristol-Deman Dec. ¶ 3, Exh. 4.)

Redwood's Rental Agreements.  Redwood's rental agreements specifically require that residents represent that they are capable of providing for their health care and personal care needs and will agree to "promptly move out" if they cannot provide for their own needs. (*See* Amberstone Dec. ¶ 3, Exh. 1 at page 3, ¶ 9.A and 9.B.)  The rental agreement gives Redwood management the sole discretion to decide when a resident should move out for failure to provide for their own care needs. *Id.* at ¶ 9.B.

Oral Statements to Residents and their Relatives.  David and Denise Hall, Redwood's former resident managers, have repeatedly stated that Redwood is an "independent living" facility. (Valencia Dec. ¶ 5.)  Higher authorities from Holiday Retirement Corporation have also made statements to the effect that anyone physically unable to, for example, use the dining room does "not belong at Redwood." (Northern Dec. ¶ 13.)  When family members of residents visited Redwood, David and Denise Hall repeatedly made comments reinforcing this policy.  For example, Denise Hall stated that Redwood was "weeding out" the wheelchairs and walkers because "they

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION; CASE NO. C 07-3652 MEJ

19

1   gave Redwood a bad impression." (Whitaker Dec. ¶ 13.)

2      <u>Written Notices.</u>  Redwood's written communications with residents have

3 included explicit policy statements making housing unavailable to residents with

4 disabilities.  For example, the opening paragraph of the meal tray policy reminds

5 residents to " . . .please keep in mind that Redwood is a retirement community

6 designed for active and independent seniors." *See* Exhibit 12 to the Whitaker Dec.

7 Also, as described above, the documents provided with the eviction notices included

8 language describing how the resident being evicted did not meet Redwood's

9 "independent" living requirements.  *See, e.g.* the April 5, 2007 letter from Redwood to

10 Bill Nye, attached as Exhibit 3 to the Amberstone Dec.

11      All of these policy pronouncements illustrate illegal conditions for tenancy that

12 discriminate against residents with disabilities – exactly the kind of policies found to

13 violate the Fair Housing Act in *Cason,* 748 F. Supp. at 1002, 1008-09 and

14 *Niederhauser,* 4 Fair Housing -Fair Lending at 16,305.2-.6.

15      **Discriminatory Meal Tray Policies**.  As stated above, any policies or practices,

16 that have the effect of discriminating against residents with disabilities, regardless of

17 stated intent, violate the FHAA.  *See, e.g.,  American Institute of Real Estate*

18 *Appraisers*, 442 F. Supp at 1079; *see also U.S. v. California Mobile Home Park*

19 *Management Co.*, 29 F.3d 1413 (9th Cir. 1994)(holding that although management

20 company's policy of charging residents a daily fee for long-term guests was facially

21 neutral, it had a discriminatory effect on tenant whose daughter's respiratory illness

22 required a live-in caregiver).  Redwood's Meal Tray Policy has the purpose and effect of

23 discriminating against people with disabilities.

24      Redwood's Meal Tray Policy, which took effect on January 1, 2007, explicitly

25 discriminates against residents who cannot eat in the dining room because of a

26 disability.  *See* Redwood Meal Tray Policy, Whitaker Dec. Exh. 12.  The meal tray

27 policy permits home delivery of meal trays only to those residents "who are temporarily

28 ill or who are rehabilitating and cannot come to the dining room due to their short term

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

20

condition where full or near full recovery is expected."  For those residents with permanent disabilities who do not fall into this "short-term condition" category, Redwood charges a fee of $10.00 per day, beginning on the fourth day trays are delivered to the resident.  *Id*.  The charge applies despite the fact that home health care aides pick up the meal trays, take them to residents' apartments, and return them to the kitchen. (Valencia Dec. ¶ 6; Penales Dec. ¶ 7.)

Moreover, the discriminatory effect of this additional charge is clear: those with disabilities who cannot eat in the communal dining room will rack up extraordinary fees in a very short period.  The comments of Redwood's corporate management company when confronted about the effect of the policy on disabilities leave little doubt about the discriminatory motive. Tom Ahrens, who identified himself as the Regional Manager for Holiday Retirement Corporation stated Redwood is an "independent living facility" and that people who cannot eat their meals in the dining room "do not belong at Redwood," or words to that effect.  (Northern Dec. ¶ 13.)  Mr. Ahrens stated that Redwood was "not intended" for people who could not make it to the dining room.  *Id*.

### c.  Redwood's Discriminatory Statements Violate the Fair Housing Act.

The Fair Housing Act prohibits making, printing, or publishing "any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . .handicap . . or an intention to make any such preference, limitation or discrimination."  42 U.S.C. § 3604(c).  The governing regulations interpret this provision to cover "all written or oral notices or statements by a person engaged in the sale or rental of a dwelling."  24 C.F.R. § 100.75.   In addition, plaintiffs need not prove that defendants acted with subjective intent when making such statements, but rather need only show that defendants' language would suggest to discourage an ordinary reader (or listener) that people of a protected group are preferred or dispreferred for the housing in questions.  *See Llanos v. Estate of Anthony Coehlo*, 24 F.Supp 2d. 1052, 1057 (E.D. Cal. 1998)(also quoting

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

1   *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2nd. Cir. 1991)).

