1  BRANCART & BRANCART
       Christopher Brancart (SBN 128475)
2      Liza Cristol-Deman (SBN 190516)
   Post Office Box 686
3  Pescadero, CA 94060
   Tel:   (650) 879-0141
4  Fax:   (650) 879-1103
   cbrancart@brancart.com
5  lcristoldeman@brancart.com

6  Attorneys for Plaintiffs

7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10  **GREATER NAPA FAIR HOUSING**          ) Case No. C 07-3652 MEJ
    **CENTER, a California Not for Profit**  )
11  **Corporation, doing business as**      ) **DECLARATIONS OF CELESTIA**
    **FAIR HOUSING NAPA VALLEY, et al.**    ) **AMBERSTONE, LIZA CRISTOL-**
12                                          ) **DEMAN, NANCY NORTHERN, SALVE**
                  **Plaintiffs,**            ) **PENALES, THOMAS W. THORNTON,**
13                                          ) **PRISCILLA VALENCIA, MAE LOUISE**
              **vs.**                        ) **WHITAKER, AND KATHRYN J.**
14                                          ) **WINTER IN SUPPORT OF**
    **HARVEST REDWOOD**                     ) **PLAINTIFFS' MOTION FOR**
15  **RETIREMENT RESIDENCE, L.L.C.,**       ) **ISSUANCE OF PRELIMINARY**
    **doing business as Redwood**           ) **INJUNCTION; EXHIBITS**
16  **Retirement Residence; et al.**        )
                                            )
17                **Defendants.**            )
                                            )
18  ──────────────────────────────

19         Attached hereto are the following declarations and exhibits filed in support of

20  plaintiffs' motion for issuance of preliminary injunction:

21         Celestia Amberstone, Exhibits 1-3;

22         Liza Cristol-Deman, Exhibit 4-5;

23         Nancy Northern, Exhibit 6;

24         Salve Penales;

25         Thomas W. Thornton; Exhibits 7-11;

26         Priscilla Valencia;

27         Mae Louise Whitaker, Exhibit 12; and,

28  ///

**DECLARATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE OF PRELIMINARY
INJUNCTION; EXHIBITS – CASE NO. C 07-3652 MEJ**

1   Kathryn J. Winter.

2   Dated: August 2, 2007.

3

4                                  Respectfully submitted,

5                                  BRANCART & BRANCART

6

7

8                                  Liza Cristol-Deman
                                   Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION; EXHIBITS – CASE NO. C 07-3652 MEJ**

1

**DECLARATION OF CELESTIA AMBERSTONE**

2

I, Celestia Amberstone, declare as follows:

3      1.      I have personal knowledge of the matters set forth herein and, if called to

4  testify, could and would testify competently to them.  This declaration is filed in support

5  of plaintiffs' motion for issuance of a preliminary injunction.

6      2.      I am the daughter of Bill Nye.  My father was a resident of Redwood

7  Retirement Residence from October 2001 until April 2007.  He resided alone in

8  apartment 303.

9      3.      My father signed a rental agreement for apartment 303 on or about August

10  21, 2001.  The rental agreement included an addendum that required my father to pay a

11  one-time, non-refundable "signing fee" of $725.00.  He paid this fee at or about the time

12  he paid the security deposit.  This so-called "signing fee" was not refunded when my

13  father moved out.  A true and correct copy of his rental agreement is attached hereto as

14  exhibit 1.

15      4.      When my father first moved into Redwood Retirement Residence

16  ("Redwood"), he was 87 years old.  He had a heart condition.  He also had poor hearing

17  and vision.  He used a walker.  He was diagnosed with dementia while he lived at

18  Redwood.  When he moved in, he thought he would be able to live at Redwood for the

19  rest of his life.

20      5.      I hired private home health care aides to help my father with his daily

21  needs.  They helped him with his medication, bathing, dressing, and eating.  As my

22  father became more disabled and needed more help, we increased the hours of the

23  home health care aides.

24      6.      In early 2007, I received approximately three phone calls from the resident

25  managers at Redwood Retirement Residence, Denise and David Hall, about my father.

26  In one call, Ms. Hall complained to me that my father thought it was meal time even

27  though he had already eaten.  In another call, Ms. Hall informed me that my father had

28  accidentally urinated on the floor in the bathroom in the lobby.  Ms. Hall also complained

that my father cut himself shaving and was bleeding at the dining room table.  I

1  responded that I would speak to my father's home health care aides to ensure that he is

2  receiving the care he requires and does not pose a problem for any other residents or

3  the managers.

4          7.      Although I appreciated Ms. Hall's calls about my father's welfare, I was

5  unaware that any of these problems – failure to keep track of meal time, a bathroom

6  accident, and a shaving cut – would constitute breaches of the rental agreement.

7          8.      Ms. Hall also called to tell me that my father had left the building by

8  himself one evening in a disoriented state.  I was very concerned about this incident.  I

9  assured Ms. Hall that I would work with his care givers to take precautions to prevent

10  this from happening again.  I immediately contacted the care givers.  To my knowledge,

11  my father never ventured outside again alone.

