# CALIFORNIA RENTAL AGREEMENT

This month-to-month Rental Agreement (this **"Agreement"**), effective on the _____ day of _____ _____, is a contract between _Redwood Retirement_ (the **"Landlord"**) and _Ruby Duncan_ (the **"Resident"**). The **Landlord** agrees to rent Apartment # _209_ (the **"Apartment"**) located at _2350 Redwood Rd_ _Napa_ , _CA_ , California (the **"Facility"**) to the **Resident** for the **Resident's** personal use. The **Apartment** is to be occupied by no more than __1__ adult(s).

The **Resident** agrees to pay to the **Landlord** rental for each month (the **"Monthly Fee"**) during the term of this **Agreement**, the sum of:

$ _1695_ as base rent for the premises
$ _____ for 2nd person occupancy fee (if applicable)
$ _____ for carport, garage, or underground parking fee (if applicable)
$ _____ for _____
$ _1695_ Total **Monthly Fee**

When the **Resident** signs this **Agreement**, the **Resident** shall give the **Landlord** a $ _847.50_ signing fee (the **"Fee"**) which is equivalent to one-half (1/2) of one month's base rent for the apartment in which the **Resident** will reside, or will ultimately reside (in the event that the **Resident** is currently on a wait list for a smaller apartment). Further details regarding the **Fee** are outlined in **Addendum SF** which is attached to this **Agreement**. In addition to the **Fee**, upon signing this **Agreement**, the **Resident** shall give the **Landlord** a $ _847.50_ security deposit (the **"Deposit"**) which is equivalent to one-half (1/2) of one month's base rent as described above. The **Deposit** may only be used by the **Landlord** for non-payment, or shortage in payment, of the **Monthly Fee** at the time of move-out from the **Facility**.

## 1.    MONTHLY FEE

A.    The **Resident** agrees to pay the **Monthly Fee** in advance on the first day of each and every month at the office of the Manager (the **"Manager"**) of the **Facility**. The **Manager**, whose office is located in the **Facility**, is authorized by the **Landlord** to be responsible for collecting all fees for the **Resident's** personal use of the **Apartment**.

B.    The **Monthly Fee** is subject to change after thirty (30) days' written notice to the **Resident**. However, the **Landlord** shall not increase the amount of the **Monthly Fee** for the first twelve (12) months beginning on _July_ , _2003_ (date) or more frequently than one time each twelve months thereafter.

C.    When there are charges for less than one full month, the **Monthly Fee** will be pro-rated based on the number of days in the given month.

## 2.    FORMS AND ADDENDA

Attached to, and a part of, this **Agreement** are the following forms and addenda:

__X__ Unit Billing          __X__ SF - Signing Fee
___ S-___ _____     ___

**Resident** Signature _____     Date _____
**Manager** Signature _____     Date _____

Exhibit 1

**3.    GENERAL OBLIGATIONS**

The **Landlord** and the **Resident** mutually agree that:

**A.**    the **Resident** shall not violate any city ordinance, state or federal (if applicable) law in or about the **Apartment**.

**B.**    the **Resident** shall maintain the **Apartment** in a clean and sanitary condition at all times.

**C.**    when the **Resident** vacates the **Apartment** at the time of move-out, the **Apartment** shall be returned to the **Landlord** in as good condition as when it was rented.

**4.    UTILITY SERVICES**

**A.**    The **Landlord** shall pay for:

(The **Manager** shall initial, before this **Agreement** is signed, to indicate those services that are applicable):

| | | |
|---|---|---|
| Heat | _____ | Television Service: |
| Air Conditioning | _____ | Basic Cable _____ |
| Electricity | _____ | Satellite _____ |

**B.**    The **Resident** shall pay for any and all charges incurred for telephone services.

**5.    MEALS**

The **Landlord** shall provide _____ meal(s) daily in the dining room of the **Facility** to the **Resident**.  If "**Resident**" means two people who live in the **Apartment**, the meal(s) shall be per person.

**6.    HOUSEKEEPING**

The **Landlord** shall provide weekly housekeeping consisting of cleaning the **Apartment**, changing the bed and laundering linens and towels (if the **Landlord** provides them).  The **Landlord** is not responsible for laundry of linens owned by the **Resident**.  Additionally, the **Landlord** is not responsible for cleaning areas of the **Apartment** which require moving the **Resident's** personal property, which could be broken or damaged.

**7.    RIGHT OF ENTRY**

For the **Resident's** safety and comfort, the **Facility's** staff must be permitted to enter the **Apartment** to perform basic housekeeping services and other management functions, respond to emergencies, and make repairs and improvements, as the **Landlord** deems necessary or advisable.  Therefore, additional locks are not permitted on the entrance door to the **Apartment**.  Whenever feasible, the **Facility's** staff will give the **Resident** reasonable notice before entering the **Apartment** or such notice as is required by law.

The **Resident** has the right to place personal property and to install a personal telephone in the **Apartment**. The **Landlord** shall not be held liable for lost, stolen or damaged personal property, loss due to fire, windstorms or any other hazard, unless the loss of property is due to the **Landlord's** willful misconduct or negligence, or as required by law.

In the event the **Resident** chooses to wash personal laundry in the **Facility's** resident laundry, the **Landlord** will not be responsible for any damage to or loss of that laundry.

**The Facility carries Property and Casualty Insurance to protect its property and actions. Residents are responsible for maintaining insurance coverage to protect their personal belongings and actions.**

- I certify that I intend to obtain renter's insurance _____ **(Resident's** initials) _____ (date)
- I certify that I **do not** intend to obtain renter's insurance _____ **(Resident's** initials) _____ (date)

## 9.   TRANSFERS FROM THE APARTMENT

### A.   *Resident's Capacity for Residential Apartment Living*

The **Facility** consists of residential apartments with convenience services designed for persons who are capable of providing for their own health care and personal care needs. The **Facility** is not licensed to offer and does not offer assistance with medications, bathing, dressing, mobility needs, or other personal or health care activities. By signature of this **Agreement**, the **Resident** represents to the **Landlord** the capability of providing for health care and personal care needs and the provision for all such needs while residing at the **Facility**. If the **Resident** utilizes any private duty caregivers or companions while residing at the **Facility**, the **Resident** and the **Resident's** private duty personnel agree to comply with the **Facility's** applicable policies and guidelines and acknowledge the **Facility's** right to restrict access in the event of the **Landlord's** concern for the well-being and health or safety of other residents, employees or guests.

### B.   *Transfer Due to Care Needs*

If at any time the **Resident** becomes incapable of providing or fails to provide for health care or personal care needs, or if a physical or mental condition develops that creates a danger to self or others, the **Resident** agrees to promptly move out of the **Apartment** and into an appropriate outside accommodation of the **Resident's** choice. Any determination that the **Resident** is required to move for the reasons set forth in this paragraph shall be made in the sole judgment of the **Facility Manager**.

### C.   *Release from Responsibility for Resident's Care*

It is the **Resident's** responsibility to provide for health and personal care needs while residing at the **Facility**. The **Resident** hereby indemnifies, holds harmless and releases the **Landlord**, the **Facility**, Holiday Retirement Corp. and their directors, agents and employees, from any and all liability costs, and responsibility for injury and damage, including attorneys' fees, arising from the **Resident's** failure to obtain, or from the failure of others to furnish, appropriate health or personal care services, and from all injury and damage which could have been avoided or reduced if such services had been obtained or furnished.

## 10. ASSIGNMENT OR SUBLETTING

The **Resident** shall not let, sublet, assign or transfer all or any part of the **Apartment** without the prior written consent of the **Landlord**. The **Resident** agrees that the **Apartment** will not be occupied by any more than the number of persons indicated on page 1 of this **Agreement**. Any person or persons beyond this number who stay in the **Apartment** more than fourteen (14) days and/or nights in a calendar year must have the prior written permission of the **Landlord**.

## 11. NULLIFICATION OF AGREEMENT

This **Agreement** shall be void if the **Resident** or someone under the **Resident's** control seriously threatens or harms the **Landlord**, the **Manager**, other employees, guests or other residents of the **Facility**. Furthermore, this **Agreement** shall be nullified if the **Resident** intentionally damages the **Apartment**, apartments of other residents or any other area of the **Facility**. The **Landlord** shall give a written notice of eviction to take effect in 24 hours or at such greater time as is required by law. The **Landlord** shall then take possession of the **Apartment** in the manner provided by law.

