HANSON BRIDGETT MARCUS VLAHOS & RUDY, LLP
KURT A. FRANKLIN - 172715
SARAH D. MOTT - 148597
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
kfranklin@hansonbridgett.com
smott@hansonbridgett.com

Attorneys for Defendants
HARVEST REDWOOD RETIREMENT RESIDENCE,
L.L.C., doing business as Redwood Retirement Residence,
RETIREMENT RESIDENCE, L.L.C.; and HOLIDAY
RETIREMENT CORP.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREATER NAPA FAIR HOUSING CENTER, a California Not for Profit Corporation, doing business as FAIR HOUSING NAPA VALLEY, as an individual entity only; RUBY DUNCAN, an incompetent adult, by and through her Guardian Ad Litem, MAE LOUISE WHITAKER; and EVA NORTHERN, an incompetent adult, by and through her Guardian Ad Litem, NANCY NORTHERN, each individually and on behalf of individuals similarly situated; NANCY NORTHERN, in her individual capacity only; and MAE LOUISE WHITAKER, in her individual capacity only,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>HARVEST REDWOOD RETIREMENT RESIDENCE, L.L.C., doing business as Redwood Retirement Residence; REDWOOD RETIREMENT RESIDENCE L.L.C.; and HOLIDAY RETIREMENT CORP.,<br><br>　　　　　　Defendants. | No. C 07 3652 PJH<br><br>**DECLARATION OF DAVID HALL IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION**<br><br>Date: September 26, 2007<br>Time: 9:00 a.m.<br>Dept: Ctrm. 3, 17th Fl.<br>Judge: Hon. Phyllis J. Hamilton |

- 1 -

DECL DAVID HALL IN SUPPT OPPO TO MTN FOR PRELIM INJUNCTION
(CASE NO. C 07 3652 PJH)

1351865.1

I, David Hall, hereby declare that I have personal knowledge of the facts set forth herein and, if called upon to testify, I would truthfully and competently testify to the following:

1. My wife Denise Hall and I were co-resident managers at Redwood Retirement Residence ("Redwood" or "Residence") between approximately May and July of 2006. In that capacity, we assisted John and Susan Coll, who were the resident managers. This was the first time either Denise or I had been employed by Holiday Retirement Corp. ("Holiday") and the first time we had worked in a retirement facility.

2. In July 2006, we requested a transfer to another facility and were employed as co-resident managers at The Springs of Napa, another Holiday facility, for approximately six (6) weeks. We requested the transfer because of our concerns about not receiving adequate training from the Colls and because of an incident at the Residence that resulted in the death of a 91-year-old resident (Helen Eggers). The 91-year-old resident had severe Alzheimer's and was living with her husband (Carl Eggers), a 93-year-old, in the apartment next to our apartment. They had a private-duty caregiver during the day. During our employment there, the husband exhibited some aggressive and inappropriate behavior, including complaining that our apartment had an "evil cloud" and accusing me of having sexual relations with his wife. I developed a relationship with the couple's son and informed him and the couple's caregiver of these accusations. Denise and I invited the husband into our apartment so he could see that it was fine, and I assured him I had not acted inappropriately. This was done in the presence of Susan Coll, Resident Manager. The caregiver and her employer, the Velez Care Services Agency, were also notified. Although he continued to exhibit distrustful behavior, he was not disruptive and I did not fear for his safety. On the day of the wife's death, apparently at the hands of her husband, the private-duty caregiver was the person who discovered the assault. She did not notify management or pull the emergency cord, which is the appropriate and required response. In fact, when I walked past their apartment early that morning at around 6:00 a.m. and found the caregiver standing in the doorway, I asked her how the couple was, and she specifically told me everything was fine. Approximately an hour and a half later, at 7:30 a.m., the family rushed into the Residence, hurried into the apartment and closed the door. Soon after, paramedics rushed in and went to the room. Again, I

- 2 -

1  went to the apartment. At that time, the son informed me that his father had hurt his mother. The
2  wife was wheeled out of the Residence in full sight of the dining room during breakfast, with her
3  head covered. She died shortly thereafter. This situation was highly upsetting to me for a number
4  of personal and professional reasons. One of my professional concerns was the manner in which
5  the caregiver handled the incident. We left the Residence within the month.

