1  HANSON BRIDGETT MARCUS VLAHOS & RUDY, LLP
   KURT A. FRANKLIN - 172715
2  SARAH D. MOTT - 148597
   425 Market Street, 26th Floor
3  San Francisco, CA 94105
   Telephone:   (415) 777-3200
4  Facsimile:    (415) 541-9366
   kfranklin@hansonbridgett.com
5  smott@hansonbridgett.com

6  Attorneys for Defendants
   HARVEST REDWOOD RETIREMENT RESIDENCE,
7  L.L.C., doing business as Redwood Retirement Residence,
   RETIREMENT RESIDENCE, L.L.C.; and HOLIDAY
8  RETIREMENT CORP.

9              UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12 | GREATER NAPA FAIR HOUSING CENTER, a California Not for Profit Corporation, doing business as FAIR HOUSING NAPA VALLEY, as an individual entity only; RUBY DUNCAN, an incompetent adult, by and through her Guardian Ad Litem, MAE LOUISE WHITAKER; and EVA NORTHERN, an incompetent adult, by and through her Guardian Ad Litem, NANCY NORTHERN, each individually and on behalf of individuals similarly situated; NANCY NORTHERN, in her individual capacity only; and MAE LOUISE WHITAKER, in her individual capacity only, | No. C 07 3652 PJH

   **DECLARATION OF TOM AHRENS IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION**

   Date:  September 26, 2007
   Time:  9:00 a.m.
   Dept:  Ctrm. 3, 17th Fl.
   Judge: Hon. Phyllis J. Hamilton

                Plaintiffs,

         v.

   HARVEST REDWOOD RETIREMENT RESIDENCE, L.L.C., doing business as Redwood Retirement Residence; REDWOOD RETIREMENT RESIDENCE L.L.C.; and HOLIDAY RETIREMENT CORP.,

                Defendants.

- 1 -
DECL TOM AHRENS IN SUPPT OF OPPO TO MOTION FOR PRELIM INJUNCTION
(CASE NO. C 07 3652 PJH)

1350648.2

I, Tom Ahrens, hereby declare that I have personal knowledge of the facts set forth herein and, if called upon to testify, I would truthfully and competently testify to the following:

1. I am employed as the regional director for a group of Holiday Retirement ("Holiday") residences that includes Redwood Retirement Residence ("Redwood" or "Residence"). I oversee the Northern California and Northern Nevada regions, which cover ten retirement facilities. I have held that position since July 2005.

2. Redwood is not an assisted living or residential care facility nor, to my knowledge, does Holiday operate any residential care or assisted living facilities. We provide apartment-style housing with various services for retired persons. Historically, Holiday's target market has been middle income retirees. For more than thirty years Holiday has built and operated its projects to fill this small niche.

3. Redwood has 97 units, the majority of which are one-bedroom and studio units, although there are some two-bedroom units. First-floor units have a door that leads into the hallway and another door that leads directly outside, so residents may come and go as they please. Many of the second-story units have private balconies. Redwood, like other Holiday facilities, is designed for group meals. The units have a sink, counter and small refrigerator. No units have cooking facilities and no cooking utensils or equipment are provided to residents. Residents are free to bring in a microwave oven, coffee pot or other small cooking appliance for their use, but it is anticipated they will eat in the dining room. For many residents, this meal service is a highlight, both because it means they do not have to cook and because it provides an opportunity to socialize with neighbors.

4. Residents pay a monthly fee, which includes three meals a day in the central dining room, weekly housekeeping, linen changing, scheduled transportation services, scheduled group excursions and a number of on-site activities, including exercise programs, bingo, bridge and other card games, arts and crafts, educational programs and devotional services. Hospice is provided on-site by another company.

5. Redwood does not provide any personal care services. Residents are free to hire personal care givers to assist them in their daily living. Redwood does not provide any healthcare

- 2 -

or medical services, nor is it licensed to do so

6. Holiday hires couples to act as resident managers in its senior housing facilities. A building the size of Redwood usually has another couple who act as the co-resident managers, essentially assisting and reporting to the resident managers. Resident managers are not qualified to and do not render medical assistance, nor do they provide or keep medication.

7. In May of 2006, I hired David and Denise Hall to be co-resident managers at Redwood. This was their first job with Holiday and the first time they had been resident managers in a residence for the elderly. In approximately July of 2006, they requested a transfer. This occurred within weeks of an incident in which an elderly Redwood resident named Carl Eggers (approximately 93 years old) apparently struck his elderly wife (approximately 91 year old Helen Eggers) while he was delusional. David sent me an article that had been in the Napa newspaper. The resident managers had not mentioned the incident to me. I thereafter assigned David and Denise as co-resident managers at The Springs in Napa, where I anticipated they would get good training from the resident managers.

