1   HANSON BRIDGETT MARCUS VLAHOS & RUDY, LLP
     KURT A. FRANKLIN - 172715
2   SARAH D. MOTT - 148597
     425 Market Street, 26th Floor
3   San Francisco, CA  94105
     Telephone:   (415) 777-3200
4   Facsimile:    (415) 541-9366
     kfranklin@hansonbridgett.com
5   smott@hansonbridgett.com

6   Attorneys for Defendants
     HARVEST REDWOOD RETIREMENT RESIDENCE,
7   L.L.C., doing business as Redwood Retirement Residence,
     RETIREMENT RESIDENCE, L.L.C.; and HOLIDAY
8   RETIREMENT CORP.

9             **UNITED STATES DISTRICT COURT**

10        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12  GREATER NAPA FAIR HOUSING CENTER, a California Not for Profit Corporation, doing business as FAIR HOUSING NAPA VALLEY, as an individual entity only; RUBY DUNCAN, an incompetent adult, by and through her Guardian Ad Litem, MAE LOUISE WHITAKER; and EVA NORTHERN, an incompetent adult, by and through her Guardian Ad Litem, NANCY NORTHERN, each individually and on behalf of individuals similarly situated; NANCY NORTHERN, in her individual capacity only; and MAE LOUISE WHITAKER, in her individual capacity only, | No. C 07 3652 PJH **DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION** Date:  September 26, 2007 Time:  9:00 a.m. Dept:  Ctrm. 3, 17th Fl. Judge: Hon. Phyllis J. Hamilton |

Plaintiffs,

     v.

HARVEST REDWOOD RETIREMENT RESIDENCE, L.L.C., doing business as Redwood Retirement Residence; REDWOOD RETIREMENT RESIDENCE L.L.C.; and HOLIDAY RETIREMENT CORP.,

     Defendants.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................. 1

II.  PROCEDURAL STATUS ...................................................................................... 2

III. FACTS ................................................................................................................... 2

   A.   REDWOOD RETIREMENT RESIDENCE IS DESIGNED FOR
        MIDDLE-CLASS ELDERLY PERSONS WHO CAN LIVE SAFELY IN
        THEIR OWN APARTMENTS, WITH OR WITHOUT THE
        ASSISTANCE OF A PERSONAL CAREGIVER, AND WHO DO NOT
        UNDULY DISRUPT OR UPSET OTHER RESIDENTS ................................. 2

   B.   A TRAGIC INCIDENT IN THE SUMMER OF 2006 RESULTED IN
        SUBSTANTIAL CONCERN ABOUT SOME OF THE RESIDENTS'
        ABILITY TO COMPLY WITH THE TERMS OF THEIR OCCUPANCY,
        AS WELL AS CONCERN ABOUT THE RESIDENTS' PERSONAL
        CAREGIVERS ............................................................................................... 5

   C.   THE HALLS WERE ASKED AND AGREED TO RETURN TO
        REDWOOD AS RESIDENT MANAGERS IN SEPTEMBER 2006 ................ 6

   D.   REDWOOD MANAGERS ATTEMPTED TO WORK WITH
        RESIDENTS AND THEIR FAMILIES TO IDENTIFY THOSE
        INDIVIDUALS WHO POSED A SAFETY RISK TO THEMSELVES BY
        CONTINUING TO LIVE AT THE RESIDENCE WITH THE LEVEL OF
        CARE THEY WERE BEING PROVIDED ...................................................... 6

        1.   Redwood Management Had Legitimate Concerns About The Velez
             Caregiving Agency's Business Activities And Its Failure To Interact
             Appropriately With The Resident Managers ......................................... 6

        2.   The High Rate of Meal Tray Usage Was A Legitimate Concern ................ 7

        3.   A Few Residents Were Restricted From The Dining Room For
             Specific ................................................................................................... 8

        4.   Redwood Management Reasonably Accommodated Bernice
             Thornton On A Number Of Occasions And Believed They Had
             Reached Agreement With Her Son Concerning Ms. Thornton's
             Need For An Increased Level Of Care ..................................................... 9

   E.   BECAUSE OF THE ADMINISTRATIVE, HEALTH AND SAFETY
        BURDENS ASSOCIATED WITH THE UNUSUALLY HIGH USE OF
        MEAL TRAYS, REDWOOD MANAGEMENT INSTITUTED A MEAL
        TRAY FEE BEGINNING IN JANUARY 2007; THAT FEE WAS
        WAIVED WHEN APPROPRIATE AND RESIDENTS WHO CHOSE
        NOT TO TAKE MEALS WERE PROVIDED WITH A RATE
        REDUCTION WHEN REQUESTED ........................................................... 10

- i -

## TABLE OF CONTENTS
### (continued)

Page

F.  BECAUSE ATTEMPTS TO WORK WITH A FEW RESIDENTS AND/OR THEIR FAMILIES ABOUT SAFETY AND DISRUPTION ISSUES WERE NOT SUCCESSFUL, REDWOOD MANAGEMENT ISSUED FIVE EVICTION NOTICES IN APRIL 2007; ONE OF THOSE EVICTION NOTICES WAS RESCINDED AFTER REASONABLE ACCOMMODATION WAS REQUESTED ........................................................ 11

G.  NEITHER OF THE NAMED PLAINTIFFS, EVA NORTHERN AND RUBY DUNCAN, WERE EVER THREATENED WITH OR GIVEN AN EVICTION NOTICE ................................................................................. 14

H.  REDWOOD HAS NOT HAD A MEAL TRAY POLICY SINCE AT LEAST APRIL 2007, NOR HAS REDWOOD ISSUED ANY EVICTION NOTICES SINCE THAT TIME; REDWOOD HAS NO PLANS TO ISSUE ANY EVICTION NOTICES BECAUSE NONE OF THE RESIDENTS POSE A RISK TO THEMSELVES OR IS UNDULY INTERFERING WITH OTHER RESIDENTS' QUIET ENJOYMENT OF THE PROPERTY ....................................................................................... 15

IV.  ARGUMENT ......................................................................................... 16

A.  PLAINTIFFS LACK STANDING TO BRING THE INJUNCTION AND, IN ANY EVENT, THE MOTION IS MOOT BECAUSE THE REQUESTED RELIEF IS UNNECESSARY AND THE CENTER HAS COMPLETELY FAILED TO MEET THE PREREQUISITES OF CLASS CERTIFICATION .................................................................................... 16

B.  EVEN IF THE COURT REACHES THE MERITS, PLAINTIFFS HAVE FAILED TO MAKE A CLEAR SHOWING OF EITHER A LIKELIHOOD OF SUCCESS ON THE MERITS OR THE POSSIBILITY OF IRREPARABLE INJURY ........................................................................ 18

   1.  Plaintiffs Cannot Establish A Strong Likelihood Of Success On The Merits Because There Is No Evidence That Defendants Unlawfully Discriminate Against Disabled Residents ....................................................... 18

   2.  Plaintiffs Cannot Show The Possibility Of Irreparable Injury ................. 20

   3.  Plaintiffs Similarly Cannot Demonstrate That Serious Questions Are Raised By Their Motion And That The Balance Of Hardships Tips Sharply In Their Favor .................................................................... 22

   4.  An Injunction Does Not Serve The Public Interest ................................... 22

C.  REDWOOD DOES NOT HAVE POLICIES THAT ILLEGALLY LIMIT TENANCY BASED UPON A RESIDENT'S DISABILITIES; USE OF THE TERMS "INDEPENDENT" AND "ACTIVE" ARE APPROPRIATE IN THE CONTEXT QUOTED, REFLECT GENERAL TRADE USAGE AND ARE NOT PER SE IMPROPER, AS PLAINTIFFS WOULD HAVE THE COURT BELIEVE ................................................................................. 23

- ii -

## TABLE OF CONTENTS
### (continued)

| | Page |
|---|---|
| D.    THE MOTION FOR AN INJUNCTION IS PREMATURE | 24 |
| V.    CONCLUSION | 25 |

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Appenfelder v. Deupree St. Luke,*
    1995 U.S. Dist. LEXIS 21960 (S. D. Ohio 1995) ............................................20

*Ass'n of Professional Engineering Personnel v. Radio Corp. of America,*
    183 F. Supp, 834 (D.C.N.J. 1960) ............................................16

*Barnes v. Healy,*
    980 F. 2d 572 (9th Cir. 1992) ............................................17

*Cason v. Rochester Housing Authority,*
    748 F. Supp. 1002 (W.D. N.Y. 1990) ............................................24

*City of Angoon v. Marsh,*
    749 F.2d 1413 (9th Cir. 1984) ............................................18

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ............................................16

*Doe v. National Bd. of Med. Examiners,* 199 F.3d 146, 152-53 (3rd Cir. 1999) ............................................17

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975) ............................................20

*East Texas Motor Freight System, Inc. v. Rodriguez,*
    431 U.S. 395 (1977) ............................................17