2       In this case, as described above, Redwood management made (and continues

3   to make) numerous statements limiting residency to seniors who meet Redwood's

4   "active" or "independent living requirements."   In its advertising (which describes

5   Redwood as "Active Living"), it's correspondence with residents and their families, its

6   explicit statements accompanying the eviction notices, its meal tray policy, and

7   numerous conversations with residents, families, and care givers, Redwood has stated

8   repeatedly in countless ways that people whose disabilities disqualify them from status

9   as "active" or "independent" living are not welcome.  (See, e.g, Northern Dec. ¶ 13;

10  Whitaker Dec. ¶ 13.)  The sheer number and transparency of these discriminatory

11  statements make it impossible for the ordinary listener or reader to interpret them as

12  doing anything other than discriminating against residents and prospective residents

13  with disabilities.

14      **2.    Plaintiffs Also Are Likely to Succeed on State Law Claims.**

15      The California Fair Employment and Housing Act, *Cal. Gov. Code § 12900 et*

16  *seq.*, "FEHA," like the FHAA, prohibits discrimination in housing based on disability. *See*

17  *Cal. Govt. Code § 12955*.  FEHA is explicitly intended to afford protected classes no

18  fewer rights or remedies than the FHAA and its implementing regulations, *Cal. Govt.*

19  *Code* §12955.6, and much of the language of FEHA tracks that of the FHAA verbatim.

20  Therefore, defendants' discriminatory evictions and policies, their discriminatory

21  statements, as well as its failures to accommodate residents with disabilities, violate

22  FEHA.

23      In addition, defendants' conduct violates other provisions of California law that

24  provide similar protections against discrimination in housing based on disability.  The

25  Unruh Civil Rights Act, *Cal. Civil Code §51 et seq.*, generally provides that all persons in

26  the State, "no matter what  . . .their . . .disability are entitled to full and equal

27  accommodations, advantages, facilities, privileges or services in all business

28  establishments of every kind whatsoever."  Rental housing providers such as the

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ**

defendants are clearly within the meaning of business establishment under the Unruh Act. See Marina Point, Ltd. v. Wolfson, 30 Cal.3d 721, 730-31 (1982).

Finally, defendants' conduct violates California Civil Code § 54 et seq., which provides, at Section 54.1(b)(1), that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to all housing accommodations offered for rent, lease, or compensation in this state, subject to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons."

### B. Plaintiffs Suffer Irreparable Injury that Continues to Mount, and the Balance of Hardships Tilts in Their Favor.

As shown above, when a plaintiff alleges that the defendants have engaged in a prohibited discriminatory practice, all that is needed to support an injunction is proof that the practice exists. Topic v. Circle Realty Co., 377 F.Supp. 111, 114 (C.D. Cal. 1974), rev'd. on other grounds, 532 F.2d 1273 (9th Cir. 1975), cert. denied, 429 U.S. 859 (1976); see also Association for the Advancement of the Mentally Handicapped v. City of Elizabeth, 876 F.Supp. 614, 624 (D.N.J. 1994). For the purposes of preliminary injunctive relief, courts presume irreparable injury by the very fact of discrimination and violations of the fair housing statutes. E.g Gresham v. Windrush Partners, Ltd., 730 F.2d at 1422-23.

Nonetheless, plaintiffs' declarations are rife with examples of hardships directly resulting from defendants' pattern of discriminatory conduct. As Nancy Northern describes in her declaration, her mother Eva Northern was anxious and depressed as a result of being forced to relocate. (See Northern Dec. ¶¶ 15,18,19.) Eva Northern "was very upset when we arrived at Aegis [her new residence] and initially refused to get out of the car." (Id. ¶ 18.) After she moved to Aegis, Eva Northern's mental condition rapidly declined. Previously, she had many days when she was mentally lucid and clear, and an occasional day when she seemed more confused and disoriented. After the move, confusion and disorientation became her new norm. She continued to cry

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ

23

1    frequently about her move from Redwood." (*Id.* ¶ 19.)  Eva Northern's condition

2    continued to worsen due to the trauma of the move and her anger at Redwood's

3    management.  As Nancy Northern states in her declaration, "I believe that the stress of

4    the situation at Redwood and her move from Redwood hastened my mother's mental

5    and physical decline." *Id.*

6        Louise Whitaker describes how, since her mother Ruby Duncan first became

7    aware of the eviction notices and Redwood's Meal Tray Policy, she "lived in fear of

8    eviction. She was afraid to leave her apartment and worried that, if she did go into the

9    common areas, the managers would give her a notice to vacate due to her visible

10   disabilities." (Whitaker Dec. ¶ 14.)  Ms. Duncan passed away just as this lawsuit was

11   being prepared for filing.  (Whitaker Dec. ¶ 4.)