12          9.      In early April 2007, I received another call from Ms. Hall.  She asked me to

13  come to the office of the Redwood Retirement Residence to discuss my father.  I

14  agreed to come.

15          10.     On or about April 5, 2007, I came to the Redwood Retirement Residence

16  office.  David and Denise Hall were there.  They handed me a packet of documents.

17  The first document was a letter on Redwood Retirement Residence stationary

18  addressed to my father.  The letter asked my father to move out no later than May 6,

19  2007.  The letter stated, "we believe that the time has come whereby we can no longer

20  meet your needs."  A true and correct copy of the letter I received is attached hereto as

21  exhibit __2__ .

22          11.     The next document in the packet I received was a 30-day notice to

23  terminate tenancy, also on Redwood Retirement Residence stationary.  The 30-day

24  notice was addressed to my father.  A true and correct copy of the 30-day notice I

25  received is attached hereto as exhibit __3__ .

26          12.     The next document in the packet was entitled "Bill Nye Incident Notes

27  Summary."  This document listed seven incidents or other grievances involving my

28  father.  The final sentence of the Incident Notes Summary states, "It is for these reasons

1 reasons and many others that Redwood management feels that Bill is no longer defined
2 as independent living eligible."

3    13.    I disagreed with Redwood's decision that my father needed to move out of
4 Redwood. I believe that the health care aides were meeting my father's needs, and
5 that he did not pose a danger or threat to himself or others at Redwood. Nevertheless,
6 I felt we had no choice but to move him out.

7    14.    My sister and I immediately began to search for another residence for our
8 father. We looked at several different residences around the City of Napa. We chose
9 an assisted living residence and moved our father out of Redwood on April 26, 2007.

10    15.    The move from Redwood was difficult for my father. He did not want to
11 leave his familiar apartment and trusted care givers at Redwood. The move was also
12 financially costly, since the assisted living residence was more expensive.

13    16.    On May 23, 2007, less than one month after he moved from Redwood
14 Retirement Residence, my father passed away.

15    I declare under penalty of perjury that the foregoing is true and correct under the
16 laws of the State of California and the United States of America.

17    Executed on 25 July , 2007, at Santa Rosa , California.

18
19    Celestia Amberstone
20    Celestia Amberstone/
21
22
23
24
25
26
27
28

- 3 -

1   BRANCART & BRANCART
        Christopher Brancart (SBN 128475)
2       Liza Cristol-Deman (SBN 190516)
    Post Office Box 686
3   Pescadero, CA 94060
    Tel:    (650) 879-0141
4   Fax:   (650) 879-1103
    cbrancart@brancart.com
5   lcristoldeman@brancart.com

6   Attorneys for Plaintiffs

7

8                   UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10  **GREATER NAPA FAIR HOUSING**          )    Case No. C 07-3652 MEJ
    **CENTER, a California Not for Profit**  )
11  **Corporation, doing business as**     )    **DECLARATION OF LIZA CRISTOL-**
    **FAIR HOUSING NAPA VALLEY, et al.**   )    **DEMAN IN SUPPORT OF**
12                                          )    **PLAINTIFFS' MOTION FOR**
                **Plaintiffs,**            )    **ISSUANCE OF PRELIMINARY**
13                                          )    **INJUNCTION**
            **vs.**                        )
14                                          )
    **HARVEST REDWOOD**                     )
15  **RETIREMENT RESIDENCE, L.L.C.,**       )
    **doing business as Redwood**          )
16  **Retirement Residence; et al.**       )
                                            )
17              **Defendants.**            )
                                    _____)

18

19          I, Liza Cristol-Deman, do hereby declare:

20          1.      I am an attorney licensed to practice in California and in this district.  I am

21  the attorney of record for plaintiffs in this matter.  This declaration is filed in support of

22  plaintiffs' motion for issuance of preliminary injunction.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

    **DECLARATION OF LIZA CRISTOL-DEMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR
    ISSUANCE OF PRELIMINARY INJUNCTION**

                                                                                    1

1    2.    When we prepared the complaint to be filed, plaintiff Ruby Duncan was

2  still living.  After we learned that Ms. Duncan had passed away, we worked with her

3  daughter, Mae Louise Whitaker, to determine Ms. Duncan's successor in interest.  We

4  will be filing a notice of substitution shortly.

5    3.    In March 2007, an advertisement for Redwood Retirement Residence was

6  included in the Napa County newspapers.  A true and correct copy of the advertisement

7  that was included in the newspapers is attached hereto as Exhibit 4.

8    4.    Attached hereto as Exhibit 5 is a copy of Niederhauser v. Independence

9  Square Housing, 4 Fair Housing - Fair Lending (Aspen Law & Bus.) ¶16,305.2-.6 (N.D.

10  Cal. 1998).

11    I declare under penalty of perjury that the foregoing is true and correct under the

12  laws of California and the United States.