## 12. TERMINATION OF AGREEMENT

**A.** If the **Resident** fails to pay the **Monthly Fee** or any other charges promptly when they are due, or if the **Resident** fails to comply with any of the terms or conditions of this **Agreement**, the **Landlord**, at the **Landlord's** option, while the default remains uncured, may terminate this **Agreement** at any time. The **Landlord** shall provide written notice of the intent to terminate this **Agreement**. The notice shall take effect immediately or when allowed by law.

**B.** This **Agreement** may be terminated by either party giving to the other at any time not less than thirty (30) days' notice (or such amount of time as is allowed by law) in writing prior to the date designated in the notice for termination of the occupancy. If the notice is given in accordance with the provisions indicated in the previous sentence, this **Agreement** shall terminate on the date designated, except that the provisions of Items No. **9C**, **11** and **13F** shall survive termination of this **Agreement**.

**C.** If the **Resident** chooses to keep the **Apartment** in such a manner that the **Landlord** determines the **Apartment** to be a potential fire and/or safety and/or health hazard, the **Landlord**, at the **Landlord's** option, may give notice to the **Resident** to terminate this **Agreement**. This notice shall take effect immediately or at such later time as may be required by law.

## 13. MISCELLANEOUS TERMS OF RESIDENCY

**A.** The **Landlord** authorizes the **Manager** to maintain this **Agreement** between the **Landlord** and the **Resident** and receive all of the **Resident's** notices and demands regarding the **Resident's** personal use of the **Apartment** on behalf of the **Landlord**.

**B.** The **Resident** certifies that at least one (1) person residing in the **Apartment** is fifty-five (55) years of age or older.

**C.** The **Resident** agrees to abide by the resident guidelines established, from time to time, by the **Landlord**.

**D.** The **Resident** shall occupy the **Apartment** only as a personal residence. The **Resident** and the **Resident's** guests shall conduct themselves in a manner that is peaceful and harmonious with that of the other residents of the **Facility**.

California - Revised 5/01/01

E.  In the event of a situation that the **Facility's** staff judges to be a possible medical emergency, by signing this **Agreement**, the **Resident** authorizes the **Facility** to take whatever steps are necessary to meet the **Resident's** emergency medical needs, including summoning emergency medical professionals.  Any costs incurred, even if the emergency medical services were ordered by the **Facility**, will be the **Resident's** sole responsibility.

F.  Either the **Landlord** or the **Resident** may bring a suit or an action to enforce any parts of this **Agreement** or vacate the **Apartment**.  The prevailing party may collect from the losing party, in addition to costs and necessary disbursements, reasonable attorney's fees and costs, at trial and upon any appeal, if allowed by law.

G.  The parties acknowledge and agree that this **Agreement** contains their entire understanding and agreement between them and that all other representations, assurances, and promises, either oral or written, not incorporated or contained herein, are void and of no force and effect.  If any term or provision of this **Agreement** shall to any extent be determined to be invalid, illegal or unenforceable, the remainder of this **Agreement** shall not be affected.  Each term of this **Agreement** shall be valid and enforceable to the fullest extent consistent with applicable law and this **Agreement** shall be interpreted and construed as though the invalid, illegal or unenforceable term or provision were not contained in this **Agreement**.

I/We have read, understand, and agree to the terms of the **Agreement** and understand that it is a complete expression of this **Agreement**.  I/We understand that there are no verbal promises or understandings pertaining to this contract other than those specified in this **Agreement**.  I/We agree that any amendments or modifications to this **Agreement** must be in writing and signed by the **Landlord** and me/us.  I/We acknowledge receiving copies of this **Agreement**, and of all addenda as listed in Item 2 on Page 1 of this **Agreement**.  I/We agree to abide by the terms and requirements that are presented therein.

**RESIDENT** NAME: _____ *Ruby Duncan* _____

**RESIDENT** SIGNATURE: _____

**RESIDENT** NAME: _____

**RESIDENT** SIGNATURE: _____

**LANDLORD:** _____

BY: _____
        **Manager**

*Holiday*
RETIREMENT CORP.

# Unit Billing

Facility Name __REDWOOD__                                    Facility # __5430__

Resident Name(s) __RUBY DUNCAN__                             Unit # __209__

| Move-In / Transfer-In | | | Move-Out / Transfer-Out | |
|---|---|---|---|---|
| Move-In Date | __6-5-2003__ | | Move-Out Date | _____ |
| Transfer-In Date | _____ | | Transfer-Out Date | _____ |
| # of Meals per day | __3__ | | | |

| | Market | Occupied | | | |
|---|---|---|---|---|---|
| Base Rent | $ __1695.00__ | $ __1695.00__ | Base Rent | $ _____ |
| 2nd Resident Rent | $ _____ | $ __—__ | 2nd Resident Rent | $ _____ |
| Parking Rent | $ _____ | $ __—__ | Parking Rent | $ _____ |
| Assisted Living | $ _____ | $ __—__ | Assisted Living | $ _____ |
| Other | | | Other | |
| | $ _____ | $ __—__ | | $ _____ |
| Other | | | Other | |
| _____ | $ _____ | $ __—__ | _____ | $ _____ |
| Total Occupied Rent | $ __1695.00__ (A) | | Total Occupied Rent | $ [        ] (A) |

| Move-In / Transfer-In | | Move-Out / Transfer-Out | |
|---|---|---|---|
| Daily Rate ("A" divided by "B") | $ __56.50__ (C) | Number of days in current month | _____ (B) |
| Number of days in current month | __30__ (B) | Daily Rate ("A" divided by "B") | $ _____ |
| Less: Days prior to move-in/transfer-in date *(Do not include actual move-in day)* | − __4__ (E) | Times: Number of days to charge *(Include actual move-out date)* | x _____ |
| Equals: Number of days to charge | = __26__ (D) *("B" minus "E")* | Equals: Prorated rent to collect | = [        ] |

| | | | |
|---|---|---|---|
| Prorated rent: ("C" multiplied by "D") | $ __1469.00__ | Less: Total Occupied Rent (A) | − _____ |
| Less: Money already paid | − __1695.00__ | | |
| Less: Other Credits (attach documents) | − __1469.00__ | Equals Rent Adjustment | = $ _____ |
| Plus: Security Deposit | + __847.50__ | | |
| Plus: Non-Refundable Fee | + __847.50__ | | |
| Plus: Prorated rent from transfer out | + __—__ | | |
| Balance to collect: | = $ [ __∅__ ] | | |

AR-2   Rev. 5/01

## Addendum I to Rental Agreement – Rental Incentive

**Facility #** *5430*    **Facility** Name *REDWOOD*    **Apartment #** *209*

The **Resident** and the **Landlord** have entered into an **Agreement** to which this non-renewable **Addendum** is attached. The following special arrangements are hereby made a part of the **Agreement** and are valid only at time of original move-in.

This Rental Incentive grants you a Total Savings of $*1469.00*, which will be realized within the first six months of this **Agreement** as explained below.

Effective from *06/05/03* through *06/30/03* (specify exact time period).

Incentive to reduce the **Monthly Fee** as follows:

| Month of Incentive | Amount | Description of Incentive |
|---|---|---|
| 1. *June 2003* | $ *1469.00* | *Move in incentive to move in* |
| 2. | $ | *from competitor* |
| 3. | $ | |
| 4. | $ | |
| 5. | $ | |
| 6. | $ | |
| Total Savings | $ | |

At the end of the time period shown above, the **Monthly Fee** will revert to the amount shown on page 1 of the **Rental Agreement**.

### *The information above constitutes the full extent of this Addendum.*

DATED this *5TH* day of *June* , *2003*

**LANDLORD:** *REDWOOD*    **RESIDENT** NAME: *RUBY DUNCAN*

BY: *Joe Cel*
          **Manager**    **RESIDENT** SIGNATURE: _____

**RESIDENT** NAME: _____

**RESIDENT** SIGNATURE: _____

## California Addendum SF to Rental Agreement — Signing Fee

The **Resident** and the **Landlord** have entered into the **Agreement** in which a Signing Fee (the "**Fee**") described in this addendum (this "**Addendum**") is attached. Terms defined in the **Agreement** have the same meanings in this **Addendum**.

The **Landlord** and the **Resident** mutually agree, the **Resident** shall pay a one-time, non-refundable **Fee** of $ _847.50_ which equals one-half (1/2) of one month's base rent for **Apartment #** _209_ .

### *This one-time Fee is non-refundable except as noted below.*

In an effort to guarantee our Residents' satisfaction, if the **Resident** lives at the facility 90 days or less, the **Fee** will be returned to the **Resident** based on the following schedule:

> 100% refund for 1 to 30 days of occupancy
> 66% refund for 31 to 60 days of occupancy
> 33% refund for 61 to 90 days of occupancy
> 0% refund for 91+ days of occupancy

### *The information above constitutes the full extent of this Addendum.*

DATED this _5TH_ day of _June_ , _2003_ .