6  　　　3.　　We agreed to return to the Residence as resident managers in approximately
7  August of 2006, at the specific request and urging of Regional Director Tom Ahrens, who told us
8  the residents liked us and would like to have us return. We were resident managers from then
9  until late April of 2007, when we transferred to another facility. We remain employed by
10 Holiday.

11 　　　4.　　The Residence has 97 units. The "average" resident was a woman in her early to
12 mid-eighties who used a walker or cane and exhibited some age-related vision, hearing or mental
13 impairment. The majority lived active, independent lives, many with the assistance of part-time
14 personal caregivers. They participated in social activities, ate in the dining room and utilized the
15 Resident's transportation services to stay mobile. About fifty percent (50%) of the residents
16 needed some kind of accommodation or assistance. At least four of the residents were in hospice,
17 which was provided on the premises by another company. The majority of residents had been
18 there for more than three (3) years; some had been at the Residence since it had opened,
19 approximately 21 years prior.

20 　　　5.　　We regularly provided any accommodation to the units that were requested by the
21 residents. We provided tub cut-outs and additional grab bars whenever residents requested them.
22 We provided special sheets for specialized beds when residents needed them. At least one
23 resident had a Hoyer lift installed in his apartment when he returned from the hospital. We are
24 not licensed to and cannot provide any medical assistance, nor can we or do we provide personal
25 care to residents. We cannot and do not assist residents with their medication. We never refused
26 to rent to anyone.

27 　　　6.　　When we returned to the Residence in August 2006, we had no co-resident
28 managers to assist us, the maintenance manager's employment recently had been terminated,

- 3 -

there was no activity director and the cook had quit. We hired new personnel during the first two months and attended management training for a week in September.

7. In September 2006, approximately 22-25 meal trays were being prepared by the kitchen for each meal: breakfast, lunch and dinner. Most of these trays were prepared on a regular basis for residents who, according to the caregivers, could not eat in the dining room. It was a strain on the kitchen and dining room staff because service to the dining room had to be interrupted to prepare the trays. In addition, the caregivers went directly to the kitchen to obtain the trays, resulting in further disruption to the kitchen staff. I implemented a requirement that residents who needed meal trays needed to sign up for them in the managers' office. The requirement was that they or their caregivers sign up by an hour before the meal. Some of the caregivers did not like this policy, as it created an extra stop for them and restricted their control of the tray approval process. It is possible on some occasion that a caregiver who did not sign up a resident for a meal tray was refused one by the kitchen, but I do not recall that ever happening. We never refused food to any resident.

8. At that time, the Velez agency, which provided personal caregivers to a number of residents in the Redwood, was leasing office space in the Residence. This meant that the personal caregivers could attempt to provide care to more than one resident in a day and could trade off in shifts. Although at times that was a positive, at times it also caused problems. For example, a single caregiver cannot assist six or seven residents when they each want to go to a meal. Additionally, they often could not or did not respond to emergency needs. There were numerous occasions on which I believed the caregivers were not adequately serving their clients. I believed the Residence had a right to be concerned about each resident's safety. On a number of occasions, elderly residents were found wandering in the hallways yelling for their caregivers and asking staff members where they were.

9. During our tenure, at least fifty percent (50%) of the residents had walkers or canes or were in wheelchairs. Upon arrival in the dining room, those residents who could safely walk short distances without them were asked to move the walkers or wheelchairs to the side of the dining room so that servers and serving carts could get through, and so that other residents

- 4 -

would not trip and fall. If residents were unable to walk unassisted in the dining room, they were allowed to take their devices to their tables. We never restricted anyone with walkers, canes or wheelchairs in the dining room.

10. I recall restricting dining room access to only three residents during our tenure. One was for a brief period of time because we were informed the resident was suffering from a highly contagious stomach flu. I was told by our corporate nurse Irene Drabek that it could quickly spread to other residents, and she essentially should be quarantined. This upset the resident, Marion Jacks, who was lonely. I attempted to contact her family on a number of occasions, but eventually had to restrict her from the dining room until she got better. Another person who was involuntarily restricted from the dining room for a lengthy period was Charles "Chuck" Bryden, who would cough so uncontrollably that he would vomit at the table. The vomiting occurred on several occasions before he was restricted. Other residents who sat at and near his table complained about the vomiting and the fact that Mr. Bryden did not bathe and smelled badly. We asked him not to come to the dining room because of the disruption it caused to others who were eating until he could control the coughing and vomiting. The third person restricted from the dining room during our tenure was Alda Michalis. Ms. Michalis' deteriorated mental condition caused her to sometimes violently lash out at servers and other residents. On occasion, she threw food at others and verbally assaulted people. I recall that resident Bernice Thornton also did not eat in the dining room. Her deteriorated mental state required that her personal caregiver spoon-feed her. Because there is limited room in the dining room, personal caregivers typically do not stay with residents during meals. Mrs. Thornton never requested an accommodation to eat in the dining room.