8. In August of 2006, after the Halls transferred, I terminated the employment of resident managers Susan and John Coll, who had been the managers since sometime in 2001. I also terminated the employment of the maintenance man and a cook. Mr. Coll had totaled the Redwood's vehicle while driving under the influence of alcohol. He, his wife, the maintenance man and the cook lied about it. When I investigated and discovered the truth, they were all fired. The circumstances of their terminations required their immediate departures.

9. I brought in interim and temporary managers while I sought to replace the resident managers. I also spent more time at the property and became concerned about the number of persons who appeared to be disoriented and incapable of caring for themselves, even with the assistance of their private care givers. At least four residents were receiving hospice care and others appeared extremely frail and disoriented. I do not have a medical background and have no grounds for assessing mental capacity. I asked the corporate nurse, Irene Drabek, to come to the Residence and talk with residents. I wanted to make sure that a situation like the Eggers did not recur and to assure myself that no residents were presenting a danger to themselves or others.

10. Ms. Drabek came to the property on or about August 22, 2006. In her opinion, a significant number of residents were not having their care and safety needs properly met or managed by their caregivers. One of those residents was Bernice Thornton.

11. Evictions are relatively unusual occurrences. Usually the families will agree that the parent needs additional care. Other than the evictions at Redwood, I recall only two other evictions in the last two years at any of the other facilities I manage.

12. I asked the Halls to return to Redwood. Because of the disruption to the residents, I hoped that bringing the Halls back as resident managers would bring a sense of stability. Residents appeared relieved when I talked with them and could tell them that David and Denise were returning. The Halls agreed to return in late August 2006.

13. An eviction notice was given to Bernice Thornton and her family in October 2006 after her son Tom Thornton initially balked at moving his mother. I spoke with Mr. Thornton on two occasions in the fall of 2006 about our observations of Bernice and her actions which caused us concern about her deteriorated mental and physical condition. It appeared that her care and safety needs were not being adequately met by the caregivers. I believe I reached an agreement with him that it was necessary for him to provide his mother with additional and more adequate care or that he would need to relocate her to another facility after the holidays. Because her care and safety needs were still unmet by the personal caregivers, we had little choice but to give Ms. Thornton another eviction notice the following April.

14. I was aware in the fall of 2006 that the Velez care group was leasing office space in the Redwood and providing personal care givers to a number of the Redwood residents. I also was aware that Dave Hall had been concerned about the quality of the care provided by some of the care givers. Because of the Eggers incident, among other issues, I believed we had a responsibility to ensure that the agency had adequate insurance in place to indemnify the Residence if any conduct or negligence by the care givers created liability. I entered into discussions with Patricia Valencia, the owner. After she ascertained the expense of the insurance coverage, she decided to terminate her tenancy at the Residence, which I believe to be a good result.

15. In the fall of 2006, between 20 and 25 meal trays were being sent out of the kitchen each day. This was far in excess of other facilities. I agreed with Dave and Denise that it would be a good idea to regulate how the meal trays were provided. When that did not seem to work, I approved their plan to create a policy under which residents had to pay a nominal fee of $5 for each tray. I believe this fee was reasonable considering the disruption.

16. In early 2007, Nancy Northern contacted me about her concern about the meal tray charges. I agreed to allow her mother to receive meal trays free of charge for an additional period. Ms. Northern was never faced with the prospect of her mother not being given food. I told her that because of the disruption and costs associated with meal trays, a nominal fee would be charged. She asked whether her mother could obtain reimbursement for meals that she did not obtain from Redwood. I told her I would look into it and call her back. I spoke with Ms. Northern personally several days later. She told me she was surprised and appreciative that I called. I told her that her mother would receive a reimbursement for meals she did not take at Redwood. It is my understanding that Eva Northern received a meal discount in the amount of $300.00 per month from February 1, 2007 until April 13, 2007 as reimbursement for untaken meals.

17. Because of conduct reported to me by the Halls, I agreed with assessments relating to Anne Paul, Maxine Ramacher, Bill Nye and Dorman Mitchell, and approved the eviction notices sent to them in April 2007.

18. If a disabled resident is otherwise qualified and we can reasonably accommodate him or her, we do so, so long as they do not endanger themselves or others, or regularly interfere with other residents' right to enjoy and utilize their premises and the services offered. I believe the elderly can maintain active and independent lifestyles even when they have severe disabilities, and observe this regularly, so long as they receive appropriate care. I have not made discriminatory statements relating to the disabilities of residents or prospective residents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 5th day of September, 2007 at Napa,

DECL TOM AHRENS IN SUPPT OF OPPO TO MOTION FOR PRELIM INJUNCTION
(CASE NO. C 07 3652 PJH)

1350648.2

1  California.

_____
Tom Ahrens