*eBay Inc. v. Merc Exchange, L.L.C.,*
    __ U.S. __, 126 S. Ct. 1837 (2006) ............................................21, 22

*Gamble v. City of Escondido,*
    104 F. 3d 300 (9th Cir. 1997) ............................................18

*Gen. Tel. Co. of the Southwest v. Falcon,*
    457 U.S. 147 (1982) ............................................17

*Gresham v. Windrush Partners, Ltd.,*
    730 F.2d 1417 (11th Cir 1984) ............................................21, 22

*Groener v. Golden Gate Apartments,*
    250 F.3d 1039 (6th Cir. 2001) ............................................20

*Hous. Rights Ctr. v. Donald Sterling Corp.,*
    274 F. Supp. 2d 1129 (C.D. Cal. 2003) ............................................22

*Inland Mediation Board v. City of Pomona,*
    158 F. Supp. 2d 1120 (C.D. Cal. 2001) ............................................18

*Intel Corp. v. ULSI Systems Technology, Inc.,*
    995 F.2d 1566 (Fed. Cir. 1993) ............................................16

- iv -

### TABLE OF AUTHORITIES
#### (continued)

Page

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).................................................................16

*Mantolete v. Bolger,*
    767 F.2d 1416 (9th Cir. 1985) ...................................................17

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997)................................................................18

*O'Shea v. Littleton,*
    414 U.S. 488 (1974)................................................................18

*Powell v. McCormack,*
    395 U.S. 486 (1969)................................................................17

*Save Our Summers v. Wash. State Dep't of Ecology,*
    132 F. Supp. 2d 896 (E.D. Wa. 1999) ......................................21

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) ................................................20

*Sierra On-Line, Inc. v. Phoenix Software, Inc.,*
    739 F. 2d 1415 (9th Cir. 1984) .................................................16

*Silver Sage Partners, LTD v. City of Desert Hot Springs,*
    251 F.3d 814 (9th Cir. 2001) ....................................................22

*Simon v. Eastern Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976)..................................................................17

*Sokol v. New United Motor Mfg., Inc.,*
    1999 U.S. Dist. LEXIS 20215 (N.D. Cal. 1999) ..........................17

*Topic v. Circle Realty Co.,*
    377 F. Supp. 111 (C.D. Cal. 1974) ...........................................21

*United States v. California Mobile Home Park Management Co.,*
    29 F.3d 1413 (9th Cir 1994) .....................................................19

*United States v. California Mobile Home Park Management,*
    107 F.3d 1374 (9th Cir. 1997) ..................................................19

*United States v. Forest Dale, Inc.,*
    818 F. Supp. 954 (N.D. Tex. 1993) ...........................................24

*United States v. Hayes International Corporation,*
    415 F.2d 1038 (5th Cir. 1969) ..................................................21

*United States v. Hillhaven,*
    960 F.Supp. 259 (D. Utah 1997)...............................................20

- v -

## TABLE OF AUTHORITIES
### (continued)

**Page**

**Federal Statutes**

Americans with Disabilities Act Titles I, and II, 42 U.S.C. §§ 12111(8) and 12131(2) ...............20

Rehabilitation Act, § 504, 29 U.S.C. § 794 (a)..........................................................................20

**State Statutes**

California Health & Safety Code § 1569.44(a)(3).......................................................................20

California Welfare and Institutions Code  § 19801 .....................................................................24

**Treatises**

11a C. Wright, A. Miller & M. Kane,
   *Federal Practice and Procedure* §2942, p. 43 (2d ed. 1995)......................................passim

B. Garner, *A Dictionary of Modern Legal Usage*, p. 469 (2nd ed. 1995) .......................................21

Schwartzer, Tashima & Wagstaffe,
   *Cal. Prac. Guide: Fed. Civ. Pro. Before Trial*, p. 13-27 (The Rutter Group 2007)...........22

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
(CASE NO. C 07 3652 PJH)

## I.    INTRODUCTION

The Court should deny Plaintiffs' Motion for Preliminary Injunction because the named Plaintiffs lack standing to bring it, they are not likely to prevail in this lawsuit, and the set of issues they purport to present to the Court is moot. As Defendants have repeatedly informed Plaintiffs, orally and in writing: there is no wrong to right; there is no irreparable harm to avoid.

First, named Plaintiff Eva Northern's family voluntarily moved her to a state-licensed assisted living facility prior to the institution of this lawsuit. Named Plaintiff Ruby Duncan died while residing at Redwood, also before the institution of this lawsuit. She was 100 years old. Importantly, neither of the named Plaintiffs ever received eviction notices. And neither Plaintiff is subject to any meal tray policy. They do not have standing and their claims are moot.

Second, Plaintiff Greater Napa Fair Housing Center ("Center") is attempting an end-run around the class certification process, hoping the Court will not notice that neither Ms. Northern nor Ms. Duncan, nor their relatives, can adequately represent any putative class. Despite repeated solicitations, the Center has identified no present or former residents who face any present or future harm (or, apparently, who are willing to become plaintiffs.) The fact that the Center claims it received somewhere between six and eight complaints during the past 18 months does not constitute cause for an injunction.

Third, an injunction is inappropriate because (1) there is no meal tray policy in effect at Redwood and no one is being asked or required to pay for any meal trays, (2) there are no pending eviction notices and no plans to evict anyone from the premises, and (3) there are no allegations of any discriminatory statements being made about or policies being enforced against disabled persons by any current management personnel of Redwood. David and Denise Hall, the focus of the hearsay declarations, transferred from Redwood in April of 2007. There is no evidence in the Complaint or in Plaintiffs' hearsay declarations that any alleged conduct is on-going. This Court cannot enjoin that which is not occurring.

Finally, none of the parties have been able to engage in any discovery, prohibiting Defendant from challenging the claims. Because no discovery has taken place, a preliminary injunction risks harming and interfering with the right of a majority of Redwood residents to the

-1-

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
(CASE NO. C 07 3652 PJH)

1350649.7

1    safe and quiet enjoyment of their homes, which is jeopardized by residents whose families are

2    unable or unwilling to meet their elderly parent's care and medical needs. Thus, a preliminary

3    injunction risks harming a majority of the very class the named plaintiffs purport to represent.

4    The Motion for a Preliminary Injunction is, at best, premature.

5         In sum, Plaintiffs cannot show a combination of probable success on the merits and

6    possibility of irreparable injury, nor a "tipping" of the balance of hardship in their favor. The

7    Motion for a Preliminary Injunction is moot, lacks any probability of success on the merits, and if

8    granted could be detrimental to the very putative class on which it is purportedly brought. For

9    these reasons, and others, the Court should dismiss Plaintiffs' motion.

10                        **II.    PROCEDURAL STATUS**

11        The Complaint was filed on July 16, 2007, and served on July 19, 2007. Defendants filed

12   their Answer on August 15, 2007. (Franklin Dec. ¶ 2)  Despite repeated requests to have this

13   Motion scheduled for after the Case Management Conference ("CMC") and Initial Disclosures,

14   Plaintiffs filed this Motion to be heard on September 26, 2007. (Franklin Dec. ¶¶ 4, 6, 8, 9, 11,

15   .12)  The CMC is scheduled for October 25, 2007.

16                           **III.    FACTS**

17   **A.    REDWOOD RETIREMENT RESIDENCE IS DESIGNED FOR MIDDLE-CLASS
         ELDERLY PERSONS WHO CAN LIVE SAFELY IN THEIR OWN**
18       **APARTMENTS, WITH OR WITHOUT THE ASSISTANCE OF A PERSONAL
         CAREGIVER, AND WHO DO NOT UNDULY DISRUPT OR UPSET OTHER**
19       **RESIDENTS**

20        Redwood is not an assisted living or residential care facility.  Rather, it provides

21   apartment-style housing with various services for retired persons.  Redwood is owned by

22   Defendant Harvest Redwood Retirement Residence LLC which purchased the facility from

23   Redwood Retirement Residence LLC on March 1, 2007.  Holiday Retirement Corp. is an

24   affiliated entity with Redwood Retirement Residence LLC.  The Defendants are collectively

25   referred to herein as "Holiday."  Historically, Holiday's target market has been middle income

26   retirees. For more than 30 years, Holiday has built and operated its projects to fill this small

27   niche. (Tom Ahrens Dec. ¶ 2.)

28        Redwood has 97 units. First-floor units have a door that leads into an interior hallway and

- 2 -

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
(CASE NO. C 07 3652 PJH)                                                    1350649.7

1    another door that leads directly outside, so residents may come and go as they please. Many of the

2    second-story units have private balconies. Redwood, like other Holiday facilities, is designed for

3    group meals. The units have a sink, counter and small refrigerator. No units have cooking

4    facilities; it is anticipated that residents will eat in the dining room. For many residents, this meal

5    service is a highlight, both because it means they do not have to cook and because it provides an

6    opportunity to socialize with neighbors. (Ahrens Dec. ¶ 3.)