12       Another former resident of Redwood, Bill Nye, passed away less than a month

13   after he was forced to move out of Redwood.  (Amberstone Dec. ¶ 16.)  Mr. Nye did not

14   want to leave Redwood and his trusted home health care aides.  (Amberstone Dec. ¶

15   15.)  His daughter disagreed with Redwood's decision to evict Mr. Nye and had to

16   quickly find another residence for him after receiving their 30-day notice.  (Amberstone

17   Dec. ¶¶ 13, 14.)

18       Finally, Fair Housing of Napa Valley has incurred and will continue to incur

19   damages if Redwood's discriminatory policies are not halted immediately.  Their

20   mission is to eradicate housing discrimination throughout the Napa Valley.  (Winter

21   Dec. ¶ 3.)  That mission is injured every day that Redwood is permitted to maintain and

22   enforce its discriminatory policies – especially since those policies are reflected in

23   marketing documents seen by the general public.  *See, e.g., Havens Realty Corp. v.*

24   *Coleman,* 455 U.S. 363, 379 (1982) (where discriminatory housing practices impair

25   organization's ability to carry out its mission, "there can be no question that the

26   organization has suffered injury in fact").  Moreover, individuals who are affected by

27   Redwood's discriminatory policies in the future may file complaints with FHNV, as the

28   plaintiffs in this case did, injuring FHNV by diverting its limited resources away from

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ**

1  important educational campaigns and other efforts.  (Winter Dec. ¶¶ 5-7.)

2      The injuries to plaintiffs and putative class members cannot seriously be

3  disputed.  On the other side of the scale, it is hard to imagine any harm defendants will

4  face if they must withdraw their discriminatory polices and eviction notices and refrain

5  from making discriminatory statements.  Plaintiffs are not asking the Court to order

6  defendants to incur any financial costs or take any action that would place staff or

7  residents in harm's way.  Rather, plaintiffs ask that defendants conform their policies

8  and practices to the requirements of the fair housing laws in order to prevent future

9  injury to FHNV and others.

10                    **IV.  CONCLUSION**

11      Defendants' blatant attempts to weed out residents with disabilities from their

12  luxury apartment building in order to further its "active" or "independent" living policies

13  violate both federal and state fair housing laws and, if allowed to continue, will cause

14  irreparable injury to countless seniors with disabilities, many of whom may have no

15  other place to go.  For the reasons stated above, plaintiffs respectfully request that the

16  Court issue a preliminary injunction to halt defendants' discriminatory policies.

17      Dated: August 2, 2007.

18                    Respectfully submitted,

19                    BRANCART & BRANCART

20

21

22                    Liza Cristol-Deman
                       Attorneys for Plaintiffs

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION;
CASE NO. C 07-3652 MEJ**

25

1

**PROOF OF SERVICE**

2

I am over the age of 18 and am not a party to the within action.  My business

3    address is 8205 Pescadero Road, Loma Mar, California  94021.

4

On August 2, 2007, I served a true and correct copy of the following

5    document(s):

6    **(1) NOTICE OF MOTION AND MOTION FOR ISSUANCE OF**

7    **PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND**
     **AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION; (2)**

8    **DECLARATIONS OF CELESTIA AMBERSTONE, LIZA CRISTOL-**
     **DEMAN, NANCY NORTHERN, SALVE PENALES, THOMAS W.**

9    **THORNTON, PRISCILLA VALENCIA, MAE LOUISE WHITAKER, AND**
     **KATHRYN J. WINTER IN SUPPORT OF PLAINTIFFS' MOTION FOR**

10   **ISSUANCE OF PRELIMINARY INJUNCTION; EXHIBITS; (3)**

11   **[PROPOSED] ORDER ISSUING PRELIMINARY INJUNCTION**

12   upon the following person(s):

13

14   Defendants' Agent for Service of Process, CT Corporation System, 818 West
     Seventh Street, 2nd Floor, Los Angeles, CA 90017, (by mail only); and,

15

16   Kurt A. Franklin, Hanson, Bridgett, Marcus, Vlahos, Rudy LLP, 425 Market
     Street, 26th Floor, San Francisco, CA 94105 (by mail and electronic mail)

17

| | |
|---|---|
| | **BY HAND DELIVERY**:  By causing such document(s) to be delivered by hand to the above person(s) at the address(es) set forth above. |
| xx | **BY MAIL**:  By placing a copy thereof enclosed in a sealed envelope, with postage thereon fully prepaid, in the United States mail at Loma Mar, California, addressed as set forth above. |
| | **BY THIRD-PARTY COMMERCIAL CARRIER (OVERNIGHT DELIVERY)**: By delivering a copy thereof to a third-party commercial carrier, addressed as set forth above, for delivery on the next business day. |
| xx | **BY ELECTRONIC MAIL:** By transmitting the above document(s) to the email address of the person designated above, or by electronically filing the documents on the Court's ECF system. |
| | **BY FACSIMILE**:  By transmitting the above document(s) to the facsimile number(s) of the addressee(s) designated above. |

18

19

20

21

22

23

24

25

26

27

28   ///

1    I certify that I am employed in the office of a member of the bar of this court at

2  whose direction the service was made.

3    Executed on August 2, 2007, Loma Mar, California.

4

5

6    Tom Kayes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28