13    Executed this 1st day of August, 2007 at Loma Mar, California.

14

15    _____

16    Liza Cristol-Deman

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF LIZA CRISTOL-DEMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR
ISSUANCE OF PRELIMINARY INJUNCTION**

2

## DECLARATION OF NANCY NORTHERN

I, Nancy Northern, declare as follows:

1.    I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently to them.  This declaration is filed in support of plaintiffs' motion for issuance of a preliminary injunction.

2.    I am a plaintiff in this matter.  I also have been appointed to serve as the guardian ad litem for my mother, Eva Northern.  She is a named plaintiff and proposed class representative in this matter.

3.    My mother will be 87 years old on July 11, 2007.  Until late 2000, my mother was living with her sister in a home in Napa.  When her sister died, we decided that it was best to find a new home for her so that she did not live alone.

4.    In or about December 2000, my mother and I visited Redwood Retirement Residence to look into renting an apartment for her.  The resident managers showed us several different apartments.  We decided to rent an apartment at Redwood with two bedrooms and one bathroom.  I mentioned that we chose the two-bedroom apartment because there was enough room for many of her possessions from her home, and because we might need extra room for a live-in caregiver as my mother aged.  The resident managers stated that they did not provide any health care services but that we could hire a home health care aide.  My mother and I expected that she would live at the Redwood Retirement Residence for the rest of her life, and neither of us wanted to have to move her ever again at this stage of her life.

5.    In or about January 2001, my mother signed a rental agreement for apartment 112 at the Redwood Retirement Residence.  She moved into apartment 112 on or about March 1, 2001.  The apartment had two bedrooms, one bathroom, and a small kitchenette with a mini refrigerator and sink.  The monthly rent  included three meals a day, light housekeeping, social programs for the residents, and a variety of other amenities.

6.    At the time that my mother moved into Redwood Retirement Residence, she had several disabilities, including diabetes.  She also had complications from a

1  previous stroke, including communication and perception impairments. In or about late
2  2005, she began to show symptoms of dementia.

3          7.      Soon after my mother moved in to Redwood Retirement Residence, we
4  hired home health care aides from Priscilla Valencia's agency to assist my mother with
5  daily activities such as taking medications and getting dressed. A home health care
6  aide assisted my mother for several hours each day throughout her tenancy at
7  Redwood. We paid the home health care aides directly for their services.

8          8.      Because my mother has difficulty communicating with others as a result of
9  the stroke, she does not like to eat meals in the communal dining room. For most
10  meals, her home health care aide went to the Redwood kitchen at meal times to pick up
11  meal trays for my mother to eat in her apartment.

12          9.      In or about September 2006 I received a phone call from one of the home
13  health care aides. The aide stated that Redwood had a new policy that would not
14  permit her to bring meals to the apartment every day. Shortly thereafter, my mother
15  received a notice from Redwood entitled "Redwood Meal Tray Policy." A true and
16  correct copy of the notice is attached hereto as exhibit 6.

17          10.     I called the resident managers of Redwood to discuss the new meal tray
18  policies. I informed them that my mother wanted to continue to have her home health
19  care aide pick up meal trays from the kitchen and bring them to her room. The
20  managers agreed that this arrangement could continue for some unspecified period of
21  time.

22          11.     On or about December 31, 2006 a home health care aide called me and
23  stated that Redwood had prohibited her from picking up any additional meals for my
24  mother. She stated that Redwood had refused her breakfast tray, but that she had
25  taken some fruit from a holiday gift basket so that my mother could eat and her blood
26  sugar would not become dangerously low.

27          12.     I was shocked and outraged that Redwood would deprive my mother of
28  food, especially since her meals are included in the rent and she is diabetic. I drove to

2

1  Redwood right away to look into this serious problem. I met with the managers and

2  explained to them that it was uncomfortable for my mother to eat in the dining room

3  because of her communication impairments.  I reminded them that my mother had

4  eaten her meals in her room since she moved in without any problems.  The managers

5  agreed to permit the home health care aides to pick up additional food trays for a fee of

6  $5.00 per tray.  I reluctantly agreed to pay the charges because the managers told me

7  that my mother's meal trays would be discontinued if we did not agree to pay.  I

8  reiterated to the resident managers that I disagreed with the meal tray policy.  The

9  resident managers stated that implementing the meal tray policy was not their decision.

10     13.    On or about January 3, 2007, I received a phone call from Tom Ahrens,

11  who identified himself as a regional manager for Holiday.  Mr. Ahrens stated that

12  Redwood is an "independent living facility," and that people who cannot eat their meals

13  in the dining room "do not belong at Redwood," or words to that effect.  Mr. Ahrens

14  stated that Redwood was "not intended" for people who could not make it to the dining

15  room.  I told Mr. Ahrens that she had never before been told that Redwood was limited

16  to people who could use the dining room, and that I had helped my mother move into

17  Redwood with the expectation that she could live there until she died even if she had

18  disabilities that prevented her from going to the dining room.  I pointed out that meal

19  trays imposed no additional burden or cost on Redwood, since the privately-paid, home

20  health care aide picked up the meal trays, brought them to my mother, and returned

21  them to the kitchen after she was finished.  I also pointed out that my mother is diabetic,

22  and that it was inhumane to deny her food.  Mr. Ahrens stated that he would permit her

23  to continue to receive meal trays in her room free of extra charges until January 8,

24  2007, but no longer.  I reminded him that meals were included in the rent, and that I

25  believed that my mother should be reimbursed if Redwood refused to provide meals.