LANDLORD: _Redwood_

BY: _Joel Coll_
       **Manager**

RESIDENT NAME: _Ruby Duncan_

RESIDENT SIGNATURE: _____

RESIDENT NAME: _____

RESIDENT SIGNATURE: _____



4-5-07

Dear: Bill Nye

We do not wish to place an undue burden on you or your family, but sometimes it becomes necessary to make a difficult decision. Therefore, it is with great difficulty that we write this letter to you.

We want you to live with dignity and respect in an atmosphere where you may be happy, safe and comfortable. However, we believe the time has come whereby we can no longer meet your needs.

It is for these reasons that we find it necessary to ask you to arrange to relocate, and are submitting to you the attached 30 day notice to vacate your apartment. Please arrange to relocate by Sunday May 6, 2007

If we may be of any assistance, please let us know.

Sincerely,

Redwood Retirement Residence

David & Denise Hall
Managers

Cc: Celestia



**Redwood**
*Gracious Retirement Living*

## 30-DAY NOTICE TO TERMINATE TENANCY

To: Bill Nye
CC: Celestia Amberstone

NOTICE IS HEREBY GIVEN that your month-to-month tenancy of the hereinafter described premises is terminated as of the date thirty (30) days after the service of this NOTICE upon you and that you are required to quit and surrender possession thereof to the undersigned on or before the date thirty (30) days after the service of this NOTICE upon you.

The premises, of which you are required to surrender possession of, are commonly known as 2350 Redwood Road Apt# 303, Napa, CA 94558.

This is intended as a thirty (30) day legal notice for the purpose of terminating your tenancy in accordance with California Civil Code section 1946.

DATED: 4-5-07          Owner: Redwood Retirement

                       By: David & Denise Hall

                       Its: Managers

2350 Redwood Road • Napa CA 94558 • (707) 257-0333

Exhibit 3



4-5-07

Bill Nye Incident Notes Summary

1) Increased incidents of agitation especially with staff in the dining room.
2) Frequently wanders halls both in the daytime and at night. He has been seen attempting to open the doors of other residents.
3) Urinates on the public restroom floor frequently. Three times this month alone.
4) Several incidents of Bill eating his meal, forgetting he ate it, and demanding another meal after meal service is completed.
5) Frequently enters the office asking what time it is. Example; Bill walked into the office today at 4pm and asked what time breakfast was being served. He demonstrates no concept of time.
6) Sleeps in the dining room.
7) Several incidents of bleeding in the dining room due to overly aggressive shaving.

It is for these reasons and many others that Redwood management feels that Bill is no longer defined as independent living eligible.



Exhibit 4





# Make your move before April 15th, and receive
## 1/2 off your first and second month's rent!

- Beautiful, spacious suites
- Resident managers are here for you day and night
- Delicious gourmet meals served three times each day
- Weekly housekeeping and linen service
- Convenient, scheduled local transportation
- Diverse activities and outings
- Safety call system
- All utilities, except phone
- Barber/beauty salon
- So much more!

**Call today for more information on Napa's best choice for an active, independent retirement lifestyle!**

EQUAL HOUSING OPPORTUNITY



**THE SPRINGS OF NAPA**

*Gracious Retirement Living*

### 707-224-7855

**3460 Villa Lane • Napa, CA 94558**
*www.thespringsofnapa.com*





**Redwood**

*Gracious Retirement Living*

### 707-257-0333

**2350 Redwood Rd. • Napa, CA 94558**
*www.redwoodretirement.com*

© 2007 HOLIDAY RETIREMENT CORP. 0204

**[¶16,305]** Niederhauser v. Independence Square Housing, No. C 96-20504 RMW, (N.D. Cal. 8-27-98)

(1) Disabled tenants may have standing to challenge an apartment complex's rules and policies even though they have not yet suffered damages if they are threatened with injury that is about to occur.

(2) A Section 202 housing project may tailor itself to persons in one or more categories of disabilities but it may not discriminate against a person solely because the person falls into another category of disability in addition to the category for which the complex was intended.

(3) Landlords of a Section 202 project may inquire about an applicant's disabilities to determine whether the appliant meets the qualifications for entering, but must use the least invasive means necessary to make their inquiries; they may not inquire into the nature and extent of an applicant's disabilities beyond what is necessary to determine eligibility for the housing.

Plaintiffs' motion for summary adjudication was submitted on the papers. The court has read the moving and responding papers.[1] For the reasons set forth below, the court grants in part and denies in part plaintiffs' motion for summary adjudication.

## I. BACKGROUND

Plaintiffs Sydney and Rhoda Niederhauser bring this action against Independence Square Housing Corporation ("ISHC"), Doris Harbert, and Judith Sargent alleging violations of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3600 et seq. ("FHAA"), section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and corresponding provisions of California state law, Government Code sections 12900 et. seq., Civil Code sections 51 et, seq., and Civil Code section 54.1. They also seek relief under California Civil Code sections 789.3(b)(1) and 1942.5(c) for defendants' alleged interference with their tenants' rights.

In the current motion plaintiffs seek injunctive and declaratory relief on their first, second and fifth through eighth claims. Specifically, they claim they are entitled to summary adjudication that the written occupancy policies used by defendants from 1993 through the present have violated and continue to violate the above-identified federal and state laws prohibiting disability discrimination. Plaintiffs also seek summary adjudication that the policy involving confiscation of tenants' card keys has violated and continues to violate their tenancy occupancy rights.

Defendant ISHC is a private non-profit corporation which receives federal monetary assistance from the U.S. Department of Housing and Urban Development ("HUD"). ISHC owns and operates Independence Square ("IS"), a 100-unit apartment complex providing low income housing to elderly and disabled families. IS was designed and architecturally modified to support a population of physically disabled and elderly adult tenants. Defendant Judith Sargent is the general manager of IS. Defendant Doris Harbert was a tenant consultant to the general manager from January 1, 1989 through February 1997.

Plaintiffs contend that IS is a "dwelling" covered by the FHAA and the Rehabilitation Act and that ISHC is a "program or activity" receiving federal financial assistance within the meaning of section 504 of the Rehabilitation Act. Defendants, on the other hand, contend that IS is not a "standard apartment complex, undeniably subject to the broad, anti-discrimination laws, imposed by the FHAA." Opposition at 2. Defendants contend that IS is a Section 202 project, "specifically designed and permitted by law to serve the physically handicapped and elderly." Id.; see also 12 U.S.C. § 1701q(a)(1).

The Niederhausers are a married, elderly couple who have been tenants of IS, a federally subsidized housing complex, since 1979. The Niederhausers are each over 70 years of age and both disabled due to cerebral palsy which affects their abilities to speak, walk, and carry out daily living activities. On May 1, 1979, plaintiffs executed a rental agreement providing for a one-year lease of a two-bedroom apartment at IS and for federal rent subsidization under Section 8 of the United States Housing Act of 1937. This rental agreement was renewed

---

[1] The court did consider the supplemental papers filed by defendants which included excerpts from the deposition of Sydney Niederhauser and a copy of the opinion in *Cooper v. St. Martin Manor Inc.*, 1998 U.S. Dist. LEXIS 1114 (E.D. LA 1998). The court, however, agrees with plaintiffs that the deposition excerpts are largely irrelevant to the instant motion and that the *Cooper* decision adds nothing to the law previously cited to the court.

Δ © 1998 Aspen Law & Business

Exhibit 5

16,305.2          **Federal Court Decisions**          11-1-98

by ISHC each year through 1993. In March 1993, Mr. Niederhauser was admitted to Watsonville Community Hospital for surgery. In late July 1993, ISHC transferred Mrs. Niederhauser from the two-bedroom apartment to a one-bedroom apartment at IS. On May 27, 1996, Mr. Niederhauser returned to IS to reside with his wife in the one bedroom apartment, where they currently reside.

## A. ISHC's TENANCY POLICIES 1985–1997

Plaintiffs claim that a number of ISHC's tenancy policies in effect from January 1, 1985 to August 1, 1997 and embodied in the Rental Agreement, Qualifications for Tenancy, and Occupancy Rules and Regulations were illegal. According to plaintiffs, the offending policies were given to tenants at IS when their lease agreements were executed. The Qualifications for Tenancy required that IS tenants must (1) "be capable of tending to their needs independently and be able to transfer, bathe, cook and feed themselves;" (2) "be able to be self-sufficient mentally and emotionally and be able to conduct their own affairs, such as paying their own rent, hiring and terminating, if necessary, and supervising their own chore worker;" and (3) "demonstrate and have a successful history of living independently on their own, without an attendant or 'relative' care." In 1989, ISHC modified its tenancy eligibility policies requiring that an "applicant must be able to live independently if disabled, commensurate with the use of our special architecture and environment features."