11. I sent an eviction notice to one (1) Redwood resident and her family in October of 2006. That resident was Bernice Thornton, who was disoriented and delusional. Attached as Exhibit 1 to this Declaration is a true and correct copy of the letter I sent to Ms. Thornton's son, Thomas Winfield Thornton, on October 28, 2006. At the time, I was concerned about Ms. Thornton's personal safety at the Residence, in addition to the safety of others, as well as the fact that she was occasionally disruptive and incontinent in her room and in the hallway. Specifically,

- 5 -

she had wandered out of the Residence in the middle of the night in a t-shirt and diaper. She fell on the sidewalk and injured her leg. She was found by a motorist and taken to Queen of the Valley hospital by paramedics. She could not identify herself to them. We do not have staff to ensure that residents do not leave the building. In fact, first floor apartments have two exit doors, one to the shared hallway and one to the outdoors. The grounds are not patrolled. Ms. Thornton was suffering from advanced Alzheimer's according to her son and needed 24-hour care. On at least one occasion, our sous chef discovered her wandering in common areas without a shirt or bra and attempted to go outside in that state of undress. She was often incoherent and hallucinatory and required caregivers to lead her everywhere by the hand. The fact that she would leave the building and endanger herself in that manner while reportedly having 24-hour care indicated to me that she was not able to live in the Residence's environment with continued inadequate care. After speaking with Mr. Thornton about the issue, I agreed to rescind the notice so long as he would start making arrangements to move his mother to a facility that offered assistance we could not provide. My understanding and belief is that Tom Ahrens also spoke with Mr. Thornton and that he agreed to transfer his mother after the end-of-the year holidays.

12. In December 2006, I received authorization from Tom Ahrens to implement a meal tray policy at the Residence in January 2007. We discussed it at several residents' meetings, and I made sure that each resident received a copy of the policy 30 days in advance of implementation. In general, it required that residents pay $5 for provision of a meal tray after three (3) days. I believed it necessary and appropriate to implement this policy because (1) I believed the caregivers were abusing the meal tray provision, (2) the provision of meal trays had an actual labor cost and inconvenience factor, (3) the Residence is not designed to provide room service, (4) I believed it was important to encourage residents to continue to socialize and come to the dining room when they could and believed some of the residents were obtaining meal trays because it was easier for the caregivers, and (5) I believed that some of the residents were getting meal trays because they were mentally disoriented and incapable of leaving their rooms, which indicated to me that they were not able to continue to live independently. Although we began by implementing the policy across the board and treating everyone equally, we soon made

exceptions. One exception was for Ruby Duncan, a plaintiff in this lawsuit, who turned 100 in January 2007, and who often had a difficult time physically getting to the dining room. We initially tracked her trays with the intention of collecting the charges, but eventually cancelled the fee for her trays. We never actually charged Ms. Duncan for any meal tray and she continued to receive them, consistent with her doctor's request, whenever she wanted to eat in her room, until her death in July 2007.

13.   I sent five (5) eviction notices in April 2007 that were previously reviewed and approved by Tom Ahrens. One was a second notice, sent to Bernice Thornton's family. The other four (4) notices were sent to Anne Paul, Maxine Ramacher, Bill Nye and Dorman "Pete" Mitchell and/or their family members. Each eviction notice I sent was done on a case-by-case basis, and was due to my concern for the safety of the resident involved as well as my concern for the safety and rights of other residents to enjoy peaceful possession and enjoyment of their home. I had made several observations of conduct and behavior by these residents evidencing safety and disruption concerns evidently due to mental deterioration that resulted in disorientation, irrational fears and behavior, inability to remember recent events, agitation and inappropriate and sometimes aggressive public behavior, which was not controllable by the private caregivers. In all cases but Mr. Mitchell, who did not have family in the area, our management team spoke with family members on multiple occasions about the deteriorating conditions before issuing the notices. I believe that these adult children were unwilling to take responsibility for their parents' need for assistance and care unless they were forced to do so, either because it was too personally painful or because they did not want to spend the money.