7         Residents pay a monthly fee, which includes three meals a day in the central dining room,

8    weekly housekeeping, linen changing, scheduled transportation services, scheduled group

9    excursions and a number of on-site activities, including exercise programs, bingo, card games,

10   arts and crafts, educational programs and devotional services. Hospice is provided on-site by

11   another company. (Ahrens Dec. ¶ 4.)

12        Redwood does not provide any personal care services. Residents are free to hire personal

13   caregivers to assist them in their daily living. Redwood does not screen or in any way control

14   these caregivers. (However, caregivers, residents, and families must agree to abide by the

15   Personal Caregiver Rules of Conduct.) Redwood does not provide any healthcare or medical

16   services, nor is it licensed to do so. Until approximately October 2006, an agency that provided

17   personal care services to a number of Redwood residents, Velez Care Services, leased office

18   space in the Residence. (Ahrens Dec. ¶ 5, ¶ 14.)

19        Holiday hires couples to act as resident managers in its senior housing facilities. A

20   building the size of Redwood usually has a second couple who act as the co-resident managers,

21   essentially assisting and reporting to the resident managers. Resident managers are not qualified

22   to and do not render medical assistance, nor do they provide or keep medication for residents.

23   (Ahrens Dec. ¶ 6; David Hall Dec. ¶ 5.)

24        The Rental Agreement ("Agreement") signed by Plaintiffs Duncan and Northern, and

25   which was typical of rental agreements in 2001 when they moved in, clearly states that the

26   apartments are designed "for persons who are capable of providing for their own health care and

27   personal care needs" and that "private duty caregivers or companions," hired by the resident, are

28   welcome at Redwood so long as they comply with applicable policies and guidelines. The

- 3 -

1    Agreement confirms that the facility "is not licensed to offer and does not offer assistance with

2    medication, bathing, dressing, mobility needs, or other personal or health care activities." The

3    Agreement also specifically provides that if at any time a resident "becomes incapable of

4    providing or fails to provide for health care or personal needs, or if a physical or mental condition

5    develops that creates a danger to self or others, the Resident agrees to promptly move out of the

6    Apartment .... Any determination that the Resident is required to move for the reasons set forth in

7    this paragraph shall be made in the sole judgment of the Facility Manager." (Exhibit 1, Plfs'

8    Motion for Injunction at page 3.)

9         The typical Redwood resident is a woman in her early to mid-eighties. The majority live

10   active, independent lives, many with the assistance of part-time personal caregivers. They

11   participate in social activities, eat in the dining room and utilize the Residence's transportation

12   services to stay mobile. About fifty percent (50%) of the residents need some kind of

13   accommodation or assistance. Many use walkers, canes, motorized carts (mobies) and

14   wheelchairs. (David Hall Dec. ¶ 4; Vanessa Batten Dec. ¶¶ 8-9.)

15        Holiday regularly provides any accommodation to the units that are requested by the

16   residents. It provides tub cut-outs and additional grab bars whenever residents request them. It

17   provides special sheets for specialized beds when residents need them. At least one resident had a

18   Hoyer lift temporarily installed in his apartment. (David Hall Dec. ¶ 5.)

19        If a disabled resident is otherwise qualified and can reasonably be accommodated,

20   Redwood accommodates him or her; management works with residents and their families so they

21   can remain at Redwood so long as they do not endanger themselves or others, or do not regularly

22   interfere with other residents' right to enjoy their homes and receive the services offered. (Ahrens

23   Dec. ¶ 18; David Hall Dec. ¶ 22; Denise Hall Dec. ¶¶ 5-6 ; Batten Dec. ¶ 12.)

24        Nine (9) units have been filled since April 2007. At least fifty percent (50%) of the new

25   residents have walkers and canes. Several are in wheelchairs. All except one, a 62-year-old

26   mentally disabled man, are in their 80's or 90's. Some of them have Alzheimer's or other mental

27   incapacities. Approximately a quarter of Redwood residents have personal caregivers who come

28   to or live on the premises with residents. (Batten Dec. ¶ 9.)

- 4 -

**B.    A TRAGIC INCIDENT IN THE SUMMER OF 2006 RESULTED IN SUBSTANTIAL CONCERN ABOUT SOME OF THE RESIDENTS' ABILITY TO COMPLY WITH THE TERMS OF THEIR OCCUPANCY, AS WELL AS CONCERN ABOUT THE RESIDENTS' PERSONAL CAREGIVERS**

In May of 2006, Regional Director Tom Ahrens hired David and Denise Hall to be co-resident managers at Redwood. This was their first job with Holiday and the first time they had worked in a residence for the elderly. (David Hall Dec. ¶ 1.) The resident managers, John and Susan Coll, had been at Redwood since 2001. (Ahrens Dec. ¶¶ 7-8.)

In approximately July of 2006, the Halls requested a transfer. This occurred within weeks of an incident in which an elderly Redwood resident named Carl Eggers apparently repeatedly struck his elderly wife while he was delusional. Mrs. Eggers had severe Alzheimer's and was living with her husband in the apartment next to the Hall's apartment. They had a private-duty, part-time caregiver during the day, who worked for the Velez Care Services agency. Mr. Eggers exhibited some aggressive and inappropriate behavior, including complaining that the Hall's apartment had an "evil cloud." (David Hall Dec. ¶ 2.)

On the day of the incident, the private-duty caregiver was the person who discovered the assault on Mrs. Eggers. He did not notify management or pull the emergency cord, which is the appropriate and required response. In fact, when Mr. Hall went to the apartment to ascertain if anything was wrong because the couple did not come to breakfast (their apartment was right off the dining room), the caregiver specifically told Mr. Hall that everything was fine. (*Id.*)

Approximately 90 minutes later, the Eggers' family rushed into the Residence, hurried into the apartment and closed the door. Soon after, paramedics rushed in and went to the room. Again Mr. Hall went to the apartment. At that time, the Eggers' son informed him that Mr. Eggers had hurt his mother. She died soon thereafter. (*Id.*)

This situation was highly upsetting to the Halls for a number of personal and professional reasons. One of Mr. Hall's professional concerns was the manner in which the caregiver handled the incident. The Halls left the Residence within a month. (*Id.*)

/ / /

/ / /

- 5 -

**C.    THE HALLS WERE ASKED AND AGREED TO RETURN TO REDWOOD AS RESIDENT MANAGERS IN SEPTEMBER 2006**

In August of 2006, Ahrens terminated the Colls' employment. He also terminated the employment of the maintenance manager and a dishwasher. All were terminated for misconduct. The circumstances of their terminations required their immediate departures. (Ahrens Dec. ¶ 8.)

Mr. Ahrens brought in interim and temporary managers while he sought replacements. He also spent more time at the property and became concerned about the number of persons who appeared to be disoriented and incapable of caring for themselves, even with the help of their private caregivers. At least four residents were receiving hospice care and others appeared extremely frail and disoriented. Ahrens does not have a medical background and has no grounds for assessing mental capacity. (Ahrens Dec. ¶ 9.)

In order to make sure that a situation like the Eggers did not recur, and to ascertain whether other residents presented a danger to themselves or others, he asked the corporate nurse, Irene Drabek, to come to Redwood, talk with residents and make an initial assessment based upon their behavior and interaction with her. Ms. Drabek came to the property on or about August 22, 2006. In her opinion, as expressed to Mr. Ahrens, a number of residents were not having their care and safety needs properly met or managed by their caregivers. One of those residents was Bernice Thornton. (Ahrens Dec. ¶¶9-10.)

Mr. Ahrens asked the Halls to return to Redwood as resident managers. Because of the disruption to residents caused by the previous managements' departure, he hoped bringing the Halls back would bring a sense of stability. Residents appeared relieved when he talked with them and could tell them that David and Denise Hall were returning. The Halls agreed to return in late August 2006. (Ahrens Dec. ¶ 12; David Hall Dec. ¶ 3.)

**D.    REDWOOD MANAGERS ATTEMPTED TO WORK WITH RESIDENTS AND THEIR FAMILIES TO IDENTIFY THOSE INDIVIDUALS WHO POSED A SAFETY RISK TO THEMSELVES BY CONTINUING TO LIVE AT THE RESIDENCE WITH THE LEVEL OF CARE THEY WERE BEING PROVIDED**

**1.    Redwood Management Had Legitimate Concerns About The Velez Caregiving Agency's Business Activities And Its Failure To Interact Appropriately With The Resident Managers**

- 6 -

In the fall of 2006, the Velez care group was leasing office space in the Residence and providing personal caregivers to a number of the residents. David Hall had been concerned about the quality of the care provided by some of the caregivers during his previous tenure at Redwood. In his view, the caregiver had acted very inappropriately in the Eggers incident by lying to him. In addition, the Halls were concerned about a number of on-going issues. The fact that the caregivers leased office space on-site meant they could attempt to provide care to more than one resident in a day and could trade off in shifts. It also meant they had a place to go other than their clients' apartments and, therefore, were not always available to the residents who were paying them. Further, a single caregiver could not assist six or seven residents when they each wanted to go to a meal, so residents' needs to get to the dining room were unmet. In Mr. Hall's opinion, the caregivers often could not or did not respond to individual emergency needs. (David Hall Dec. ¶ 8.)