26  Mr. Ahrens denied that she would be reimbursed for any such meals.

27     14.    I was shocked and upset by this phone call with Mr. Ahrens.  I did not

28  think it was proper to charge my mother for meals that were included in the rent, but I

1    did not want my mother to starve.  So I purchased a small freezer and placed it in her

2    apartment.  I cooked or purchased food to be frozen and then reheated for meals.  I

3    purchased pre-made meals to be refrigerated and served to my mother by the home

4    health care aides.  For two and a half months, I made extra trips to Redwood – at least

5    two trips per week – to purchase and deliver special food for my mother.

6         15.    Around the same time that the meal tray policy changed, the home health

7    care aides told me that the managers of Redwood had asked a number of residents to

8    move out because they required assistance and could not live independently.  I

9    immediately began to worry that my mother would be asked to move out.  I knew that if

10   she received a 30-day notice, as other residents had been receiving, we would not have

11   enough time to find another residence for her.  As a result of all of the changes at

12   Redwood – the new meal tray policy, 30-day eviction notices for those who could not

13   live without help, and Mr. Ahrens' comments indicating that people with disabilities were

14   not welcome at Redwood – I began to look for another residence for my mother.  I felt

15   we had no alternative but to move out.  My mother vehemently opposed moving and

16   became very depressed and anxious.  Around this time, she was prescribed medication

17   for depression and anxiety.

18        16.    I looked at several different senior housing facilities over the ensuing

19   couple of months.  In or about early March 2007, I made arrangements to move my

20   mother to Aegis, an assisted living facility located approximately one block away from

21   Redwood.  We scheduled her move for the third week in March.  The monthly cost of

22   Aegis far exceeded the cost of Redwood, even when the cost of the private, in-home

23   health care aide at Redwood is included.

24        17.    In mid-March, while she still lived at Redwood, my mother accidentally left

25   the bathtub faucet on.  The tub overflowed and flooded my mother's apartment and part

26   of the hall outside her apartment.  I received a very angry call from David Hall, the

27   manager of Redwood.  He implied that she would have to move out as soon as

28   possible, even though I agreed to pay to replace the damaged linoleum, carpet and

- 4 -

1   padding

2       18.    As a result of the hostility from the manager over this incident, we decided
3   to move my mother to Aegis a week earlier than planned. She moved out of Redwood
4   to Aegis on or about March 15, 2007 in spite of her own vehement protests. She cried
5   and did not want to get into the car to go to Aegis. She was very upset when we arrived
6   at Aegis and initially refused to get out of the car.

7       19.    After she moved to Aegis, my mother's mental condition rapidly declined.
8   Previously, she had many days when she was mentally lucid and clear, and an
9   occasional day when she seemed more confused and disoriented. After the move
10  confusion and disorientation became her new norm. She continued to cry frequently
11  about her move from Redwood.

12      20.    Around the first of June, 2007, she developed an infection and needed to
13  be hospitalized. Her depression worsened while she was in the hospital and she
14  expressed a desire to end her life. After two weeks in the hospital, she was not well
15  enough to move back to Aegis. I had to move her to a board and care home where she
16  now resides.

17      21.    I believe that the stress of the situation at Redwood and her move from
18  Redwood hastened my mother's mental and physical decline.

19      I declare under penalty of perjury that the foregoing is true and correct under the
20  laws of the State of California and the United States of America.

21      Executed on July 27, 2007 at _____**El Sobrante**_____, California.

22

23

24                              Nancy Northern

25

26

27

28

## DECLARATION OF SALVE PENALES

I, Salve ("Sally") Penales, declare as follows:

1. I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently to them.

2. I work with Priscilla Valencia as a care giver serving residents of Redwood Retirement ("Redwood"). I am a certified nursing assistant. I have served residents at Redwood since 2004.

3. In July 2006 resident managers Susan and John Cole left Redwood. After they left, I saw several other persons acting as managers. They said they were from Redwood's corporate office. I met about three sets of acting managers at Redwood between July and October 2006.

4. In October 2006, David and Denise Hall arrived at Redwood to take over as resident managers. After David and Denise arrived, some policies at Redwood changed. David and Denise began to describe Redwood as an "independent living" facility.

5. After David and Denise changed the policy, many Redwood residents began to express fears about being evicted for being "too disabled." One of the residents I care for, Dorman Mitchell, had me read his eviction notice when I visited him in his apartment. Mr. Mitchell uses a walker. Another resident who talked to me and was worried about eviction was Maxine Kaufman. Ms. Kaufman is in a wheelchair.

7. After David and Denise arrived, some residents were told they could no longer use the dining hall. I heard that after Marion Jacks choked and threw up in the dining room she was told by the management that she would need to go to "assisted living," and that she could no longer use the dining hall. Charles Bryden was also told he could not eat in the dining hall after throwing up there.