In January 1996, ISHC questioned Mrs. Niederhauser's ability to meet ISHC's tenancy requirements. While Mrs. Niederhauser was recuperating from arm surgery, ISHC's attorney sent her a reminder that IS residents must be self-sufficient. On March 21, 1996, ISHC's attorney also wrote Mrs. Niederhauser a letter indicating that her husband did not appear to meet the minimum tenancy requirements since "he is not self-sufficient [and] does not have a successful history of living independently on his own." In April 1996, ISHC's attorney further informed Mrs. Niederhauser that IS would not accept her husband as an occupant and suggested that they seek another residence.

Despite these letters, Mr. Niederhauser moved back into IS on May 27, 1996. On June 8, 1996, ISHC management allegedly asked Mr. Niederhauser to demonstrate that he could transfer to and from his wheelchair without help and could live independently including tending to his own bathroom needs. Harbert and Sargent were satisfied that Mr. Niederhauser met the eligibility requirements and offered plaintiffs a downstairs apartment with a fully accessible kitchen and shower. However, Harbert and Sargent received a letter from the Niederhausers' attorney rejecting their offer and requesting that they no longer talk to plaintiffs.

Although no showing has been made that ISHC's tenant application procedures were actually applied to the Niederhausers, plaintiffs complain about them. They contend that prospective tenants were required to sign an Authorization of Release of Medical Information which IS would forward to the prospective tenant's physician to obtain his or her medical information. Applicants were also asked to complete a Physical Disability Inventory containing detailed inquiries into health histories and needs, medications, personal care arrangements and their ability to perform daily living activities. IS apparently relied on this information in its decisions to accept or reject applicants.

Defendants contend that the written policies during this period did not reflect ISHC's actual practices at IS. They say that ISHC's policies changed as they became aware of various changes in the regulations promulgated by HUD. Defendants also contend that according to HUD, ISHC's rules were satisfactory as late as May 1996. Sargent Decl. ¶ 7, Ex. D. Defendants also contend that notwithstanding their written policies, IS has allowed live-in aides in appropriate circumstances.[2]

## B. ISHC's TENANCY POLICIES 1997–PRESENT

On August 1, 1997, ISHC adopted new tenancy policies. Plaintiffs contend that ISHC's new policies suffer from the same problems that the earlier version had. Among other provisions, plaintiffs challenge ISHC's so-called Statement of Purpose providing that IS

does not . . . accept or retain residents who demonstrate any level of need for care and supervision services (beyond those 'based on a licensed physician's certification provided by the tenant family, to be essential to their care or well-being,'. . . . A person may be considered **Capable of Fulfilling the Lease Requirements** (free from the need for licensed residential care) if that person can meet all their needs, can fulfill the lease agreement or has pro-

---

[2] Although defendants cite the entire Sargent Declaration, nothing in that declaration supports this factual proposition.

Case 3:07-cv-03652-PJH    Document 9-3    Filed 08/02/2007    Page 16 of 36

vided for any assistance necessary for all of the following activities:

> Household, meal preparation and clean-up, laundry, taking of medications, money management, appropriate transportation, correspondence, telephoning, dressing, feeding, toiletting, bathing, transferring, planning, and decision making.

Molina Decl. ¶ 4, Ex. 3.

Plaintiffs also contend that in order to determine eligibility requirements, ISHC continues to inquire into the nature and extent of applicants' disabilities and requires tenants to voluntarily terminate their tenancy if they have progressively deteriorating diseases. Plaintiffs further argue that ISHC's policy of excluding tenants with developmental disabilities or persons requiring 24-hour care violates the FHAA.

### C. KEY CARD CONFISCATION POLICY

ISHC's Tenancy Rules and Regulations provided from January 1985 through August 1, 1997 that a tenant's key card, providing entry through the front gate and side entrances, would be confiscated if the key card were used by anyone other than an IS tenant. The Niederhausers contend that on June 4, 1996 ISHC confiscated their key card as they entered IS because Diane Tanner, a friend of theirs, actually used the card to help them enter the complex. Defendants point out that plaintiffs' keycard was ultimately returned. Plaintiffs also state that under new policies, a tenant's key card will be not be confiscated when used by a non-tenant, unless the non-tenant is assisting the non-tenant in entering or leaving the building. Defendants point out, however, that confiscation of a key card does not preclude access to IS. Rather, tenants without key cards are buzzed in from the front desk at any time of day or night.

### II. LEGAL STANDARDS FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF

#### A. SUMMARY JUDGMENT

Summary judgment is proper if the record indicates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. § 56(c). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 106 S. Ct. 2505, 2510 (1986). The nonmoving party must reference specific facts to create a triable issue of fact. *T.W. Elec. Serv. v.*

*Pacific Elec. Contractors,* 809 F.2d 626, 630 (9th Cir. 1987). The court views all evidence in a light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.,* 111 S. Ct. 2419, 2434–35 (1991). However, "the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 106 S. Ct. at 2512. Credibility determinations, weighing evidence, and drawing inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 106 S. Ct. at 2513. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in its favor. *Id.*

### B. INJUNCTIVE RELIEF

In a civil action under subsection (a) of [42 U.S.C. § 3613], if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action, as may be appropriate).

42 U.S.C. § 3613(c)(1).

"So when a plaintiff alleges that the defendants have engaged in a prohibited discriminatory practice, all that is needed to support an injunction is proof that the practice exists." *Topic v. Circle Realty Co.,* 377 F. Supp. 111, 114 (C.D. Cal. 1574) *rev'd on other grounds,* 532 F.2d 1273 (9th Cir. 1975), *cert. denied,* 429 U.S. 859 (1976). "[I]rreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes." *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir. 1984).

### III. ANALYSIS

#### A. STANDING

Defendants contend that the Niederhausers lack standing to obtain injunctive relief since they have never been denied tenancy at IS and continue to live there even now. Defendants also contend that ISHC's current tenancy rules comply with HUD regulations and all relevant discrimination laws. However, the court finds that plaintiffs do have standing since they are threatened by the very tenancy rules and

**¶16,305**

policies which are at issue in this case. *See* 42 U.S.C. § 3602(i) (" 'Aggrieved person' includes any person who — (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur.")

## B. DISCRIMINATION LAWS RELEVANT TO SECTION 202 HOUSING PROJECT

Defendants submit that IS, as a Section 202 Housing Project specifically designed to accommodate the physically disabled and elderly, is subject to more relaxed standards relating to discrimination laws and regulations. Defendants also argue that a Section 202 Project can tailor itself to persons within one category of HUD's regulations, while excluding others. Finally, defendants contend that HUD regulations permit IS to inquire into an applicant's medical history to the extent necessary to determine eligibility.

### 1. *Relevant Discrimination Laws*

#### a. *Fair Housing Amendment Act*

The FHAA proscribes discrimination "in the sale or rental of a dwelling to any buyer or renter" because of a handicap. 42 U.S.C. § 3604(f)(1). The FHAA also prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" based on that person's disability. 42 U.S.C. § 3604(f)(2). Occupancy conditions and rules incorporated into a tenant's rental agreement are terms or conditions of rental within the meaning of section 3604(f)(2). *See Samuelson v. Mid-Atlantic Realty Co., Inc.,* 947 F. Supp. 756, 761 (D. Del. 1996).

#### b. *Section 504 of the Rehabilitation Act*

No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a).

#### c. *Requirements of Section 202 Housing Projects*

A Section 202 Housing Project may actually discriminate based on age or disability but only in a manner otherwise consistent with the FHAA and the Rehabilitation Act. Thus, a Section 202 Housing Project may tailor itself to

persons in one or more of the following Section 202 categories: elderly, developmentally disabled, chronically mentally ill, or physically handicapped and exclude those persons not falling within the selected category or categories. *See Knutzen v. Eben Ezer Lutheran Housing Center,* 815 F.2d 1343, 1349, 1353 (10th Cir. 1987); *Brecker v. Queens B'nai B'rith Housing Development Fund Co.,* 798 F.2d 52, 56 (2d Cir. 1986). However, a Section 202 Project intended for persons who are elderly or have physical disabilities, for example, may not deny housing to an elderly person *solely* because that person is developmentally disabled as well. *See U.S. v. Forest Dale, Inc.,* 818 F. Supp. 954, 963–65 (N.D. Tex. 1993); *see also Knutzen,* 815 F.2d at 1353 n. 9. In that circumstance, it appears that the Section 202 Project, like any other program receiving federal funds, is required to determine whether it could reasonably accommodate that applicant. *See* 42 U.S.C. § 3604(f)(3); *see generally U.S. v. California Mobile Home Park Management Co.,* 29 F.3d 1413, 1416–18 (9th Cir. 1994) (failure to make reasonable accommodations in rules or policies violates the FHAA).