14.   I never sent eviction notices to Ruby Duncan or Eva Northern, nor did I have any plan to do so, despite the fact that Ms. Northern was severely mentally disabled and was not getting adequate care from her personal caregiver, which we had discussed with her daughter on a number of occasions. Eva Northern notified me in March 2007 that she wanted to move out. We never evicted any residents, or discussed with residents' family members the need to look for a more restricted environment based on physical disabilities. Our concern was always because of residents' inability to live in an independent (i.e., non-assisted living) environment, even with the

- 7 -

help of personal caregivers, because of a deterioration in their mental faculties that caused a fear for their safety and the safety of other residents. Attached as Exhibit 2 is a true and correct copy of a "Move Out Notification Form" that Ms. Northern signed on March 25, 2007 after notifying me of her intent to move.

15. Anne Paul was afraid to be alone or in her apartment and her mental faculties had deteriorated to the point that she regularly was inappropriate in public settings. Her fear of enclosed spaces resulted in her wandering in the hallways and frequently sleeping in her nightgown on the lobby couch in a fetal position. She also refused to close the door to the bathroom and frequently would take off her clothes when using the public restroom in the front of the building, with the door open to the lobby. She would take out her false eye and play with it, or mistakenly leave it on furniture in public areas.

16. Maxine Ramacher used an oxygen machine, which she carried with her at all times. She was very confused and disoriented and could not operate the machine by herself. She frequently became frightened that she couldn't breathe, and would come into the open areas screaming that she couldn't breathe, then would hyper-ventilate and on occasion appear to come close to collapsing. She expected Residence managers to operate her oxygen machine, although none of us had that expertise, nor is it appropriate for us to provide that kind of medical care on any on-going basis. She lost her keys multiple times each week and would have to be escorted to and let into her apartment. She often stood in the hallway yelling, "Where's my caregiver?" or "Call my caregiver." She exhibited clear signs of being frightened and unhappy much of the time, and she needed and deserved a facility in which more attention would be paid to her.

17. Bill Nye had severe memory problems and was becoming increasingly agitated and disoriented. His adult daughter, who lives in Santa Rosa, was contacted several times about his deteriorating condition in early 2007. He frequently would eat his meal, then complain to dining room staff that he had not been served and would come to the manager's office to complain that food was being withheld from him. He had no concept of time. He frequently wandered in the halls during the day and at night, and was seen attempting to open the doors of other residents' apartments. Other residents complained about his behavior. I worried about him

- 8 -

1  leaving the building in the night given his disorientation. He needed a lot of attention, particularly from our co-resident managers, because of his deterioration. He was often agitated and disoriented with staff and regularly cut himself shaving and came to the dining room bleeding. He sometimes slept in the dining room. During the 30-days prior to the notice, he urinated on the floor of the public restroom three (3) times. I attempted to detail some of the incidents that caused us to believe it was not safe for him to stay at the Residence, which had earlier been communicated to Mr. Nye's daughter Celestia Amberstone, in a memo that accompanied the notice.

18. Dorman "Pete" Mitchell had a hearing problem and would listen to his television late into the night at a volume so loud that his neighbors complained. Although he had earphones for the television, he refused to wear them. He had no family of which we were aware. He had a caregiver who provided limited service. He had incontinence problems that he did not or could not control, and on a number of occasions for a period of time would bleed and defecate on his sheets and sometimes defecate on the floor of his apartment, damaging the carpet. On one occasion, he called me in my apartment at 3 a.m. to tell me that he had defecated in his bed and that I needed to come to change the sheets. That is not something we do. When Mr. Mitchell was told that neighbors complained, he defecated directly in front of the door of the unit of the resident who had complained. When confronted, he laughed about it.

19. Eva Northern, one of the Plaintiffs in this matter, exhibited advanced symptoms of dementia. She was very reclusive. When we first arrived, Denise would make a point of delivering her meal tray so that she could make sure she was okay. Ms. Northern could speak clearly but the topic of conversation was nonsensical. She made irrational complaints and strung unrelated thoughts together in sentences without stopping. Denise, the co-resident managers and I had numerous conversations with Ms. Northern's children about her condition and the fact that the 24-hour care she allegedly was receiving was insufficient. On the few occasions when Ms. Northern left her room, she would wander and talk incoherently. For a time, one of Ms. Northern's children, a son, stayed with her. He, however, was overweight and unconditioned so that he could not physically help her and generally did not appear to assist in her care in any way.