There were numerous occasions on which Mr. Hall believed the caregivers were not adequately serving their clients. For example, on several occasions, elderly residents were found wandering the hallways yelling for their caregivers and asking staff members where they were. (*Id.*)

Because of the Eggers incident, among other issues, Mr. Ahrens believed Holiday had a responsibility to ensure that the Velez agency had adequate insurance in place to indemnify the Residence if any conduct or negligence by the caregivers created liability. He entered into discussions with Patricia Valencia, the owner. After she ascertained the expense of the insurance coverage, she decided to terminate her tenancy at the Residence, which Ahrens believed to be a good outcome. (Ahrens Dec. ¶ 14.)

**2.** The High Rate of Meal Tray Usage Was A Legitimate Concern

In September 2006, approximately 22-25 meal trays were being prepared by the kitchen for each meal: breakfast, lunch, and dinner. (David Hall Dec. ¶ 7.) This was far in excess of other facilities. (Ahrens Dec. ¶ 15.) Most of these trays were prepared on a regular basis for residents who, according to the caregivers, could not eat in the dining room. It was a strain on the kitchen and dining room staff because service to the dining room had to be interrupted to prepare the

- 7 -

trays. In addition, the caregivers went directly to the kitchen to obtain the trays resulting in further disruption to the kitchen staff. (David Hall Dec. ¶ 7.)

After consultation with Mr. Ahrens, the Halls implemented a requirement that residents who needed meal trays had to sign up for them in the managers' office. The requirement was that they sign up at least an hour before the meal. Some of the caregivers did not like this policy, as it restricted them from the kitchen. It is possible on some occasion that a caregiver who did not sign up a resident for a meal tray was refused one by the kitchen, but Hall does not recall that occurring. Redwood management never refused food to any resident. (David Hall Dec. ¶ 7; Denise Hall Dec. ¶ 3; Ahrens Dec. ¶ 15.)

### 3.    A Few Residents Were Restricted From The Dining Room For SpecificPeriods And For Specific Reasons

Upon arrival in the dining room and depending upon where they chose to sit, some residents were asked to move their walkers or wheelchairs to the side so that servers and serving carts could get through, and so that other residents would not trip and fall. If residents were unable to walk unassisted in the dining room, the Halls, staff members or personal caregivers assisted them. The Halls never restricted any resident with a walker, cane or wheelchair from the dining room. (David Hall Dec. ¶ 9.)

David Hall recalls restricting dining room access to only three residents during his tenure. One was for a brief period because management was informed the resident was suffering from a highly contagious stomach flu. The Halls were instructed by corporate nurse Irene Drabek that this particular flu could quickly spread to other residents and the person essentially should be quarantined. This upset the resident, Marion Jacks, who was lonely. Hall attempted to contact her family on a number of occasions, but eventually had to restrict her from the dining room until she got better. (*Id.* ¶ 10.)

The second person who was involuntarily restricted from the dining room for a lengthy period was Charles "Chuck" Bryden, who would cough so uncontrollably that he would vomit at the table. The vomiting occurred on several occasions before he was restricted. Other residents who sat at his table complained about the vomiting and the fact that Mr. Bryden did not bathe and

- 8 -

1   smelled badly. The Halls asked him not to come to the dining room, because of the disruption it

2   caused to others who were eating, until he could control the coughing and vomiting. (*Id.*)

3         The third person restricted from the dining room was Alda Michalis. Ms. Michalis

4   violently lashed out at servers and residents. She threw food at others and verbally assaulted

5   people. (*Id.*)

6         Bernice Thornton did not eat in the dining room; however, she was not restricted from

7   doing so. Her care needs required her to be spoon fed by her personal caregiver. The caregiver fed

8   Ms. Thornton in her room. Because there is limited room in the dining room, personal caregivers

9   typically do not stay with residents during meals. Ms. Thornton never requested an

10  accommodation to eat in the dining room. (*Id.*)

11      **4.**    **Redwood Management Reasonably Accommodated Bernice Thornton On A Number Of Occasions And Believed They Had Reached Agreement With Her**

12                  **Son Concerning Ms. Thornton's Need For An Increased Level Of Care**

13        An eviction notice was given to Bernice Thornton and her family in October 2006. Ms.

14  Thornton was disoriented and delusional. Mr. Hall was concerned about Ms. Thornton's personal

15  safety at the Residence. On one specific occasion, she had wandered out of the Residence in the

16  middle of the night in a t-shirt and diaper. She was found by a motorist and taken to Queen of the

17  Valley Hospital by paramedics. She could not identify herself to them. Mr. Hall also was

18  concerned that Ms. Thornton was disruptive and incontinent in her room and in the hallway.

19  (David Hall Dec. ¶ 11.)

20        Redwood does not have staff to ensure that residents do not leave the building. In fact,

21  first floor apartments have two exit doors, one to the shared hallway and one to the outdoors. The

22  grounds are not patrolled. Ms. Thornton was suffering from advanced Alzheimer's according to

23  her son and needed 24-hour care. She wandered in common areas without a shirt or bra and

24  attempted to go outside in that state of undress. She was often incoherent. The fact that she would

25  leave the building and endanger herself in that manner while reportedly having 24-hour care

26  indicated to the Halls that she was not able to live in the Residence's environment with this

27  continued inadequate care. (*Id.*)

28        After speaking with Ms. Thornton's son, Hall agreed to rescind the notice so long as Mr.

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
(CASE NO. C 07 3652 PJH)

1    Thornton would start making arrangements to obtain assistance for his mother that Redwood

2    could not provide. Tom Ahrens also spoke with Mr. Thornton on two occasions in the fall of 2006

3    about Ms. Thornton's actions because it appeared her care and safety needs were not being

4    adequately met by the caregivers. Mr. Ahrens believes he reached an agreement with Mr.

5    Thornton that it was necessary for him to provide his mother with additional and more adequate

6    care or that he would need to relocate her to another facility after the holidays. (Ahrens Dec. ¶ 13;

7    David Hall Dec. ¶ 11.)[1]

8    **E.     BECAUSE OF THE ADMINISTRATIVE, HEALTH AND SAFETY BURDENS
         ASSOCIATED WITH THE UNUSUALLY HIGH USE OF MEAL TRAYS,**
9    **     REDWOOD MANAGEMENT INSTITUTED A MEAL TRAY FEE BEGINNING
         IN JANUARY 2007; THAT FEE WAS WAIVED WHEN APPROPRIATE AND**
10   **     RESIDENTS WHO CHOSE NOT TO TAKE MEALS WERE PROVIDED WITH A
         RATE REDUCTION WHEN REQUESTED**

11

12          By December 2006, it was evident that the meal tray issue, although more under control,

13   was still creating disruption for the kitchen. After discussion with Ahrens, the Halls created a

14   written policy under which residents had to pay a nominal fee of $5 for each tray. Ahrens

15   believed this fee was reasonable considering the disruption. (Ahrens Dec. ¶ 15.)

16          The meal tray policy was discussed at several residents' meetings and each resident

17   received a copy of the policy at least a month before it was implemented. In general, it required

18   that residents pay $5 for provision of a meal tray after three (3) days. Mr. Hall believed the policy

19   was necessary and appropriate because (1) they believed the caregivers were abusing the meal

20   tray provision, (2) the provision of meal trays had an actual labor cost and inconvenience factor,

21   (3) the Residence is not designed to provide room service, (4) Mr. Hall believed it was important

22   to encourage residents to continue to socialize and come to the dining room when they could and

23   believed some of the residents were obtaining meal trays because it was easier for the caregivers

24   and (5) Mr. Hall believed that some of the residents were getting meal trays because they were

25   mentally disoriented and incapable of leaving their rooms, which indicated to him that they may

26   not be able to continue to live independently. (David Hall Dec. ¶ 12.)

---

[1] Plaintiffs allege, through hearsay allegations, that other residents were issued eviction notices
and moved out. (Pls' Motion for Injunction, 17:14-17). The cited evidence does not support this
allegation, which is untrue.

- 10 -

1    Although the Halls began by implementing the policy across the board, exceptions were

2    soon made when residents requested accommodation. One of those exceptions was for Ruby

3    Duncan, who turned 100 in January 2007, and who often had a difficult time physically getting to

4    the dining room. To management's knowledge, Redwood never actually charged Ms. Duncan for

5    any meal tray and she continued to receive them, consistent with her doctor's request, whenever

6    she wanted to eat in her room, until her death in July 2007. *(Id.*; Batten Dec. ¶ 7. *)*

7    In early 2007, Nancy Northern contacted Ahrens about her concern about the meal tray

8    charges. Ahrens agreed to allow her mother, Eva Northern, to receive meal trays free of charge

9    for an additional period. Ms. Northern was never faced with the prospect of her mother not being

10    given food. Ahrens told her that because of the disruption and costs associated with meal trays, a

11    nominal fee would be charged. This charge is substantially less than a room service charge would

12    be in a hotel. Ms. Northern asked whether her mother could obtain reimbursement for meals that

13    she did not obtain from Redwood. Ahrens told her he would look into it and call her back. Ahrens

14    spoke with Ms. Northern personally several days later. She told Ahrens she was surprised and

15    appreciative that he called. Ahrens told Ms. Northern that her mother would receive a

16    reimbursement for meals she did not take at Redwood. Eva Northern received a meal discount in

17    the amount of $300 per month from February 1, 2007, until April 13, 2007, as reimbursement for

18    untaken meals. (Ahrens Dec. ¶ 16; David Hall Dec. ¶ 19.)