6. The other care givers and I started bringing trays of food from the kitchen to the residents who were no longer allowed to eat in the dining hall. The first time the ///

1  care givers had to pay $5 cash to get trays from the kitchen even though the trays are

2  taken to the resident's rooms, rinsed and returned by me or the other care givers.

3       I declare under penalty of perjury that the foregoing is true and correct under the

4  laws of the State of California and the United States of America.

6  Executed on July 26, 2007, at Napa, California.

8  _____
   Salve ("Sally") Penales

- 2 -

**DECLARATION OF THOMAS W. THORNTON**

I, Thomas W. Thornton, declare as follows:

1.    I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently to them.  This declaration is filed in support of plaintiffs' motion for issuance of a preliminary injunction.

2.    I am the son of Bernice Thornton.  My mother was a resident of Redwood Retirement Residence ["Redwood"] from April 2004 until July _15_, 2007.  She resided alone in apartment 101.

3.    In or about early 2004, my mother and I visited Redwood to look into renting an apartment for her.  She liked Redwood and decided she wanted to rent a two-bedroom apartment with a patio where she could enjoy a garden. There were no two-bedroom apartments available at that time, so she was placed on the waiting list.  I asked for, and the managers of Redwood provided, the name and telephone number of the private home health care aides who assisted many Redwood residents.

4.    In or about March 2004, the managers of Redwood notified us that my mother's name was next on the waiting list for an available two-bedroom apartment. On or about April 1, 2004, my mother signed a rental agreement for apartment 101 and moved into the Redwood Retirement Residence.  Apartment 101 has two bedrooms, one bathroom, and a small kitchenette with a mini refrigerator and sink.  We replaced the carpet in Apartment 101 when she moved in, at our own expense.  The monthly rent was originally $2,495.00.  The rent includes three meals a day, light housekeeping, social programs for the residents, and a variety of other amenities.  My mother resided in Redwood in Apartment 101 until July _15_, 2007.

5.    The rental agreement my mother signed requires payment of a "signing fee" in the amount of $1,247.50, and a security deposit in the amount of $1,247.50. The "signing fee" is described in an addendum to the rental agreement as a "one-time fee [that] is non-refundable" unless the tenant moves out in 90 days or less. If the tenant stays at Redwood 91 days or longer, the "signing fee" is non-refundable.  My

1   mother paid both the security deposit and non-refundable "signing fee" to Redwood on

2   or about April 1, 2004.

3       6.      In 2004, my mother was diagnosed with Alzheimer's Disease. She has

4   difficulty communicating and remembering. Her motor skills are also impaired. I assist

5   my mother with her financial affairs, medical issues, housing, and a wide variety of

6   other matters. In or about November 2006, my mother and I entered into an agreement

7   giving me power of attorney.

8       7.      In or about early 2005, we hired a home health care aide to assist my

9   mother with daily activities such as taking medications, bathing, eating, and getting

10  dressed. In 2006, if became difficult for my mother to eat in the communal dining room.

11  Her motor skills had deteriorated, and eating without assistance was messy. Redwood

12  rules prohibit care givers from sitting at the dining room tables to assist residents at

13  meals. As a result, her home health care aide started picking up meal trays from the

14  Redwood kitchen and helping my mother eat in her apartment. The home health care

15  aide then returns the tray and dishes to the kitchen. While she lived at Redwood, a

16  home health care aide stayed with my mother 24 hours per day, 7 days per week, at

17  our personal expense, *beginning in or about July 2005.*

18      8.      On or about October 29, 2006, I received a letter from Redwood dated

19  October 28, 2006, stating that my mother had thirty days to move out of Redwood. The

20  letter stated, in pertinent part, "[t]his decision is entirely based on Bernice's needs and

21  the health and safety of our facility. As you know, the Redwood is an independent living

22  community for seniors able to maintain an active lifestyle." A true and correct copy of

23  this letter is attached hereto as Exhibit _7_. Before receiving this notice, I had not

24  received any phone calls, letters, notices, emails, or any other communication from

25  Redwood concerning my mother's condition or problems with her tenancy.

26      9.      Shortly after receiving the October 28, 2006 letter, I called one of the

27  resident managers of Redwood, David Hall. Mr. Hall stated that my mother was being

28  asked to move out because (1) she is incontinent; and, (2) on one occasion, she *momentarily* left her

- 2 -

*I explained to Mr. Hall that the care aides told me that*

1  apartment half-dressed because she mistakenly opened the door leading to the hall
   *on that one occasion.*
2  rather than the bathroom door, I assured Mr. Hall that home health care aides were

3  assisting my mother, and that my mother posed no threat to herself, others, or

4  Redwood property.  Mr. Hall agreed to rescind the 30-day notice provided in the

5  October 28, 2006 letter.

6       10.    Between November 1, 2006 and late January 2007, I learned from one of

7  my mother's home health care aides that Redwood's meal tray policy had changed.  I

8  did not receive written notice of the new policy until March 2007, when I received a

9  letter from Redwood dated March 5, 2007 containing a demand for payment of $870.00

10 in meal tray fees.  The March 5, 2007 letter stated that the fees were based on a

11 charge of $5.00 per meal provided to my mother on a tray for use in her apartment

12 instead of in the communal dining room.  A true and correct copy of the March 5, 2007

13 letter is attached hereto as Exhibit  8 .