### 2. *Permissible Inquiries to Prospective Tenants*

Section 202 Housing Projects must comply with certain restrictions on the nature and extent of inquiries to housing applicants.

It shall be unlawful to make an inquiry to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is so sold, rented or made available, or any person associated with that person, has a handicap or to make inquiry as to the nature or severity of a handicap of such a person. However, this paragraph does not prohibit the following inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps:

(1) Inquiry into an applicant's ability to meet the requirements of ownership or tenancy;

(2) Inquiry to determine whether an applicant is qualified for a dwelling available only to persons with handicaps or to persons with a particular type of handicap.

24 C.F.R. § 100.202(c).

However, Section 202 Projects are required to verify information provided by an applicant for housing.

(a) General. Adequate procedures must be developed to obtain and verify

information with respect to each applicant. . . .

(b) *Suggested sources of information.* Sources of information may include, but are not limited to, the applicant (by means of interviews or home visits), landlords, employers, family social workers, parole officers, court records, drug treatment centers, clinics, physicians or police departments where warranted by the particular circumstances.

24 C.F.R. § 960.206.

The legislative history of the FHAA makes clear that a dwelling need not be made available to an individual "whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9). However,

[42 U.S.C. § 3604(f)(9)] is not intended to give landlords and owners the right to ask prospective tenants and buyers blanket questions about the individuals' [sic] disabilities. Under Section 504 of the Rehabilitation Act, employers may not inquire, as part of pre-employment inquiries, whether an applicant is a handicapped person or as to the nature or severity of the handicap. Employers may only make pre-employment inquiries into an applicant's ability to perform job-related functions. Similarly, under this provision, only an inquiry into a prospective tenant's ability to meet tenancy requirements would be justified. Thus, in assessing an application for tenancy, a landlord or owner may ask an individual the questions that he or she asks of all other applicants that relate directly to the tenancy (e.g., questions relating to rental history or a targeted inquiry as to whether the individual has engaged in acts that would pose a direct threat to the health or safety of other tenants), but may not ask blanket questions with regard to whether the individual has a disability. Nor may the landlord or owner ask the applicant or tenant questions which would require the applicant or tenant to waive his right to confidentiality concerning his medical condition or history. The only exception is that a landlord or owner may ask whether the individual is a current illegal abuser or addict of controlled substances.

H.R. Rep. No. 100-711, at 30 (1988), reprinted in 1988 U.S.C.C.A.N. 1762, 2191.

In summary, landlords of a Section 202 Project may make inquiries about an applicant's disabilities to determine whether an applicant meets its qualifications for tenancy. 24 C.F.R. § 100.202(c)(2). Information may also be sought to verify an applicant's purported qualifications. However, the legislative history of the FHAA and the HUD regulations show that an applicant's privacy rights are to be preserved to the extent possible and that a landlord should use the least invasive means necessary to verify an applicant's qualifications. *See* H. Rep. No. 100-711 at 30 ("Nor may the landlord or owner ask the applicant or tenant questions which would require the applicant or tenant to waive his right to confidentiality concerning his medical condition or history."); 24 C.F.R. § 960.206(b) ("Sources of information may include, but are not limited to, the applicant (by means of interviews or home visits), landlords, employers, family social workers, parole officers, court records, drug treatment centers, clinics, physicians or police departments *where warranted by the particular circumstances*.") (emphasis added).

Although a landlord may make necessary inquiries to determine an applicant's qualifications for tenancy, the landlord may not inquire into the nature and extent of an applicant's or tenant's disabilities beyond that necessary to determine eligibility. For example, if an applicant applies for tenancy at a Section 202 Project intended for the elderly, the applicant may be asked whether that person meets the minimum age requirement and whether that person is otherwise qualified for tenancy; e.g., ability to pay rent. However, it does not appear that the applicant can be asked if he or she can live independently since this is not an eligibility criterion. *See Cason v. Rochester Housing Authority,* 748 F. Supp. 1002, 1008–09 (W.D.N.Y. 1990).[3]

### 3. *Discriminatory Notices*

Regardless of a landlord's actual policies or practices, the FHAA prohibits the publication of written policies which indicate disability-based discrimination. More precisely, the FHAA deems it unlawful to

make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color,

---

[3] Even though *Cason* did not involve a Section 202 Housing Project, the court finds its reasoning persuasive since Section 202 Housing Projects are still subject to the requirements of the FHAA, the Rehabilitation Act and HUD's regulations.

△ © 1998 Aspen Law & Business       

religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

## C. ISHC's PAST AND CURRENT TENANCY RULES AND POLICIES

Plaintiffs claim that the written occupancy policies used by defendants from 1993 through the present have violated and continue to violate the FHAA, and in particular, 42 U.S.C. §§ 3604(c) and 3604(f), and section 504 of the Rehabilitation Act.

### 1. ISHC's Tenancy Rules 1985–1997

Plaintiffs identify a number of ISHC's pre-1997 written policies as violative of federal law. In particular, plaintiffs challenge ISHC's occupancy criteria requiring that tenants be able to meet their personal care, financial, and other needs independently, without outside assistance. *See* Molina Decl. Ex. 3 (Sargent Depo. Ex. 63 at 2). Plaintiffs argue that complete self-sufficiency and independence are not requirements which a landlord may impose. Further, inquiring into the nature and severity of disabilities of tenants and applicants is too intrusive and goes beyond what is required to determine eligibility at IS. Plaintiffs also argue that ISHC's policy of excluding the developmentally disabled violates the FHAA. Lastly, plaintiffs attack ISHC's policy that tenants with "progressively deteriorating diseases or conditions which will eventually prevent them from complying with all qualifications for tenancy must authorize, in writing, that they will voluntarily terminate their tenancy at [IS] if their physical and/or mental condition renders them unable to meet tenancy qualifications." *See* Molina Decl. Ex. 3 (Sargent Depo. Ex. 59).

Defendants do not directly respond to plaintiffs' contentions and appear not to contest that the above-cited written policies violated the FHAA and the Rehabilitation Act. Rather, defendants explain that those policies were changed in August 1997. Defendants also argue that, although the written policies may have violated federal discrimination laws, the actual practices and policies at IS did comply with then applicable legal requirements. Opposition at 2–3. In support of this contention, defendants point out that the Niederhausers have never been denied tenancy at IS. However, defen-

dants' arguments do not address the language of 42 U.S.C. § 3604(c) which prohibits the publication of discriminatory notices and policies. Further, plaintiffs faced the threat of application of the policies. Accordingly, defendants fail to raise a triable issue of fact as to whether ISHC's pre-1997 written policies violated 42 U.S.C. § 3604(c) and the Rehabilitation Act. The court, therefore, grants plaintiffs' motion for summary adjudication to the extent that plaintiffs seek a declaration that the above-identified ISHC policies violated federal law and an injunction prohibiting their enforcement.[4]

### 2. ISHC's Present Policies

Plaintiffs challenge ISHC's current Statement of Purpose in its Tenant Selection Plan as being discriminatory. The allegedly discriminatory portion of the Statement of Purpose provides that IS "does not . . . accept or retain residents who demonstrate any level of need for care and supervision services (beyond those 'based on a licensed physician's certifications provided by the tenant family, to be essential to their care or well-being,')."[5]

*See* Molina Decl. Ex. 3 (Sargent Depo. Ex. 58, Tenant Selection Plan at 7). Plaintiffs argue that tenants with disabilities may not be restricted from receiving home care. Plaintiffs also assert that a landlord may not require a physician's certification as a condition to a tenant's receiving assistance at home. Although plaintiffs cite no authority for these specific propositions, defendants do not appear to disagree.

Plaintiffs also challenge ISHC's lease requirements that a tenant meet all needs, either independently or through any assistance necessary for all the following activities:

Household, meal preparation and clean-up, laundry, taking of medications, money management, appropriate transportation, correspondence, telephoning, dressing, feeding, toiletting, bathing, transferring, planning, and decision making.