- 9 -

1  Whenever I interacted with him, he was in the unit watching television and drinking beer. Ms.
2  Northern was never denied a meal tray. Effective January 1, 2007, she was required to pay for
3  her meal tray service per the requirements of the meal tray policy, however, beginning on
4  February 1, 2007 through April 13, 2007 she received a meal discount in the amount of $300 per
5  month. At no time was a meal tray unavailable to her. Nancy Northern, Eva's daughter, chose to
6  obtain a freezer and have her mother's caregiver make food for Ms. Northern.

7       20.   Eva Northern had a cat. A week before she moved to Aegis, she decided to empty
8  the kitty-litter box by dumping it into the bathtub and turning on the water to flush it down the
9  drain. She left the water on all night, flooding not only her apartment but thirty (30) feet of the
10 hallway, causing thousands of dollars of damage to the Residence. In my view, this was another
11 incident that underscored Ms. Northern's incapacity. I was told and believed that we would not
12 be able to begin repairs to the apartment, which necessitated tearing out the carpet and replacing
13 flooring and plaster, until the unit was vacant. I also was told and believed that if even a week
14 went by, mold would grow and cause even further damage. I explained this to Nancy Northern
15 and asked her to have her mother move out as soon as possible. At the time, Ms. Northern
16 appeared very understanding and embarrassed about her mother's actions. It was unclear whether
17 Eva Northern flooded the apartment by accident or on purpose.

18      21.   At the time I left the facility at the end of April 2007, transferring to another
19 property in the Holiday Retirement group, there were no other eviction notices issues or planned.
20 At that time, Ms. Ramacher and Mr. Nye had moved out of the Residence and, on information
21 and belief, had been relocated to assisted living facilities.

22      22.   Among other reasons, I work in this business to help the aging and disabled, some
23 of whom are neglected by their families. In my experience, even persons with severe disabilities
24 can live active and independent lives if they are provided appropriate care. We reasonably
25 accommodate residents with disabilities so long as doing so does not endanger them or others, or
26 regularly interfere with other residents' right to enjoy and utilize their premises. I have not made
27 discriminatory statements relating to the disabilities of residents or prospective residents.

- 10 -

1  |  I declare under penalty of perjury under the laws of the State of California that the
2  |  foregoing is true and correct. Executed this 5th day of September, 2007 at Napa, California.

/s/ David Hall
_____
David Hall

I, Kurt Franklin, hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature ("/s/") within this e-filed document.

/s/ Kurt Franklin
_____
Kurt Franklin

- 11 -

DECL DAVID HALL IN SUPPT OPPO TO MOTION FOR PRELIM INJUNCTION
(CASE NO. C 07 3652 PJH)

1351865.1

**EXHIBIT 1**

faxed to Tom
10-28-06



October 28, 2006

Tom Thornton
1505 Stockton Street
St Helena, CA 94 574

Dear Tom Thornton,

Please call me immediately. After careful consideration, Redwood management has decided that it is best to provide Bernice with a thirty day notice to find other accommodations, effective the date of this letter.

This decision is entirely based on Bernice's needs and the health and safety of our facility. As you know, the Redwood is an independent living community for seniors able to maintain an active life style.

We are asking for your assistance and cooperation in managing Bernice's behavior and needs in the interim while you and your family make arrangements for re-locating her. If you should have any questions, feel free to call us.

Thank You,

David Hall – Manager
Redwood Retirement Living
(707)257-0333

**EXHIBIT 2**

**Holiday** RETIREMENT CORP.

| Redwood Retirement Residence | 5430 |
|---|---|
| Facility Name | Facility # |

# Move Out Notification Form

| Eva Northern | 190077 | 112 |
|---|---|---|
| Resident Name(s) | Resident # | Unit # |

03/15/2007
**Date Notice Received**

**Reason for Moving Out...** Higher level of care

You will be responsible for rent through ___04/13/2007___. Once this date has passed, your account will be evaluated and if applicable, your security deposit will be refunded to your most recent address.

Thank you for choosing ___Redwood Retirement Residence___ as your home.

_____   3/25/07
**Resident(s) Signature**                **Date Signed**

_____   3-25-07
**Facility Management Team Member Signature**   **Date Signed**