19    **F.    BECAUSE ATTEMPTS TO WORK WITH A FEW RESIDENTS AND/OR THEIR
        FAMILIES ABOUT SAFETY AND DISRUPTION ISSUES WERE NOT**
20    **SUCCESSFUL, REDWOOD MANAGEMENT ISSUED FIVE EVICTION
        NOTICES IN APRIL 2007; ONE OF THOSE EVICTION NOTICES WAS**
21    **RESCINDED AFTER REASONABLE ACCOMMODATION WAS REQUESTED**

22    The Halls sent five eviction notices in April 2007. One was a second notice, sent to

23    Bernice Thornton's family. The other four notices were sent to Anne Paul, Maxine Ramacher,

24    Bill Nye and Dorman "Pete" Mitchell and/or their family members. Each of these eviction notices

25    was based on Holiday's concerns for the safety of the residents involved as well as its concerns

26    for the rights of other residents to enjoy safe and peaceful possession of their homes.  Holiday

27    management made several observations of conduct and behavior by these residents evidencing

28    mental deterioration that resulted in disorientation, irrational fears and behavior, inability to

- 11 -

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
(CASE NO. C 07 3652 PJH)

1350649.7

1   remember recent events, agitation and inappropriate and sometimes aggressive public behavior,

2   which was not controllable by the private caregivers. (David Hall Dec. ¶ 13.)

3        Because of conduct reported to him by the Halls, Ahrens agreed with assessments relating

4   to Anne Paul, Maxine Ramacher, Bill Nye and Dorman Mitchell, and approved the eviction

5   notices sent to them in April 2007. Because her care and safety needs were still unmet by the

6   personal caregivers and Tom Thornton now refused to consider moving her, Ahrens believed

7   Redwood had little choice but to give Ms. Thornton another eviction notice. Evictions are

8   relatively unusual occurrences. Usually the families will agree that the parent needs additional

9   care. Mr. Ahrens recalls only two other evictions in the last several years at any of the other

10  facilities he manages. (Ahrens Dec. ¶ 11, ¶ 13.)

11       In all cases but Mr. Mitchell, who did not have family in the area, Redwood management

12  spoke with family members on multiple occasions about the deteriorating mental conditions of

13  the residents before issuing the notices. It appeared to Mr. Hall that these adult children were

14  unwilling to take responsibility for their parents' need for assistance and care unless they were

15  forced to do so, either because it was too personally painful or because they did not want to spend

16  the money. (David Hall Dec. ¶¶ 13-14.)

17       **Anne Paul** was afraid to be alone or in her apartment and her mental faculties had

18  deteriorated to the point that she regularly was inappropriate in public settings. Her fear of

19  enclosed spaces resulted in her wandering in the hallways and frequently sleeping in her

20  nightgown on the lobby couch in a fetal position. She also refused to close the door to the

21  bathroom and frequently would take off her clothes when using the public restroom in the front of

22  the building, with the door open to the dining room. She would take out her false eye and play

23  with it, or mistakenly leave it on furniture in public areas. (*Id.* ¶ 15.)

24       **Maxine Ramacher** used an oxygen machine, which she carried with her at all times. She

25  was very confused and disoriented and could not operate the machine by herself. She frequently

26  became frightened that she couldn't breathe, and would come into the open areas screaming that

27  she couldn't breathe, then would hyper-ventilate and sometimes collapse. She expected Residence

28  managers to operate her oxygen machine,  although they did not have that expertise, nor is it

- 12 -

1   appropriate for them to provide that kind of medical care on any on-going basis. Ms. Ramacher

2   lost her keys multiple times each week and would have to be escorted to and let into her

3   apartment. She often stood in the hallway yelling, "Where's my caregiver?" or "Call my

4   caregiver." She exhibited clear signs of being frightened and unhappy much of the time and she

5   needed and deserved a facility in which more attention would be paid to her. (*Id.* ¶ 16.)

6       **Bill Nye** had severe memory problems and was becoming increasingly agitated and

7   disoriented. His adult daughter, who lives in Santa Rosa, was contacted several times in early

8   2007 about his deteriorating condition. He frequently would eat his meal, then complain to dining

9   room staff and managers that he had not been served and that food was being withheld from him.

10  He had no concept of time. He frequently wandered in the halls during the day and at night, and

11  was seen attempting to open the doors of other residents' apartments. Other residents' complained

12  about his behavior. The Halls worried about him leaving the building in the night given his

13  disorientation. He needed a lot of attention, particularly from the co-resident managers, because

14  of his deterioration. He was often agitated and disoriented with staff and regularly cut himself

15  shaving and came to the dining room bleeding. He sometimes slept in the dining room. During

16  the 30-days prior to the notice, he urinated on the floor of the public restroom three times.

17  Redwood attempted to detail some of the incidents that lead to the conclusion that it was not safe

18  for him to stay at the Residence, in a memo given to Mr. Nye's daughter, Celestia Amberstone,

19  that accompanied the notice. (*Id.* ¶ 17; Denise Hall Dec. ¶ 2.)

20      **Dorman "Pete" Mitchell** had a hearing problem and would listen to his television late

21  into the night at a volume so loud that his neighbors complained. Although he had earphones for

22  the television, he refused to wear them. He had no family of which the Halls were aware. He had

23  a caregiver that provided limited service. He had incontinence problems that he did not or could

24  not control, and on a number of occasions defecated on the floor. On one occasion, he called

25  David Hall in his apartment at 3:00 a.m. to tell him that he had defecated in his bed and that Hall

26  needed to come to change the sheets. When Mr. Mitchell was told that neighbors complained

27  about the volume of his television, he defecated directly in front of the door of the unit of the

28  resident who had complained. When confronted, he laughed about it. (David Hall Dec. ¶ 18.)

- 13 -

1   **Bernice Thornton** needed 24-hour assistance seven days a week. Other than finding her

2   occasionally wandering in the hallway, disoriented, she was a recluse. She did not regularly come

3   out of her room and when she did, she was led by her caregiver and was incoherent. On occasion

4   she was in public areas unclothed. She received her meals on trays in her room. During the time

5   the Battens were resident managers, Ms. Thornton was not charged for a meal tray. Ms. Thornton

6   still owes Redwood for her last month's rent. (*Id.* ¶ 11; Batten Dec. ¶ 3.)

7   **G.    NEITHER OF THE NAMED PLAINTIFFS, EVA NORTHERN AND RUBY
         DUNCAN, WERE EVER THREATENED WITH OR GIVEN AN EVICTION**
8   **NOTICE**

9         Neither Ruby Duncan nor Eva Northern were ever given eviction notices, nor did the

10  Halls have any plan to do so. (David Hall Dec. ¶ 14.)

11        On a number of occasions, however, Mr. Hall did discuss with Eva Northern's daughter

12  his observations of Ms. Northern's behavior and Ms. Northern not receiving adequate care from

13  her personal caregiver. Ms. Northern exhibited advanced symptoms of dementia. She was very

14  reclusive. When the Halls first arrived, Denise would make a point of delivering her meal tray so

15  that she could make sure Ms. Northern was safe. Ms. Northern could speak clearly, but the topic

16  of conversation was nonsensical. She made irrational complaints and strung unrelated thoughts

17  together in sentences without stopping. Redwood management members had numerous

18  conversations with Ms. Northern's children about her condition and the fact that the 24-hour care

19  she allegedly was receiving was insufficient. On the few occasions when Ms. Northern left her

20  room, she would wander and talk incoherently. For a time, one of Ms. Northern's children, a son,

21  stayed with her. He, however, was so overweight and unconditioned that he could not physically

22  help her and generally did not appear to assist in her care in any way. (David Hall Dec. ¶ 19.)

23        Nancy Northern informed the Halls she was moving her mother to an assisted living

24  facility in March 2007.  (David Hall Dec., Ex. 2.) A week before she moved to Aegis, Eva

25  Northern, who had a cat, decided to empty a kitty-litter box by dumping it into her bathtub and

26  turning on the water to flush it down the drain. She left the water on all night, flooding not only

27  her apartment but thirty (30) feet of the hallway, causing thousands of dollars of damage to the

28  Residence. In Redwood's view, this was another incident that underscored Ms. Northern's

- 14 -

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
(CASE NO. C 07 3652 PJH)

1350649.7

1    incapacity. (*Id.* ¶ 20.)