14      11.    On March 18, 2007, I sent a letter to Redwood manager, David Hall,

15 protesting the meal tray charges.  In this letter and one other letter to Redwood, I

16 referenced my mother's health condition and Redwood's legal obligation to make

17 reasonable accommodations to the meal tray policy for residents with disabilities.

18 Redwood has never responded to my request for reasonable accommodation.  True

19 and correct copies of my letters are attached hereto as Exhibits  9 .

20      12.    On March 25, 2007, I received a notice from Redwood that my mother's

21 monthly rent had been increased.

22      13.    In or about early April 2007, Mr. Hall called me and requested a meeting

23 to discuss the meal tray policy.  We made arrangements to meet on April 13, 2007.  On

24 or about April 9, 2007, Mr. Hall called me and requested to meet earlier.  I agreed to

25 come to Redwood for a meeting on April 10, 2007.

26      14.    On April 10, 2007, I came to Redwood for the meeting with Mr. Hall.

27 Instead of discussing the meal tray policy, however, Mr. Hall handed me  a 30-day

28 notice to terminate my mother's tenancy.  Mr. Hall stated that he had a written report

1    detailing the reasons that the move was in her best interests.  He provided me with a

2    copy of that report, entitled "resident summary."  The first two reasons stated on the

3    resident summary in support of the 30-day notice are: "1.  Bernice is incapable of

4    providing for her own healthcare and personal needs.  2.  She is completely dependent

5    upon others for her care and well-being and requires 24 hour care and supervision."

6    True and correct copies of the 30-day notice and "resident summary" I received from

7    Mr. Hall are attached hereto as Exhibit __10__.

8         15.    Shortly before we received the 30-day notice in April 2007, all

9    housekeeping services for my mother's room were discontinued, even though those

10   services are included in the monthly rent.  The managers never informed us or my

11   mother's home health care aide of the reason that housekeeping services were

12   discontinued.

13        16.    After they were served with a letter stating that the 30-day notice was

14   improper under the California Civil Code, Redwood served a 60-day notice to terminate

15   my mother's tenancy on or about May 18, 2007.  A true and correct copy of that 60-day

16   notice is attached hereto as Exhibit __11__.  As a direct result of that notice, my mother

17   moved out of Redwood on July _15_, 2007.

18        ~~17.   The monthly rent where my mother now lives is far higher than at~~

19   ~~Redwood, even if the fees we paid for the home health care aides are included.~~  _nor did she indicate a desire to do so._

20        18.    ~~My mother~~ _my mother_ did not want to move out of her home at Redwood_,_  She had a

21   very comfortable apartment and attractive garden on her patio at Redwood.  Her trusted

22   home health care aides provided all the care that she needed.

23        19.    My mother's physicians have informed me that people with Alzheimer's

24   Disease like my mother need stable and familiar living environments and the

25   opportunities for social interaction that a building like Redwood provides.  I fear that her

26   ///

27   ///

28   ///

- 4 -

1    condition will deteriorate because of the move.

2         I declare under penalty of perjury that the foregoing is true and correct under the

3    laws of the State of California and the United States of America.

4         Executed on _____July  30_____, 2007, at _____St. Helena_____, California.

5

6

7                                              Thomas W. Thornton

8

9

10

11   S:\Disabled\Redwood\witnesses\thorton, Tom\declaration (rv) of thornton for prelim inj motion.wpd

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 5 -

## DECLARATION OF PRISCILLA VALENCIA

I, Priscilla Valencia, declare as follows:

1.     I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently to them.

2.     I operate an independent home health aide business exclusively serving residents of Redwood Retirement ("Redwood"). I co-operate the business with my partner, Salve Valez. We serve between 30 and 40 Redwood residents at any given time, and we employ approximately six home health aides who work with clients at Redwood. I have worked with clients at Redwood since 2003. My business requires me to spend a lot of my time at Redwood and, as a result, I have gotten to know many residents and members of Redwood's staff.

3.     In July 2006, managers Susan and John Cole left Redwood. After they left, I met several persons acting as managers from Redwood's corporate office. They said that they had come to Redwood to temporarily manage the facility.    They stayed between July and October 2006. One of them was a woman named "Irene," who said she was a registered nurse from the corporate office. While Irene was there, Irene interviewed most of our clients, looking for detailed information about their health and medical conditions.

4.     In October 2006, David and Denise Hall arrived at Redwood to take over as resident managers. After David and Denise took over, several of my care givers told me that some of our clients with disabilities had heard that they would be asked to leave Redwood. The care givers told me that many Redwood residents began to express fears about being evicted because they were "too disabled."

5.     Shortly after David and Denise Hall took over as resident managers, I heard them speaking at a residents' meeting.   At that meeting, David told the residents that Redwood was an "independent living" facility.