*See* Molina Decl. Ex. 3 (Sargent Depo, Ex. 58, Tenant Selection Plan at 7). Plaintiffs argue that requiring IS applicants to certify that they can meet these requirements is based on "false and overprotective assumptions" and, therefore, is discriminatory.

Defendants assert that these inquiries are merely designed to ascertain whether a particular applicant is developmentally disabled and are proper since IS is not required

---

[4] The court, however, makes no determination as to whether the Niederhausers suffered injury as a result of any discriminatory publication. Declaratory and injunctive relief are appropriate because of the publication and threat of application.

[5] The court finds this statement of purpose ambiguous.

to and, indeed, excludes applicants with developmental disabilities. Plaintiffs respond that any inquiries into tenants' and applicants' personal lives, including hygiene, personal care, and medical needs are improper because defendants are not permitted to exclude people with developmental disabilities who otherwise meet IS's eligibility requirements.

As discussed above, ISHC is allowed to make inquiries of an applicant or tenant only to the extent necessary to determine whether that person qualifies for tenancy at IS. *See* 24 C.F.R. § 100.202(c); *Cason v. Rochester Housing Authority,* 748 F. Supp. 1002, 1008–09 (W.D.N.Y. 1990).[6] It follows that ISHC's policies of inquiring into the ability of an applicant or tenant to meet his or her personal needs, including such detailed inquiries as personal hygiene and toiletting practices, violates the FHAA. As defendants admit, these inquiries are designed to determine whether an applicant or tenant is developmentally disabled. The two eligibility categories at IS are the "elderly" and "physically disabled." Therefore, limited inquiries sufficient to determine whether an applicant or tenant qualifies as elderly or physically disabled are proper. *See* 24 C. F.R. § 100.202(c)(2).[7] However, if an applicant is "otherwise qualified," i.e. elderly or physically handicapped, whether that same applicant is also developmentally disabled is irrelevant to eligibility status. Indeed, if an applicant is otherwise qualified, ISHC may not deny him or her an available space simply because that applicant is also developmentally disabled. *See U.S. v. Forest Dale Inc.,* 818 F. Supp. at 963–65; *See also Knutzen,* 815 F.2d at 1353 n.9. Therefore, ISHC's policy that tenants certify that they can meet their personal needs appears to contravene 24 C.F.R. § 100.202 and federal discrimination laws. Defendants' arguments to the effect that IS does not have the capability to meet the needs of the developmentally disabled appears to be based on "generalized perceptions about disabilities and unfounded speculations." *See Cason,* 748 F. Supp. at 1009 (citations omitted). IS does not have, however, any obligation to provide special services for developmentally disabled tenants.[8] Plaintiffs are entitled to summary adjudication to the extent that

plaintiffs seek a declaration that the above-identified ISHC policies violate federal law and an injunction prohibiting their enforcement.

## D. CALIFORNIA DISABILITY DISCRIMINATION LAW

The California Fair Employment and Housing Act contains a provision which is substantially similar to 42 U.S.C. § 3604(c). *See* Cal. Gov. Code § 12955(c). *See also* Cal. Civ. Code §§ 51 *et seq.* and 54. Therefore, the court finds that ISHC's past and present written tenancy rules and policies identified above also violate California law.

## E. INTERFERENCE WITH OCCUPANCY RIGHTS

Plaintiffs argue that ISHC's application of its key card policy to plaintiffs interfered with their occupancy rights and were retaliatory. *See* Cal. Civ. Code §§ 789.3 and 1945.2(c). The covenant of quiet enjoyment and possession is implied into residential leases. Cal. Civ. Code § 1927. The covenant of quiet enjoyment is breached when there is a substantial and material interference with a tenant's beneficial use and enjoyment of the premises. *Lee v. Placer Title Co.,* 28 Cal. App. 4th 503, 512 (1994). For example, the covenant is breached when a landlord interferes with the tenant's right of ingress and egress. *Donoghue v. Kremmel,* 121 Cal. App. 208, 211 (1932).

Defendants contend that the application of the key card policy does not wrongfully interfere with a tenant's occupancy rights since tenants without key cards may be buzzed in by IS's 24-hour staff stationed at the front door. Sargent Decl. ¶ 6. Defendants also point out that the Niederhausers' key card was returned to them within two days of its confiscation. Sydney Niederhauser Decl. ¶ 11. Although plaintiffs argue that they were restricted from using the two side entrances and that the 24-hour staff was not always immediately present at the door, defendants cite evidence sufficient to create a triable issue of fact as to whether defendants wrongfully interfered with the Niederhausers right of ingress and egress.

Therefore, the court denies plaintiffs'

---

[6] In addition, IS's Section 202 status does not appear to entirely relieve it of the more general proscription of 24 C.F.R. § 100.202(c) rendering unlawful the practice of making "an inquiry to determine whether an applicant . . . has a handicap or [an] inquiry as to the nature or severity of [the] handicap."

[7] Inquiry that is directed to all applicants and limited to determining whether their tenancy would pose "a direct threat to the health or safety of other individuals or . . . would result in substantial physical damage to the property of others" would also appear to be appropriate. 42 U.S.C. § 3604(f)(9).

[8] Nothing in this opinion should be construed as prohibiting defendants from making reasonable inquiry or requesting specific medical documentation to verify the severity of a disability of a person seeking a reasonable accommodation.

∆ © 1998 Aspen Law & Business

motion for summary adjudication on plaintiffs' claim for interference with occupancy rights and retaliation.

## IV. ORDER

In light of the foregoing, the court grants plaintiffs' motion for summary adjudication in part and declares:

Defendant Independence Housing Square Corporation, Inc.'s ("IHSC's") tenancy policies and rules, in effect from 1985 through August 1, 1997, and those tenancy policies and rules effective since August 1, 1997, unlawfully discriminate on the basis of disability insofar as they call for inquiries into the nature and severity of the disabilities of prospective tenants which are unrelated to eligibility requirements for tenancy in Independence Square ("IS") and require the disclosure of confidential personal and medical information. Defendants may ask questions to determine if the prospective tenants fall within one of the groups IS was set up to serve, specifically the elderly or people with physical disabilities; may inform applicants who fall within one of these two eligible groups that IS does not provide personal care services to meet the needs of people with severe physical disabilities or people who have other disabilities (e.g., developmental or psychiatric disabilities); may inquire to determine the extent of disability of one seeking a reasonable accommodation because of their disability; and give priority for accessible units at IS to people with mobility impairments. IHSC may also ask questions limited to determining whether a prospective tenancy would pose a direct threat to the health or safety of other individuals or would result in substantial physical damage to the property of others. IHSC may not, however, otherwise inquire into the nature and severity of applicants' disabilities to determine if they need services IS is not required to provide; prohibit tenants from arranging for and receiving those services in their apartments; or deny tenancy to people because they need such services so long as they are either elderly or have a physical disability.

The court also issues a permanent injunction against defendants, their officers, agents, servants, employees, attorneys, and those in active concert or participation with them who receive actual notice of this order by personal service or otherwise, restraining them from that conduct prohibited in the preceding paragraph and from establishing, publishing, or applying policies or practices that:

(1) request or require the disclosure of confidential personal or medical information or the nature and extent of disability except as necessary to determine whether a person falls within one of the groups IS was set up to serve, to determine the extent of disability of one seeking a reasonable accommodation because of his or her disability, to decide whether to give priority for an accessible unit to a person with mobility impairments, or to determine whether a prospective tenancy would pose a direct threat to the health or safety of other individuals or would result in substantial physical damage to the property of others;

(2) exclude from tenancy persons, otherwise qualified for tenancy at IS, who require the assistance of others, including attendants, to meet their personal care needs.

Except as set forth above in this section IV, plaintiffs' motion is denied.

DATED: 8/25/98

RONALD M. WHYTE

United States District Judge

# REDWOOD MEAL TRAY POLICY

Many of you have asked about the guidelines for meal tray service to apartments. To help you understand more clearly, I will explain our guidelines that have recently changed. While explaining, please keep in mind that the Redwood is a retirement community designed for active and independent seniors. In accordance with our facility status, the following changes relating to meal tray service will take effect January 1, 2007.

1. All meal tray requests must be submitted at least one hour before meals to an **On-Duty Redwood Manager**.

2. With few exceptions, meal trays will be permitted only for residents who are temporarily ill or who are rehabilitating and cannot come to the dining room due to their short-term condition where full or near full recovery is expected.

3. Per existing Holiday policy, management will initially deliver meal trays to ill or rehabilitating residents for a period no longer than 3 days in order to assess their condition.