2         Mr. Hall was told that repairs to the apartment, which required removing the carpet,

3    replacing flooring and re-doing plaster, could not begin until the unit was vacant. He also was

4    told that mold would grow quickly and cause even further damage. Hall explained this to Nancy

5    Northern and asked her to have her mother move out as soon as possible. At the time, Ms.

6    Northern appeared very understanding and embarrassed about her mother's actions. (*Id.*)

7    **H.    REDWOOD HAS NOT HAD A MEAL TRAY POLICY SINCE AT LEAST APRIL
8          2007, NOR HAS REDWOOD ISSUED ANY EVICTION NOTICES SINCE THAT
9          TIME; REDWOOD  HAS NO PLANS TO ISSUE ANY EVICTION NOTICES
10          BECAUSE NONE OF THE RESIDENTS POSE A RISK TO THEMSELVES OR IS
      UNDULY INTERFERING WITH OTHER RESIDENTS' QUIET ENJOYMENT
      OF THE PROPERTY**

11         Gary and Misty Batten took over as resident managers on May 4, 2007. They have never

12    charged residents for meal trays or implemented any meal tray policy. (Batten Dec. ¶ 1, ¶ 7.)

13         At the time the Battens took over, two eviction notices were still pending. Ms. Thornton

14    moved out in July. Mr. Mitchell still resides at Redwood. (Batten Dec. ¶ 2.)

15         Soon after the Battens arrived, they were contacted by a person from the Veteran's

16    Administration ("VA"), who requested that Redwood accommodate Mr. Mitchell and agreed to

17    provide him with the services of a personal caregiver. Ms. Batten worked with the VA, which

18    arranged for a caregiver to come and assist Mr. Mitchell with his incontinence and bed sores. Mr.

19    Mitchell also agreed to wear his earphones while watching television, which he earlier had

20    refused to do. The Battens rescinded the eviction notice and have had no complaints from

21    residents. *(Id.)*

22         The Battens have not issued any eviction notices and have no intention of issuing any, nor

23    were the Halls contemplating any further eviction notices before they left Redwood. (*Id.* ¶ 6;

24    David Hall Dec. ¶ 21.) The current Redwood residents are meeting the terms of their occupancy;

25    i.e., they are capable of providing for their own health care or personal care needs, with or

26    without a caregiver, and do not create a danger to themselves. Accordingly, Redwood has no

27    intention of issuing any eviction notices to any residents. (Batten Dec. ¶ 6.)

28    / / /

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
(CASE NO. C 07 3652 PJH)

1350649.7

## IV.    ARGUMENT

Because it is a drastic remedy, courts do not routinely grant preliminary injunctions. 11a C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* §2942, p. 43 (2d ed. 1995); *Weineberger v. Romer-Barcelo*, 456 U.S. 305, 311-12 (1982); *Intel Corp. v. ULSI Systems Technology, Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). The function of a preliminary injunction is to preserve the status quo and to prevent irreparable loss of rights prior to judgment. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F. 2d 1415, 1422 (9th Cir. 1984). "[T]o warrant the granting of an injunction on ground that irreparable injury is threatened, the injury contemplated must be real, not fancied; actual, not prospective; and threatened, not imagined." 11a C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* §2942, p. 47 (2d ed. 1995), quoting, *Ass'n of Professional Engineering Personnel v. Radio Corp. of America*, 183 F. Supp. 834, 839 (D.C.N.J. 1960).

There is nothing about the facts or circumstances of this case that necessitates the extraordinary action of a preliminary injunction: (1) Plaintiffs lack standing, and the injunctive relief requested is otherwise moot; (2) Plaintiffs cannot show any likelihood that they will prevail on the merits; (3) Plaintiffs seek relief that may interfere with the quiet enjoyment, and potential safety for other residents; and (4) best case for Plaintiffs, the Motion is premature in that it is brought without any opportunity for discovery.

## A.    PLAINTIFFS LACK STANDING TO BRING THE INJUNCTION AND, IN ANY EVENT, THE MOTION IS MOOT BECAUSE THE REQUESTED RELIEF IS UNNECESSARY AND THE CENTER HAS COMPLETELY FAILED TO MEET THE PREREQUISITES OF CLASS CERTIFICATION

Mootness and standing have a particular application when a plaintiff seeks injunctive relief. Constitutional standing is a necessary element of any claim for injunctive relieve. This requires plaintiff to show injury in fact (a concrete harm that is actual or imminent), causation, and redressibility. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that *the plaintiff* will be wronged again...." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (emphasis added). The

- 16 -

1350649.7

1    jurisdictional requirement that an individual seeking relief in federal court must show some actual

2    or threatened injury to himself is imposed by the language of Article III of the Constitution,

3    limiting the jurisdiction of the federal courts to "cases or controversies." *Simon v. Eastern Ky.*

4    *Welfare Rights Org* ., 426 U.S. 26, 37 (1976). A matter is moot when the issues presented are no

5    longer "live" or the parties lack a legally cognizable interest in the outcome. *Powell v.*

6    *McCormack*, 395 U.S. 486, 496 (1969).

7        Here, none of the Plaintiffs can show any actual or threatened future injury. Plaintiff

8    Duncan is deceased; Plaintiff Northern left the Residence in March 2007. Neither of them

9    received an eviction notice nor paid a meal tray fee. Despite multiple solicitations to potential

10   class members over the last several months (*see* Batten Dec. ¶¶ 5, 10, 11), the Center has not even

11   alleged that it has elicited another complaint, much less another class member.[2]

12       Moreover, even if the Plaintiffs had standing (which they do not), the issue itself is moot

13   because Redwood no longer has a meal tray policy that requires payment, and management has

14   issued no eviction notices and has no plans to issue eviction notices. 11a C. Wright, A. Miller &

15   M. Kane, *Federal Practice and Procedure* §2942, p. 47 (2d ed. 1995) ("Because injunctive relief

16   looks to the future, and is designed to deter rather than punish, relief will be denied if the conduct

17   has been discontinued on the ground that the dispute has become moot and does not require the

18   court's intervention.") Voluntary cessation of an illegal course of conduct may render moot a suit

19   challenging such conduct where (1) there is no reasonable expectation that the wrong will be

20   repeated, and (2) interim relief or events have eradicated the effects of the alleged violation.

21   *Barnes v. Healy*, 980 F. 2d 572, 580 (9th Cir. 1992). In other words, a plaintiff must present

---

22   [2] The Supreme Court has emphasized that those seeking class certification must meet "the
23   prerequisites of numerosity, commonality, typicality, and adequacy of representation specified in
     Rule 23(a)... These requirements effectively "limit the class claims to those fairly encompassed
     by the named plaintiff's claims." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 156
24   (1982). Additionally, "a class representative must be part of the class and 'possess the same
     interest and suffer the same injury' as the class members." *East Texas Motor Freight System, Inc.*
25   *v. Rodriguez*, 431 U.S. 395, 403, (1977). Even if Plaintiffs could somehow adequately represent a
     putative class with respect to equitable relief (which they cannot), disability-access cases are
26   particularly inappropriate for class certification. *Mantolete v. Bolger*, 767 F.2d 1416, 1425 (9th
     Cir. 1985) (district court did not err in dismissing class allegations under the Rehabilitation Act
27   because it required a case-by-case adjudication); *Sokol v. New United Motor Mfg., Inc.*, 1999 U.S.
     Dist. LEXIS 20215 (N.D. Cal. 1999) (class allegations under the ADA dismissed as
28   individualized inquiry would be required, resulting in no typicality).

- 17 -

1   evidence demonstrating a likelihood that she *will be injured* by the threatened conduct. *Doe v.*

2   *National Bd. of Med. Examiners*, 199 F.3d 146, 152-53 (3rd Cir. 1999).

3       That the present Plaintiffs have suffered some alleged injury in the past is insufficient to

4   confer standing to challenge present or future actions. "Past exposure to illegal conduct does not

5   in itself show a present case or controversy regarding injunctive relief.... if unaccompanied by

6   present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974).

7       Thus, even assuming *arguendo* that Redwood's actions somehow violated the law, that

8   conduct has ceased. The claim for an injunction is moot.

9   **B.    EVEN IF THE COURT REACHES THE MERITS, PLAINTIFFS HAVE FAILED
        TO MAKE A CLEAR SHOWING OF EITHER A LIKELIHOOD OF SUCCESS**
10      **ON THE MERITS OR THE POSSIBILITY OF IRREPARABLE INJURY**

11      Because a preliminary injunction is an extraordinary remedy, courts require the moving

12  party to carry its burden of persuasion by a "clear showing." 11A *C. Wright, A. Miller, & M.*

13  *Kane, Federal Practice and Procedure* § 2948, pp. 129-130 (2d ed. 1995); *Mazurek v.*

14  *Armstrong,* 520 U.S. 968, 972 (1997); *City of Angoon v. Marsh*, 749 F.2d 1413, 1415 (9th Cir.