6.     At about the same time (late 2006), Redwood changed the dining policy. Now if a resident gets ill they can get trays of food sent to their rooms for three days free of charge, but after three days they are charged $5 per tray. For the first day of the

1  new tray rule Redwood staff delivered the trays, after that first day my care givers were

2  told to take the trays, and Redwood would not deliver them anymore. It is unclear to

3  me what the fee is based on because it is my staff that takes the trays to our clients in

4  their apartments, rinses the trays, and returns them to the kitchen.

5        7.    I was told by a care giver that Dorman Mitchell was seen crying in the

6  lobby. I went to see Mr. Mitchell, and asked why he was crying. Mr. Mitchell told me

7  that he was crying because David Hall told him that Mr. Mitchell had to leave Redwood.

8  Mr. Mitchell said he was sad because he did not want to leave, and had nowhere to go.

9  Mr. Mitchell uses a walker.

10        I declare under penalty of perjury that the foregoing is true and correct under the

11  laws of the State of California and the United States of America.

12        Executed on July 26, 2007, at Napa, California.

13

14                                Priscilla Valencia

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF MAE LOUISE WHITAKER

2    I, Mae Louise Whitaker, declare as follows:

3    1.    I have personal knowledge of the matters set forth herein and, if called to
4    testify, could and would testify competently to them.

5    2.    I am a plaintiff in this matter.  I was also appointed to serve as the
6    guardian ad litem for my mother, Ruby Duncan, a named plaintiff and proposed class
7    representative in this matter.

8    3.    On July 9, 2007, I executed a guardian ad litem petition to represent my
9    mother Ruby in this action.

10    4.    On July 11, 2007, my mother Ruby passed away at the age of 100 years.
11   For the last few years of her life she had multiple physical and cognitive disabilities,
12   most of which were the result of old age.  She had difficulty walking, severe memory
13   loss, and was experiencing symptoms of dementia.

14    5.    My mother moved into Redwood Retirement Residence (Redwood) in
15   May 1991, after relocating from Riverside, California to be closer to her family.
16   Between May 1991 and May 2002, she lived in apartment 110, a one bedroom, one
17   bathroom unit a Redwood.

18    6.    In June 2002, my mother moved to an assisted living facility in Napa,
19   California, where she lived for approximately one year.  At the end of that year, she
20   decided to return to Redwood.  In June 2003, my mother signed a new rental
21   agreement for apartment 209 at Redwood.  She lived in apartment 209 until she passed
22   away.  Apartment 209 is a studio apartment with one bathroom and a small kitchenette.
23   The initial rent for apartment 209 was $1,695, but it was recently raised to $1,955.  The
24   rent included three meals a day, light housekeeping, social programs for the residents,
25   and a variety of other amenities.

26    7.    When my mother signed her rental agreement at Redwood, the
27   agreement required her to pay a "signing fee" in the amount of $847.50, and a security
28   deposit in the amount of $847.50.   She paid both of these fees on or about June 5,
     2003.

8.    My mother used the services of a home health care aide beginning in approximately June 2003. My mother and I paid the home health care aide directly for her services. The aide assisted my mother with activities such as taking medication and ambulating. Frequently, my mother did not feel well enough to dress and leave her apartment. As a result, the home health care aide went to the kitchen at meal times to pick up meal trays for my mother so that she could stay in her apartment instead of going to the communal dining room.

9.    In late 2006, on one of my trips to Redwood to visit my mother, I heard from other tenants that the new managers at Redwood had begun to pressure residents to move out if they could no longer use the common dining room or did not otherwise fit the managers' definition of "active, independent" seniors.

10.    Around the same time (late 2006), during one of my visits to Redwood, I discovered a document in my mother's apartment entitled "Redwood Meal Tray Policy." The document described how Redwood management had begun to assess extra charges for residents who used the home health aides to bring their meal trays to the residents' apartments, with very limited exceptions.  I became very concerned, since the limited exceptions described in the policy – short term illness such as the flu, or short term recuperation from injury or illness with full expected recovery – did not apply to my mother, who has permanent disabilities.   A true and correct copy of the letter entitled "Redwood Meal Tray Policy" is attached hereto as exhibit 12.

11.    In December 2006, I contacted the new managers at Redwood and asked about the meal trays. At that time, Denise Hall, one of the new managers, told me that my mother would have to move out if she continued to be unable to take meals in the dining room. I pointed out to them that in-home meal trays did not pose any extra burden or expense for Redwood, since my mother's home health aide picks up and returns the trays and dishes to the kitchen. I also asked for reimbursement for the meals my mother was not able to eat as a result of this policy.

- 2 -

1      12.    Shortly thereafter, I provided Redwood with a letter from my mother's

2 physician, describing her medical condition, and verifying that it necessitated her taking

3 her meals in her apartment.  Neither my mother nor I ever received any response to

4 that letter.

5      13.    At about that same time (December 2006), I contacted Denise Hall, one of

6 the on-site managers to express my concern about the number of residents with

7 disabilities who were facing eviction notices at Redwood.  Ms. Hall informed me that

8 Redwood maintained a list of tenants who "did not belong" at Redwood and that the list

9 included tenants who use walkers or wheelchairs.  She stated that Redwood was

10 "weeding out" the wheelchairs and walkers because "they gave Redwood a bad

11 impression."  I told Ms. Hall that I was very concerned my mother might be on this list.