4. If the illness or rehabilitation lasts longer than 3 days, the resident will need to develop an acceptable meal tray delivery option; i.e. caregiver, family or friend.

5. If the temporary illness or rehabilitation lasts longer than 3 days, the Redwood will charge the resident a $5.00 a meal tray preparation fee commencing on the 4th day trays are being delivered to the resident.

6. Residents who are not ill or rehabilitating, who are able to come to the dining room but choose not to, will need to develop alternative options for meals if they elect to eat meals in their apartments.

I hope this explains our meal tray service. If you have any questions, please do not hesitate to contact a Redwood manager.

Thank You,

Redwood Management

Exhibit 6



## Redwood
### Gracious Retirement Living

October 28, 2006

Tom Thornton
1505 Stockton Street
St Helena, CA 94 574

Dear Tom Thornton,

Please call me immediately. After careful consideration, Redwood management has decided that it is best to provide Bernice with a thirty day notice to find other accommodations, effective the date of this letter.

This decision is entirely based on Bernice's needs and the health and safety of our facility. As you know, the Redwood is an independent living community for seniors able to maintain an active life style.

We are asking for your assistance and cooperation in managing Bernice's behavior and needs in the interim while you and your family make arrangements for re-locating her. If you should have any questions, feel free to call us.

Thank You,

David Hall – Manager
Redwood Retirement Living
(707)257-0333

Exhibit 7



**Redwood**

*Gracious Retirement Living*

March 5, 2007

Thomas Thornton
1550 Stockton Street
St Helena, CA 94574

Dear Mr. Thornton,
On January 1, 2007, the Redwood implemented a meal tray policy that all residents were notified of 30 days prior. On February 4, 2007, I sent you a letter informing you that under this policy, your mother had ordered and received 87 meal trays from January 1 through February 4, 2007 totaling $435.00. I asked you to contact me to discuss this amount. I am concerned that I have not heard back from you nor have we received payment as yet.

I have again attached a copy of the policy to this letter. From January 1 through March 5, your mother has ordered and received 174 meal trays prepared by our kitchen. As of January 1, 2007, a $5.00 tray preparation fee is now charged for approved trays. Your mother currently owes the Redwood $870.00 for meal trays received through March 5, 2007.

Please contact me at your earliest convenience to discuss this matter.

Sincerely,

David Hall
Manager

Exhibit 8

2350 Redwood Road • Napa CA 94558 • (707) 257-0333

# Thomas Winfield Thornton

March 18, 2007                                                    <u>BY HAND & MAIL</u>

Mr. David Hall, Manager
Redwood Retirement Living
2350 Redwood Road
Napa, CA  94558

RE:  Bernice K. Thornton, Apt. #101

Dear David,

I received your hand-delivered letter, dated 3/5/07, at my mother's apartment.  Since then, I've talked to other residents about their understanding about your new food tray program.  Due to my mom's condition, her health aide picks up her meals in the dining room, as you are aware.

On her behalf, I am enclosing a check in the amount of $870.00 for the fees you are now demanding for food trays in that letter for the only purpose of avoiding a potential situation in which you would withhold food trays for my mother for what you consider to be nonpayment.

Be advised that I protest your new meal tray fees, for the following reasons:

- <u>Lease Terms</u>. The meal tray fee violates Article 5 of my mother's lease in which you provide 3 meals a day. Transporting a food tray to her room is within the standards of service offered by the caregivers for which my mother is already paying. Article 5 does not preclude this from occurring, especially since the apartments are equipped with kitchenettes and designed with the intent of food being served in the apartments.

- <u>Rent Increase</u>. The tray fees constitute a rent increase. Redwood sent my mother a notice from you in 2006 advising her of her rent increase for her apartment. It stated there would be no further rent increases before April 2007. These fees are in violation of that notice.

- <u>Advertisement</u>. Your recent advertisement in Napa newspapers states that "all of our amenities are included in one affordable month-to-month rent, with no hidden costs or fees" which directly contradicts your new tray fee.

(Continued/...)

1505 Stockton Street
St. Helena, CA 94574

Tel: 707.963.8289
Fax: 707.963.9838

123 East Elm Street
Greenwich, CT 06830

Tel: 203.661.8669

Exhibit 9

Letter to D. Hall
March 13, 2007
Page Two

- <u>Tray Policy Notification</u>. Your 3/5/07 letter is the first time you've notified my mother or me of this tray policy in writing. It's unwarranted for you to send this "invoice" for so-called services that are retroactive to your proper notice to my mother and myself. There are two errors in your letter regarding notification.

  - First, you did not notify all residents of your policy in January via the postal service or other deliberate means in accordance with generally accepted business or legal standards. We understand from other residents is that you placed your so-called notice on some tables in the public area. That casual and secretive approach to this issue demonstrates your lack of managerial experience, and certainly does not constitute a complete and comprehensive notification to "all" residents as you claim.

  - Second, I never saw the letter dated 2/4/07 letter you refer to. I noticed that you put the wrong address on the 3/5/07 letter, and I would suggest you probably made the same mistake on the previous letter. That would explain why I didn't receive it. However, the letter you sent on 10/28/06 had the correct address, so the mistake was yours.

Please be advised that I demand that these tray fees be credited back to my mother's account by the date of April 5, 2007.  If they are not credited back by that date, my family and I will pursue further action regarding these unwarranted charges.

Sincerely yours,

Thomas W. Thornton

# Thomas Winfield Thornton

January 23, 2007                                          BY HAND & MAIL

1505 Stockton Street
St. Helena, CA 94574

Tel: 707.963.8289
Fax: 707.963.9838

123 East Elm Street
Greenwich, CT 06830

Tel: 203.661.8669

Mr. David Hall, Manager
Redwood Retirement Living
2350 Redwood Road
Napa, CA  94558

RE:  Bernice K. Thornton, Apt. #101

Dear David,

The purpose of this letter is to express my strong objection to the mean-spirited policies and practices you have imposed on the Redwood residents, including my mother, over the past few months. In a short period of time, you have succeeded in creating a chilly atmosphere in the hallways of a once warm and friendly environment.

It is clear to me from my own observations, as well as from conversations with other residents and their families who have approached me and each other, that you and your management company are systematically intimidating selected elderly residents because they don't fit your definition of "active" human beings and/or because they have a disability. There are several recent examples of this, including your denial of food trays to certain residents, your one-sided "hand votes" in the dining room which railroad through your predetermined agenda (such as cutting back Wednesday bus excursions), your petition used to support the dismissal of the previous managers which was misunderstood by some residents who signed it, the rumor that you're encouraging people to call 911 instead of also coming to the aid of older residents who fall down, your obstruction of the caregivers' abilities to sit with their clients in common areas, and the rude and petty wisecracks from your co-managers about taking fruit from the fruit basket or from your housekeeper when residents complain about the quality or timing of the cleaning services.

However, the biggest example is your recent campaign to send numerous eviction notices to elderly residents who aren't "active" enough for your standards. I've heard one resident lament, "am I next?" The contradiction is that you've since admitted new elderly residents, some of whom I've heard are using "walkers." It appears that you have no clear policy on this matter or that you are applying your policy in a discriminatory way.

You sent one of these eviction letters to my attention in October 2006 advising me to move my mother out in 30 days, but after I met with you in early November, you rescinded your deadline. In that episode, I learned that the reasons you cited for her eviction were either not true or relied on undocumented and fabricated events relating to a few occasions in which she wet her pants. You accused her of "damaging your property"

(Continued/...)

Letter to D. Hall
January 23, 2007
Page Two

because she had some accidents on her bedroom carpet – carpet which she installed at her own expense in lieu of Redwood replacing the previous tenant's carpet. After talking to your boss at Holiday Retirement about your letter, I discovered his story differed from yours, which showed me that neither of you had real facts about any legitimate complaint. I don't know your or his qualifications, but you may be in the wrong business if you are making life-altering decisions about older people without regard for their well-being.

Through my architectural profession, I am familiar with the Fair Housing Act and the Americans with Disabilities Act. It's my understanding that the courts have long settled the issue that "independent living" is not a legal excuse for not making "reasonable accommodations" for people with disabilities. It is my opinion that your new policies are potentially in violation of Fair Housing law, on both state and federal levels. I have had recent conversations with the Greater Napa Fair Housing Center which agrees that your actions may be illegal. You should refer to these rulings before you take actions to remove services or support that would be considered "reasonable accommodations", such as denying use of trays to deliver food to people with disabilities, or even charging premiums for the use trays. Your facility's accommodations include meals, and I do not understand how you can start denying the right of residents to take food trays to their rooms given this standard. One resident's family recently showed me your tray policy memo (which was apparently distributed on tabletops around the building), and I would further dispute that your proposed tray charges are in violation of previous notifications of yearly rent increases.