15  1984). Here, Plaintiffs have failed to meet that burden.

16      **1.    Plaintiffs Cannot Establish A Strong Likelihood Of Success On The Merits
                Because There Is No Evidence That Defendants Unlawfully Discriminate**
17          **Against Disabled Residents**

18      Discrimination claims brought under the Fair Housing Act ("FHA") are analyzed in the

19  same manner as Title VII employment discrimination claims. *Gamble v. City of Escondido*, 104

20  F. 3d 300, 304 (9th Cir. 1997). Plaintiffs cannot establish a *prima facie* case of disability

21  discrimination, first because they are not "qualified disabled persons" as that term is defined

22  under either state or federal law and, second, because they cannot show they were treated

23  differently than non-disabled persons, and third because they were not denied a reasonable

24  accommodation. To state a claim under § 3604(b), a plaintiff must show that he or she was

25  subjected to different "terms, conditions, or privileges because of a protected status." *Inland*

26  *Mediation Board v. City of Pomona*, 158 F. Supp. 2d 1120, 1148 (C.D. Cal. 2001).

27      To be protected under the anti-discrimination statutes, a person must be a "qualified

28  disabled person," which means a person who, with or without accommodation can (in this

- 18 -

1    context) reside at Redwood so long as they meet the basic requirements of occupancy, e.g., (1)

2    are financially qualified, (2) pay their rent and other fees, (3) follow other contract terms, the

3    lawful rules of residency and do not unreasonably disrupt the quiet enjoyment of the day-to-day

4    living for the other residents (with, or without accommodation and/or assistance from personal

5    care providers), and (4) they do not pose a danger to others, or themselves. 29 U.S.C. § 794 (a)

6    (Section 504 of the Rehabilitation Act); 42 U.S.C. §§ 12111(8) and 12131(2) (Americans with

7    Disabilities Act Titles I, and II).

8        Here, the Plaintiffs are no longer able to live at the Residence. The evidence in Nancy

9    Northern's declaration makes clear that her mother is no longer capable of living in an assisted

10   care facility, much less an apartment complex like Redwood. To the extent the Court treats Mr.

11   Nye, Ms. Thornton or any of the other "evictees" as Plaintiffs (which they are not), they similarly

12   will be unable to make a *prima facie* case because they were and are unable, even with ample

13   accommodation, including 24-hour caregivers, to live at Redwood safely and without disrupting

14   other residents' peaceful enjoyment of their homes. These former residents were asked to leave

15   not because of their status but because of their particular conduct, and consistent with the

16   Agreement they signed.

17       Second, there is no evidence to support the contention that Ms. Duncan, Ms. Northern or

18   any of the evictees were treated differently than non-disabled persons (assuming there is such a

19   resident at Redwood). There is no evidence that Redwood tolerated (1) able-bodied persons who

20   presented a danger to themselves, (2) able-bodied persons who repeatedly interfered with other

21   residents' right to a quiet enjoyment of their homes, or (3) able-bodied persons that violated

22   material contract terms or other lawful rules of residency. Further, Plaintiffs cannot show that a

23   nominal meal tray fee, assuming *arguendo* that any of them had to pay it, violates the law. *See*

24   *United States v. California Mobile Home Park Management Co.,* 29 F.3d 1413, 1418 (9th Cir

25   1994) (Challenged mobile-home fee rules must have the potential to deny persons an equal

26   opportunity to use and enjoy a dwelling because of their disability -- a question of fact that calls

27   for a case-by-case determination. There are, of course, many types of residential fees that affect

28   disabled and able-bodied residents equally; such fees are clearly proper.); *United States v.*

- 19 -

1   *California Mobile Home Park Management,* 107 F.3d 1374 (9th Cir. 1997) (Similarly and to the

2   extent the Court addresses the hearsay allegations of discrimination in the dining room, residents

3   may be restricted if their conduct creates an unsafe situation for them or disrupts others. *E.g.,*

4   *United States v. Hillhaven,* 960 F.Supp. 259 (D. Utah 1997) (summary judgment upholding

5   reasonable safety restrictions on disabled person's use of motorized cart in retirement

6   community); *Appenfelder v. Deupree St. Luke,* 1995 U.S. Dist. LEXIS 21960 (S. D. Ohio 1995)

7   (defense summary judgment granted: limits on reasonable accommodation when resident required

8   spoon feeding, disrupted other residents' dining experience, and needed a nurse to supervise her

9   eating*).*

10      Third, there is no evidence that either of the Plaintiffs requested any accommodation that

11  was not granted nor that Redwood refused them any right to tenancy or enjoyment of their

12  tenancy. As to the putative plaintiffs, Redwood is not an assisted living facility or a skilled

13  nursing facility and is not required to fundamentally alter the nature of its business to

14  accommodate persons with disabilities. *See Groener v. Golden Gate Apartments,* 250 F.3d 1039

15  (6th Cir. 2001) (defense summary judgment granted: tenant with schizophrenia and depression,

16  who screamed at night and slammed doors, lawfully had month-to-month tenancy terminated).

17  See also Cal Health & Safety Code § 1569.44(a)(3), which requires that a facility that retains

18  residents who need care and supervision must be licensed as a residential care (assisted living)

19  facility for the elderly. Plaintiffs do not have cognizable discrimination claims. An injunction

20  cannot be issued under these facts and circumstances.

21      **2.    Plaintiffs Cannot Show The Possibility Of Irreparable Injury**

22      Even if plaintiffs' establish a likelihood of success on the merits, the absence of substantial

23  likelihood of irreparable injury would, standing alone, make preliminary injunctive relief

24  improper. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000); *Doran v. Salem Inn, Inc.*, 422

25  U.S. 922, 931 (1975) ("The traditional standard for granting a preliminary injunction requires the

26  plaintiff to show that in the absence of its issuance he will suffer irreparable injury."); 11a C.

27  Wright, A. Miller & M. Kane, *Federal Practice and Procedure* §2948.1, p. 149-53 (2d ed. 1995),

28  ("[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate

- 20 -

1    alternate remedy in the form of money damages or other relief....a party may not satisfy the

2    irreparable harm requirement if the harm complained of is self-inflicted."); *Save Our Summers v.*

3    *Wash. State Dep't of Ecology*, 132 F. Supp. 2d 896, 906 (E.D. Wa. 1999) ("As a general rule,

4    irreparable harm is not present when the plaintiff has a claim for monetary damages, since the

5    monetary award is generally sufficient compensation for the harm."); B. Garner, *A Dictionary of*

6    *Modern Legal Usage*, p. 469 (2nd ed. 1995) ("Often misunderstood, irreparable injury means

7    merely that the injury cannot be remedied through an award of damages.")

8        Here, as stated above, neither Plaintiff Duncan nor Plaintiff Northern faces the prospect of

9    irreparable injury -- Ms. Duncan passed away, and Ms. Northern's voluntarily moved due to her

10   care and medical needs. Next, any alleged harm to the Center, can be satisfied in an action at law

11   rather than equity. Indeed, Plaintiffs seek an award of "statutory, compensatory, and punitive

12   damages according to proof." (Request for Judicial Notice; Plfs' Complaint for Monetary,

13   Declaratory and Injunctive Relief, 24:6-7.)

14       With respect to irreparable injury, Plaintiffs put misplaced reliance on their claim that

15   "when a plaintiff alleges that the defendants have engaged in prohibited discriminatory practice,

16   all that is needed to support an injunction is proof that the practice exists." (Plfs' Motion for

17   Injunction, 23:11-13.) *Topic v. Circle Realty Co.* makes no reference to "irreparable injury" and is

18   instead a ruling on an apartment-owner defendant's motion to dismiss -- not a pre-discovery

19   preliminary injunction motion initiated by plaintiff. *Topic v. Circle Realty Co.*, 377 F. Supp. 111,

20   114 (C.D. Cal. 1974).

21       Similarly, Plaintiffs' cite to *Gresham v. Windrush Partners, Ltd.*, an Eleventh Circuit case,

22   for the proposition that irreparable injury may be presumed in Fair Housing Act cases. (Plfs'

23   Motion for Injunction, 14:20-28); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417,1423 (11th

24   Cir 1984). But *Gresham* further recognized that the plaintiffs in that case (1) had standing to bring

25   suit, and (2) showed substantial likelihood that defendant violated the FHA, which was

26   unrebutted by the defendants. *Id.* Also, *Gresham* relied on an old rule that "Where . . . an

27   injunction is authorized by statute and the statutory conditions are satisfied . . . the usual

28   prerequisite of irreparable injury need not be established ..." *Id.* quoting *United States v. Hayes*

- 21 -

*International Corporation*, 415 F.2d 1038, 1045 (5th Cir. 1969). The continued validity of these cases seems doubtful in light of *eBay Inc. v. Merc Exchange, L.L.C.*, which rejected the notion that if an injunction is authorized by statute the courts may dispense with the prerequisite of irreparable injury. That is, plaintiffs must demonstrate each of the four elements required under the traditional test; proof of one does not dispense with proof of another. The court's discretion must be exercised consistent with traditional principles of equity. Schwartzer, Tashima & Wagstaffe, *Cal. Prac. Guide: Fed. Civ. Pro. Before Trial*, p. 13-27 (The Rutter Group 2007), citing *eBay Inc. v. Merc Exchange, L.L.C.*, __ U.S. __, 126 S. Ct. 1837 (2006).[3]

In terms of factual comparisons, the plaintiff in *Gresham* was a black female attempting to locate subsidized housing. She was turned away from an apartment complex due to her race and was concerned that she would not be able to locate subsidized housing in an integrated area. In contrast, here, neither of the named plaintiffs was turned away from the Residence. Duncan lived at the Residence until her death after her 100th birthday, and Northern voluntarily moved into an assisted living facility where her care and medical needs could be better met.