12 She stated that my mother was not on the "first" list of tenants who had to leave, but

13 that she was on a "second" list, and that I better start looking for other housing for her

14 because those on the second list would be asked to move out soon.   When I asked her

15 why Redwood was evicting these people, she stated that the managers wanted

16 Redwood to be a retirement home, like it used to be, rather than an "old folks" home.

17      14.    Since she first became aware of the eviction notices Redwood issued to

18 tenants with disabilities and Redwood's "meal tray" policy, my mother lived in fear of

19 eviction.  She was afraid to leave her apartment and worried that, if she did go into the

20 common areas, the managers would give her notice to vacate due to her visible

21 disabilities.  Even so, she did not want to move and, at that point in her life, moving to a

22 new residence would have been extremely difficult for her physically and mentally.

23      I declare under penalty of perjury that the foregoing is true and correct under the

24 laws of the State of California and the United States of America.

25      Executed on July 26 , 2007, at Napa, California.

26

27                              Mae Louise Whitaker

28

## DECLARATION OF KATHRYN J. WINTER

I, Kathryn J. Winter, declare as follows:

1.      I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently to them.  This declaration is filed in support of plaintiffs' motion for issuance of a preliminary injunction.

2.      I am the Executive Director of Greater Napa Valley Fair Housing Center, doing business as Fair Housing Napa Valley.

3.      Plaintiff Greater Napa Valley Fair Housing Center, doing business as Fair Housing Napa Valley ["FHNV"], is a non-profit agency with a mission to promote the eradication of housing discrimination throughout Napa County.  We provide counseling, investigation, and educational services regarding fair housing to residents and housing providers.  FHNV has one part-time and four full-time staff members.  We are a small non-profit with a limited budget.

4.      FHNV receives an average of seven complaints concerning possible violations of fair housing laws every month.  For every fair housing complaint we receive, our staff members generally: (1) conduct an intake interview with the complainant; (2) conduct an investigation to determine whether there is evidence to support the allegation, including fair housing testing, witness interviews, and document review if necessary; (3) counsel the complainant about the results of the investigation, his or her fair housing rights, and available legal remedies; (4) refer the case to an administrative agency or attorney for enforcement action, if appropriate.  In many cases, staff members conduct meetings with residents, correspond with housing providers, and take other actions to assist the complainant.  All of these activities are time-consuming.

5.      In addition to responding to individual complaints, FHNV also conducts training sessions and educational campaigns in the community to teach residents and housing providers about the fair housing laws.  These educational efforts include writing, publishing, and distributing brochures and handbooks; conducting training sessions for housing providers such as landlords and resident managers; teaching

1    social service agency staff members how to identify and respond to fair housing issues;
2    and, translating current educational literature into Spanish.  All of these activities are
3    critical to FHNV's mission of eradicating housing discrimination in Napa Valley.  All
4    require a significant expenditure of money and staff time.

5        6.    Case-related intake and investigation take priority over general
6    educational campaigns.  Consequently, the number of complaints received is inversely
7    proportional to the time and money that can be expended on community education.  If
8    staff members receive a large number of complaints, they have less time and fewer
9    resources for planning and executing educational campaigns.

10       7.    FHNV suffered damages when Redwood Retirement Residence
11   committed discriminatory housing practices against people with disabilities.  As a direct
12   result of those practices, plaintiffs Nancy Northern and Louise Whitaker both lodged
13   complaints with FHNV.  At least six other residents of Redwood or their next of kin have
14   made similar complaints to FHNV between October 2006 and the present, and we have
15   been informed that many other residents have been adversely affected by Redwood's
16   discriminatory policies.

17       8.    Our staff conducted intake interviews with each of the complainants from
18   Redwood.  FHNV then conducted an investigation that included witness interviews and
19   document review.  FHNV spent time counseling the complainants about their rights and
20   referring the complainants to counsel if they so chose.  FHNV has also prepared an
21   educational flyer for Redwood residents and distributed that flyer door-to-door in June
22   2007.  Because our staff and resources were engaged in activities to address
23   Redwood's discriminatory housing practices, we had less time and fewer resources to
24   devote to other programs.

25       9.    Our mission of eradicating housing discrimination has been frustrated by
26   Redwood's practices that discriminate against people with disabilities.  In order to
27   counteract the effects of those discriminatory practices, we have devised a plan to
28   educate community members regarding the fair housing laws, focusing on people with

1  disabilities and seniors.  We also anticipate conducting training sessions for Redwood

2  management and staff and taking other steps in order to prevent future fair housing

3  violations.  These activities will require additional financial resources and staff time.

4        I declare under penalty of perjury that the foregoing is true and correct under the

5  laws of the State of California and the United States of America.

6        Executed on _July 26_, 2007, at _Napa_, California.

7

8                                          _Kathryn J. Winter_
                                           Kathryn J. Winter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28