I am concerned that this may be a continuing pattern and that you might send another eviction letter to my attention for my mother. My suspicion arises from an incident last Friday in which your housekeeper entered my mother's apartment with her nose in the air, repeating "I smell pee." The caregiver denied that there was any reason to smell urine. This exchange grew to include your co-manager, and in the ensuing conversation, the caregiver was told that unnamed residents had complained that my mother walks around with "poop in her pants." My mother's caregivers have intimate knowledge of my mother's habits, and they assert that these accusations are false. Even if your housekeeper did smell urine inside her apartment, that would not constitute a danger to either her or the other residents. I know that my mother has had a couple four or five pant-wetting accidents in her apartment in the past year, but that doesn't mean she is not well cared for, nor that she can't live independently with caregiver assistance as provided in her lease.

The facts are that last Friday my mother's caregivers had recently cleaned the carpeting which may have emitted a fresh scent. They frequently clean and shampoo the carpet in my mother's apartment for two reasons, namely that the quality of your cleaning service is poor, and because the caregivers frequently rest, by choice, on a roll-up bed on the floor near my mother.

(Continued/...)

Letter to D. Hall
January 23, 2007
Page Three

My mother's doctors at the University of California have endorsed my mother's
independent living situation at Redwood and have advised our family that, in addition to
the high quality of her 24/7 care, her ongoing familiarity with her physical environment,
i.e. the building and her apartment, are important to her orientation and well-being.

As I said to you last November, if there are circumstances in the future that would suggest
that my mother should move elsewhere, then our family is capable of and prepared for
making that decision when and if the time comes.


Sincerely yours,

Thomas W. Thornton

# Redwood
## Gracious Retirement Living

April 10, 2007

Dear Bernice Thornton

We do not wish to place an undue burden on you or your family, but sometimes it becomes necessary to make a difficult decision.  Therefore, it is with great difficulty that we write this letter to you.

We want you to live with dignity and respect in an atmosphere where you may be happy, safe and comfortable.  However, we believe the time has come whereby we can no longer meet your needs.

It is for these reasons that we find it necessary to ask you to arrange to relocate, and are submitting to you the attached 30 day notice to vacate your apartment.  Please arrange to relocate by May 10, 2007

If we may be of any assistance, please let us know.

Sincerely,

Redwood Retirement Residence

David & Denise Hall
Managers

Cc:  Tom Thornton

```
Exhibit 10
```

2350 Redwood Road • Napa CA 94558 • (707) 257-0333

# Redwood
### Gracious Retirement Living

30-DAY NOTICE TO TERMINATE TENANCY

To: Bernice Thornton

NOTICE IS HEREBY GIVEN that your month-to-month tenancy of the hereinafter described premises is terminated as of the date thirty (30) days after the service of this NOTICE upon you and that you are required to quit and surrender possession thereof to the undersigned on or before the date thirty (30) days after the service of this NOTICE upon you.

The premises, of which you are required to surrender possession of, are commonly known as 2350 Redwood Road Apt# 101, Napa, CA 94558.

This is intended as a thirty (30) day legal notice for the purpose of terminating your tenancy in accordance with California Civil Code section 1946.

DATED: 4-10-07          Owner: Redwood

                                By: Dave & Denise Hall

                                Its: Manager



## Redwood
*Gracious Retirement Living*

Bernice Thornton:  Resident Summary

1. Bernice is incapable of providing for her own healthcare and personal needs.
2. She is completely dependent upon others for her care and well-being and requires 24 hour care and supervision.
3. Bernice has wandered from the premises late at night and was stopped by Napa Police and taken to Queen of the Valley Hospital by Napa Paramedics.
4. Bernice was seen topless (no shirt or bra) by Redwood staff in a common area of the building. She attempted to exit the facility unto a public street.  She was chanting something about "apples".
5. Bernice is incontinent and has caused damage to her carpet and surrounding areas.

Date: 4-10-07

Redwood Retirement

David & Denise Hall
Managers



**Redwood**
*Gracious Retirement Living*

## 60-Day Notice to Terminate Tenancy

To: **Bernice Thornton,** an individual
c/o: Jack B Burstein
    Smith & Burstein
    1730 Sonoma Blvd.
    Vallejo CA  94590

NOTICE IS HEREBY GIVEN that your month-to-month tenancy of the hereinafter described premises is terminated as of sixty (60) days after the service of this NOTICE upon you, and that you are required to quit and surrender possession thereof to the undersigned on or before the date sixty (60) days after the service of this NOTICE upon you.

The premises, of which you are required to surrender possession of, are commonly known as 2350 Redwood Road #101, Napa, CA 94558.

This is intended as a sixty (60) day legal notice for the purpose of terminating your tenancy in accordance with:
        California Civil Code Section 1946.1

Dated: *5/18/07*

Redwood Retirement, Owner

By: *Gary Batten*
    Gary Batten

Its: Manager

Exhibit 11

# REDWOOD MEAL TRAY POLICY

Many of you have asked about the guidelines for meal tray service to apartments. To help you understand more clearly, I will explain our guidelines that have recently changed. While explaining, please keep in mind that the Redwood is a retirement community designed for active and independent seniors. In accordance with our facility status, the following changes relating to meal tray service will take effect January 1, 2007.

1.  All meal tray requests must be submitted at least one hour before meals to an **On-Duty Redwood Manager**.

2.  With few exceptions, meal trays will be permitted only for residents who are temporarily ill or who are rehabilitating and cannot come to the dining room due to their short-term condition where full or near full recovery is expected.

3.  Per existing Holiday policy, management will initially deliver meal trays to ill or rehabilitating residents for a period no longer than 3 days in order to assess their condition.

4.  If the illness or rehabilitation lasts longer than 3 days, the resident will need to develop an acceptable meal tray delivery option; i.e. caregiver, family or friend.

5.  If the temporary illness or rehabilitation lasts longer than 3 days, the Redwood will charge the resident a $10.00 per day meal tray preparation fee commencing on the 4th day trays are being delivered to the resident.

6.  Residents who are not ill or rehabilitating, who are able to come to the dining room but choose not to, will need to develop alternative options for meals if they elect to eat meals in their apartments.

I hope this explains our meal tray service. If you have any questions, please do not hesitate to contact a Redwood manager.

Thank You,

Redwood Management

Exhibit 12

## **PROOF OF SERVICE**

I am over the age of 18 and am not a party to the within action.  My business address is 8205 Pescadero Road, Loma Mar, California  94021.

On August 2, 2007, I served a true and correct copy of the following document(s):

**(1) NOTICE OF MOTION AND MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION; (2) DECLARATIONS OF CELESTIA AMBERSTONE, LIZA CRISTOL-DEMAN, NANCY NORTHERN, SALVE PENALES, THOMAS W. THORNTON, PRISCILLA VALENCIA, MAE LOUISE WHITAKER, AND KATHRYN J. WINTER IN SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION; EXHIBITS; (3) [PROPOSED] ORDER ISSUING PRELIMINARY INJUNCTION**

upon the following person(s):

Defendants' Agent for Service of Process, CT Corporation System, 818 West Seventh Street, 2nd Floor, Los Angeles, CA 90017, (by mail only); and,

Kurt A. Franklin, Hanson, Bridgett, Marcus, Vlahos, Rudy LLP, 425 Market Street, 26th Floor, San Francisco, CA 94105 (by mail and electronic mail)

| | |
|---|---|
| | **BY HAND DELIVERY**:  By causing such document(s) to be delivered by hand to the above person(s) at the address(es) set forth above. |
| xx | **BY MAIL**:  By placing a copy thereof enclosed in a sealed envelope, with postage thereon fully prepaid, in the United States mail at Loma Mar, California, addressed as set forth above. |
| | **BY THIRD-PARTY COMMERCIAL CARRIER (OVERNIGHT DELIVERY)**: By delivering a copy thereof to a third-party commercial carrier, addressed as set forth above, for delivery on the next business day. |
| xx | **BY ELECTRONIC MAIL:** By transmitting the above document(s) to the email address of the person designated above, or by electronically filing the documents on the Court's ECF system. |
| | **BY FACSIMILE**:  By transmitting the above document(s) to the facsimile number(s) of the addressee(s) designated above. |

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I certify that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on August 2, 2007, Loma Mar, California.

Tom Kayes