**3.    Plaintiffs Similarly Cannot Demonstrate That Serious Questions Are Raised By Their Motion And That The Balance Of Hardships Tips Sharply In Their Favor**

The Center has received a handful of complaints over the last year or so related to changes that have taken place at Redwood Retirement Residence. As set forth above, those changes resulted from serious and well-reasoned management concerns. There is no evidence that Redwood management acted arbitrarily or capriciously in enforcing provisions of the rental agreements that require residents to relocate if they, in the opinion of Redwood management, present a danger to themselves or others. The balance of hardships does not tip in their favor.

**4.    An Injunction Does Not Serve The Public Interest**

---

[3] Plaintiffs string cite to *Silver Sage Partners, LTD v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) for the same proposition as *Gresham*. *Silver Sage Partners* is not a preliminary injunction motion (let alone a preliminary injunction motion before any discovery), and is instead a motion for a permanent injunction following two trials -- where the defendant did "not contest its liability." Next, Plaintiffs' string cite to *Hous. Rights Ctr. v. Donald Sterling Corp.*, 274 F. Supp. 2d 1129, 1139 (C.D. Cal. 2003). The *Hous. Rights Ctr.* case involved facts related to a landlord promoting his building as a "Korean" building. In that case, the court <u>denied</u> much of plaintiffs' motion for preliminary injunction.

- 22 -

1  Holiday fills a particular niche between single family home living and licensed assisted

2  living. It provides apartments for middle-class individuals and couples, particularly elderly

3  females, to enable them to live independently, with or without the assistance of a caregiver, as

4  they age. Redwood has communal dining and no cooking facilities in the apartments, but it is not

5  an assisted living facility nor is it residential care. It does not have the ability to provide care to its

6  residents. Indeed, if it attempted to provide medical services or care for persons with Alzheimer's

7  or senile dementia, it would be in violation of a number of laws and regulations. It also has a

8  responsibility and a right to determine when a resident is incapable of continuing to live safely in

9  the apartment and peaceably and nondisruptively in a community of other elderly people, most of

10  whom are disabled. That determination is made based upon a number of factors, the most

11  important being the safety of the person involved. If caregivers do not provide adequate care for a

12  resident who cannot live independently in an unlicensed communal setting without that care, the

13  resident must move, under the terms of the Agreement.

14  Defendants recognize that assisted living and residential care facilities are expensive and

15  that many adults do not want their elderly disabled parents in their home because of disruption

16  and the amount of attention that is required. However, Defendants are not required to

17  fundamentally alter their business model to become an assisted living facility, or to allow

18  dangerous and disruptive behavior to destroy the ability of other residents to enjoy their homes.

19  Any injunction that would prohibit Defendants from making reasoned, legitimate

20  decisions about whether Redwood is safe or appropriate for a particular resident would be against

21  public policy.

22  **C.     REDWOOD DOES NOT HAVE POLICIES THAT ILLEGALLY LIMIT**
23  **TENANCY BASED UPON A RESIDENT'S DISABILITIES; USE OF THE TERMS**
    **"INDEPENDENT" AND "ACTIVE" ARE APPROPRIATE IN THE CONTEXT**
    **QUOTED, REFLECT GENERAL TRADE USAGE AND ARE NOT *PER SE***
24  **IMPROPER, AS PLAINTIFFS WOULD HAVE THE COURT BELIEVE**

25  Plaintiffs ask this Court to require Redwood to eliminate any "policies" that limit tenancy

26  by requiring that residents "be able to maintain an 'active' lifestyle or be 'independent.'" (Plfs'

27  Motion for Injunction, 4:9-12; 18:19-27). This request is overly broad, burdensome and improper.

28  First, there is nothing about those terms that is *per se* improper or unlawful. What the

- 23 -

cases have held is that use of the term "independent," when used as a subterfuge for restricting residents with disabilities or restricting residents who need personal caregivers, is unlawful. *Cason v. Rochester Housing Authority*, 748 F. Supp. 1002 (W.D. N.Y. 1990) (Plaintiffs moved for injunction at trial to prevent defendants from requiring that rental applicants demonstrate that applicants could live independently - defendants based queries on generalize perceptions and unfounded speculation.); *United States v. Forest Dale, Inc.*, 818 F. Supp. 954 (N.D. Tex. 1993) (Court denied defendants' motion for summary judgment, when defendant had a policy that required applicants to be ambulatory and physically independent. Plaintiff's husband was blind and partially paralyzed.).

As is clear from the facts set forth above, Redwood has a number of residents with disabilities. Many use walkers, mobies or wheelchairs. A number have Alzheimer's or dementia. At least one resident has a 24-hour personal caregiver. There is no policy that unlawfully discriminates against persons with disabilities, oral or otherwise, so there is nothing to enjoin.

Furthermore, the terms "active" and "independent" are common words. They do not in and of themselves reflect discriminatory animus. For example, organizations that provide rehabilitation and other services to disabled people often refer to themselves as "centers for independent living."[4] There is nothing in the context of the writings identified by Plaintiffs that would mandate or even allow the inference of improper discriminatory motive.

### D.   THE MOTION FOR AN INJUNCTION IS PREMATURE

Despite waiting for three months after service of the allegedly discriminatory eviction

---

[4] For example, the Center for Independent Living, a Bay Area organization that is "a national leader in supporting disabled people in their efforts to lead independent lives." http://www.cilberkeley.org/about_cil.htm. Additionally, under California Welfare and Institutions Code § 19801, the State legislature provides that independent living centers may be established to provide services to disabled persons. This includes providing housing assistance to persons with disabilities, in addition to promoting the "independent living philosophy" of (1) consumer control of the center regarding decision-making and management, (2) self-help and self advocacy, (3) development of peer relationships, and (4) equal access of individuals with disabilities to society and to all services, programs, activities, resources, and facilities.

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
(CASE NO. C 07 3652 PJH)

1350649.7

1  notices before filing a civil Complaint (thus ensuring that the eviction notices would have been

2  either fulfilled or expired), Plaintiffs brought this Motion before Defendants even had an

3  opportunity to file an answer. Plaintiffs claim an injunction is so urgent that a requested extension

4  until after the CMC – allowing Defendants to gather facts – is impossible. (Franklin Dec. ¶¶ 9 and

5  10).  Yet this is exactly the situation in which the law contemplates additional time.

6          When the facts are in dispute, a motion for preliminary injunction supported only by

7  written evidence usually will be denied. 11a C. Wright, A. Miller & M. Kane, *Federal Practice*

8  *and Procedure* § 2949, p. 222-223 (2d ed. 1995).  The facts that make up the bulk of Plaintiffs'

9  evidence, assertions by Mae Louse Whitaker and Nancy Northern and hearsay assertions by two

10  caregivers, are specifically and vigorously denied by Defendants' managers.  (*See, e.g.,* Denise

11  Hall Dec. ¶¶ 3-7  ; David Hall ¶ 10, 12, 19; Tom Ahrens Dec. ¶ 16.) Under the Federal Rules of

12  Civil Procedure, without its own motion for expedited discovery, Defendants are unable to depose

13  or otherwise question the third party declarants to determine the accuracy of the representations,

14  or their personal knowledge of them, until after the Case Management Conference, which is

15  scheduled for late October. This is not a situation in which a preliminary injunction is appropriate.

16          Although Plaintiffs have regularly solicited Redwood residents, by phone and in writing,

17  in an attempt to add complainants (an effort that apparently has not met with success), they have

18  failed to inform those same residents of the possibility of an injunction that arguably could

19  interfere with the residents' quiet enjoyment of their homes. Accordingly, Plaintiffs' motion is

20  premature on that ground as well.  This Motion is a waste of the Court's time and resources.

### V.    CONCLUSION

22          For all the foregoing reasons, Defendants respectfully request that this Court deny

23  Plaintiffs' request for preliminary injunction.

24  DATED:  September 5, 2007                    HANSON BRIDGETT MARCUS
                                                 VLAHOS & RUDY, LLP
25

26                                              By: _____
                                                    KURT A. FRANKLIN
27                                                  SARAH D. MOTT
                                                    Attorneys for Defendants
28

- 25 -