1  BRANCART & BRANCART
      Christopher Brancart (SBN 128475)
2     Liza Cristol-Deman (SBN 190516)
   Post Office Box 686
3  Pescadero, CA 94060
   Tel:    (650) 879-0141
4  Fax:    (650) 879-1103
   cbrancart@brancart.com
5  lcristoldeman@brancart.com

6  Attorneys for all Plaintiffs

7  PROTECTION & ADVOCACY, INC.
      Stuart Seaborn (SBN 198590)
8     Dara Schur (SBN 98638)
      Eric Gelber (SBN 95256)
9  100 Howe Ave.  Suite 235N
   Sacramento, CA 95825
10 Tel:    (916) 488-9950
   Fax:    (916) 488-9960
11 stuart.seaborn@pai-ca.org

12 Attorneys for Ruby Duncan, Eva Northern,
    and Class Plaintiffs Only
13

14                    UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16 | GREATER NAPA FAIR HOUSING          ) | Case No. C07-3652 PJH
   | CENTER, a California Not for Profit ) |
17 | Corporation, doing business as      ) | REPLY TO DEFENDANTS'
   | FAIR HOUSING NAPA VALLEY, as        ) | OPPOSITION TO MOTION FOR
18 | an individual entity only; et al.,  ) | ISSUANCE OF PRELIMINARY
   |                                     ) | INJUNCTION
19 |         Plaintiffs,                 ) |
   |                                     ) |
20 |   vs.                               ) |
   |                                     ) |
21 | HARVEST REDWOOD                     ) |
   | RETIREMENT RESIDENCE, L.L.C.,       ) | **HEARING:**
22 | doing business as Redwood           ) | Date: September 26, 2007
   | Retirement Residence; et. al,       ) | Time: 9:00 a.m.
23 |                                     ) | Place: 450 Golden Gate Ave.,
   |         Defendants.                 ) |        Courtroom 3, 17th Floor
24 |_____)

25 ///

26 ///

27 ///

28 ///

**REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH**

# **TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.    PLAINTIFFS HAVE STANDING BECAUSE THEY HAVE BEEN INJURED, AND CONTINUE TO SUFFER IRREPARABLE HARM AS A RESULT OF DEFENDANTS' DISCRIMINATORY PRACTICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.    PLAINTIFFS HAVE SHOWN, AND DEFENDANTS' ADMISSIONS CONFIRM, THAT PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

               1.    Defendants Mistakenly Rely on the "Qualifying Individual with a Disability" Standard, which is inapplicable under the FHA. . . . . . 5

               2.    Defendants' Admissions Show that Plaintiffs Have a Substantial Likelihood of Prevailing on Their Claim for Discriminatory Evictions and Discriminatory Terms and Conditions of Occupancy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

               3.    Defendants Admit that their Meal Tray Charges Were Intended to Identify People with Disabilities, in Violation of Section 3604 (f)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

               4.    Defendants Admit That They Have Made Statements That Are Facially Discriminatory, in Violation of Section 3604(c). . . . . . . . . 9

               5.    Redwood's Use of A Corporate Nurse to Interview Residents about Their Ability to Care for Themselves Violates the Fair Housing Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

               6.    Defendants Cannot Demonstrate that Their Policies Were Properly Intended to Exclude only those who Pose a Direct Threat. . . . . . . . . . . . 11

        C.    THE BALANCE OF HARDSHIPS TIP IN PLAINTIFFS' FAVOR, SINCE THE HARM ALLEGED BY DEFENDANTS IS PURELY SPECULATIVE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        D.    THIS IS A LIVE CONTROVERSY: DEFENDANTS CONTINUE TO DISCRIMINATE AGAINST THEIR RESIDENTS BASED ON DISABILITY AND FUTURE HARM IS LIKELY. . . . . . . . . . . . . 13

III.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH**

**TABLE OF AUTHORITIES**

**Federal Cases**

Adarand Constructors, Inc. v. Slater, 528 U.S. 216 (2000) .......................... 14

Blomgren v. Ogle, 850 F.Supp. 1427 (E.D. Wash. 1993) ............................ 10

Cason v. Rochester Housing Authority, 748 F. Supp. 1002 (W.D.N.Y. 1990) ......... 7, 10, 11

Fair Housing of Marin v. Combs, 285 F.3d 899 (9th Cir. 2002) ....................... 2

Federal Trade Commission v. Affordable Media, LLC, 179 F.3d 1228 (9th Cir.1999) ...... 14

Gresham v. Windrush Partners, Ltd., 730 F.2d 1417 (11th Cir. 1984) ...................... 4

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982) ............................... 2

Housing Rights Center v. Donald Sterling Corp., 284 F.Supp. 2d. 1129
    (C.D. Cal. 2003) ................................................. 3, 4, 13

Jacobus v. Alaska, 338 F.3d 1095 (9th Cir.2003) ................................... 14

LGS Architects, Inc. v. Concordia Homes of Nevada, 434 F.3d 1150 (9th Cir. 2006) ........ 14

Niederhauser v. Independence Square Housing, 4 Fair Housing - Fair Lending
    (Aspen Law & Bus.) ¶16,305 (N.D. Cal. 1998) ............................. 7, 11

Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898 (2d Cir. 1993) ................... 10

Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d. 814
    (9th Cir. 2001) ........................................................ 4

Smith v. Pacific Properties and Development Corporation, 358 F.3d 1097 (9th Cir. 2004) ... 2, 6

United States v. California Mobile Home Park Management Co., 29 F.3d 1413
    (9th Cir. 1994) ....................................................... 8

United States v. Forest Dale, Inc., 818 F.Supp. 954 (N.D. Tex 1993) ................... 7

Williams v. Matthews Co., 499 F.2d 819 (8th Cir.), *cert. denied*, 419 U.S. 1021 (1974) ........ 9

**State Cases**

Sisemore v. Master Financial, Inc., 151 Cal.App.4th 1386 (2007) ...................... 2

**Federal Statutes**

The Fair Housing Amendments Act, 42 U.S.C. section 3601 *et seq.* ............... passim

**State Statutes**

The Fair Employment and Housing Act,
    California Government Code § 12995.8 .................................... 9

**Other Material**

U.S. House of Representatives, Committee on the Judiciary, Report No. 711:
    the Fair Housing Amendments Act of 1988, 100th Cong., 2d Sess. (1988)
    reprinted in U.S.C.C.A.N. 2173, 2179 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24 C.F.R. § 100.201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

24 C.F.R. § 100.202(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 C.F.R. § 1630.2 (n)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Robert G. Schwemm and Michael Allen, "For the rest of their Lives: Seniors and the Fair
Housing Act," 90 Iowa L. Rev. 121 at 169-171 (2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

# I. INTRODUCTION

Defendants, touted on their website as the largest owner and operator of retirement housing in the world,[1] have filed an opposition to plaintiffs' motion for issuance of preliminary injunction (hereafter, "Opp."), which attempts to paint a picture of neglected and dangerous residents, languishing at the hands of incompetent care givers, untruthful former managers, and uncaring family members. Defendants bring in numerous disputed facts alleging troublesome incidents involving tenants and former tenants, including the tragic death of a former resident at the hands of her husband. Those disputed facts are not at issue here, however, as plaintiffs' motion specifically requests relief based on defendants' discriminatory policies and statements, not based on the application of those policies in specific cases.

The admissions defendants make in their opposition and accompanying declarations are striking examples of defendants' discriminatory policies, demonstrating that a preliminary injunction is warranted:

- Defendants admit that they have expressed a preference or limitation based on disability, in violation of the Fair Housing Act, 42 U.S.C. section 3604(c);
- Defendants admit that they made changes at Redwood starting in August 2006, leading to eviction notices for at least five tenants, and that those changes were motivated by the perception that certain residents seemed disabled, in violation of 42 U.S.C. sections 3604(f)(1) and 3604(f)(2)(A);
- Defendants admit that their lease agreement contains terms and conditions of tenancy requiring residents to be capable of caring for themselves, in violation of 42 U.S.C. section 3604(f)(2);
- Defendants admit that they have questioned or examined residents with disabilities to determine their fitness for independent living, in violation of 42 U.S.C. section 3604(f)(2); 24 C.F.R. § 100.202(c); and,
- Defendants admit that they instituted special charges for meal trays based, in part, on their desire to smoke out people who were unable to live independently, in violation

---

[1] http://www.holidaytouch.com/Info1.htm

of 42 U.S.C. section 3604(f)(2)(A).

## II. ARGUMENT

**A. PLAINTIFFS HAVE STANDING BECAUSE THEY HAVE BEEN INJURED, AND CONTINUE TO SUFFER IRREPARABLE HARM AS A RESULT OF DEFENDANTS' DISCRIMINATORY PRACTICES.**

Defendants initially challenge plaintiffs' standing to bring this motion because neither of the named class representatives, Eva Northern and Ruby Duncan, still lives at Redwood Retirement Residence. But they are not the only plaintiffs here. Greater Napa Fair Housing Center (dba Fair Housing Napa Valley, or "FHNV") has standing to bring this case and to obtain preliminary injunctive relief, because declarations submitted with plaintiffs' motion demonstrate that its mission of eradicating housing discrimination and educating the public has been frustrated, and it has diverted its resources to investigate and combat defendants' discriminatory housing practices. These declarations are sufficient to confer standing on FHNV with respect to this case in general, and for the purposes of issuance of a preliminary injunction.

In *Smith v. Pacific Properties and Development Corporation*, 358 F.3d 1097, 1104 (9th Cir. 2004), the Ninth Circuit reaffirmed the liberal standing requirements for a fair housing organization seeking to enforce the Fair Housing Act. Under the disability discrimination provisions of the Fair Housing Act, "an organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular housing discrimination in question. " *Id.* at 1104, citing *Fair Housing of Marin v. Combs*, 285 F.3d 899 , 905 (9th Cir. 2002); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) (originating broad standing for agencies under the Fair Housing Act); *Sisemore v. Master Financial, Inc.*, 151 Cal.App.4th 1386, 1424-26 (2007) (holding that a fair housing agency has standing under to sue under the California Fair Employment and Housing Act). These are precisely the same type of damages that FHNV has suffered in this case as a result of Redwood's discriminatory housing practices. (*See* the declaration of Kathryn J. Winter, filed in support of plaintiffs' motion for issuance of preliminary injunction, and her supplemental declaration, filed concurrently herewith ["Supp. Winter Dec."].)

These same types of damages also form the basis for FHNV's standing to obtain preliminary

injunctive relief. In *Housing Rights Center v. Sterling Corp.*, 274 F.Supp.2d 1129 (C.D. Cal. 2003), the plaintiffs moved the Court for a preliminary injunction to, among other things, bar defendants from using the word "Korean" in the names of defendants' apartment buildings. *Id.* at 1132. In support of its motion, plaintiff Housing Rights Center submitted a declaration demonstrating that it had received complaints, conducted an investigation, and distributed fair housing education packets in response to defendants' discriminatory housing practices. The Court held that such activities conferred standing on the Housing Rights Center. *Id.* at 1132-33.

Moreover, in describing the injury and hardship that would result if an injunction did not issue, the Court acknowledged that the Housing Rights Center's mission was particularly affected by discriminatory statements: "It is difficult to identify persons discouraged by a discriminatory message, and any effective educational or remedial campaign designed to counter the effects of the message necessarily will have to be broad-based and expensive." *Id.* at 1140.

Here, too, the effects of defendants' continued use of discriminatory statements cannot be easily countered by FHNV. FHNV is uniquely positioned, and bound by contract, to try to educate those who have been affected by defendants' discriminatory policies. But Redwood's giant banners on Redwood Road, a major thoroughfare in the City of Napa, and its flyers distributed in the local newspaper proclaiming housing for "active, independent" retirement affect not only the residents of Redwood; those public statements misinform the larger Napa community about the requirements of the fair housing laws and embolden other housing providers to adopt similar, illegal requirements. (Supp. Winter Dec. ¶ 7.) If Redwood is permitted to continue making public pronouncements about their "independent" living requirements, and advertising their housing for "active" seniors, the damages to FHNV's mission, and the cost of its efforts to counteract the discrimination, will necessarily increase. (Supp. Winter Dec. ¶¶ 7-11.)

FHNV's efforts are complicated by the culture of fear that has developed at Redwood as a result of the discriminatory evictions. FHNV has, in fact, interviewed many current and former residents of Redwood. (Supp. Winter Dec. ¶ 9.) Some of those residents report that others are too frightened to come forward publicly. (Id. at ¶ 9.) Their fear is not surprising, as current residents continue to live under a mushroom cloud set off by defendants' discriminatory evictions, meal

**REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH**

3

surcharges, and renewed efforts to enforce their "independent living" policy.

Defendants have vociferously claimed that no Redwood residents are at risk of injury, because there are currently no pending evictions and meal surcharges have been discontinued. (Opp. at 17.) But their representations to the Court mean virtually nothing to the current residents of Redwood, who have never received any notice or correspondence assuring them that the meal tray charges and evictions have been discontinued. (*See* the declaration of Marie Broman, filed herewith, ["Broman Dec."] ¶ 6.) Current residents continue to live in an atmosphere of fear – fear that they will be asked to move out if they need surgery or become disabled; fear that they will be asked to pay for meal trays; fear that their family will be harassed, or they will be asked to move out if they increase their care giver's work hours. Some residents even looked for new housing based on their fear that they would be next on Redwood's "hit list." (Broman Dec. ¶¶ 8, 11.) Until defendants finally and officially declare that those policies have come to a permanent end, residents who are disabled or who may become disabled in the future will live in an atmosphere of fear and anxiety.

Defendants' opposition seeks to undercut the relevance of *Housing Rights Center v. Sterling Corp.*, 274 F.Supp.2d 1129, asserting that the Court in that case denied "much of plaintiffs' motion for preliminary injunction." (Opp. at 22, n.3.) Defendants miss the point. The import of that case is not the breadth of the injunction. Rather, the case is significant in its analysis of the standing of a fair housing agency in the context of a motion for preliminary injunction. Moreover, the Court in *Housing Rights Center v. Sterling* found that a preliminary injunction should issue without a particularized showing of irreparable injury. Relying on Ninth Circuit case law, the district court held that "irreparable injury is presumed from the fact of discrimination in violation of the Fair Housing Act." *Id.* at 1140, citing *Silver Sage Partners Ltd v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) and *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984). Based on the evidence of discrimination against people with disabilities at Redwood, much of which is not rebutted by defendants, plaintiffs need not do more to establish irreparable injury.

**B. PLAINTIFFS HAVE SHOWN, AND DEFENDANTS' ADMISSIONS CONFIRM, THAT PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS.**

Defendants brazenly admit that they instituted several new policies and practices at Redwood

REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH

around August 2006, when a Holiday employee became concerned about "the number of persons who appeared to be disoriented and incapable of caring for themselves." (Opp.at 6.) Those new policies and practices included evictions, inquiries about residents' disabilities, and in-home meal tray surcharges – all motivated by the disabilities of the targets. Defendants' legal backpedaling cannot justify these unlawful practices under the Fair Housing Act ("FHA").

### 1. Defendants Mistakenly Rely on the "Qualifying Individual with a Disability" Standard, which is inapplicable under the FHA.

Defendants claim that plaintiffs cannot establish a prima facie case of discrimination based on disability under the FHA, because, in the first instance, they are not "qualified disabled persons." Defendants' analysis is fundamentally flawed, and serves as a clear warning that defendants will continue to discriminate on the basis of disability unless the Court intervenes.

Although, as defendants point out, courts do analogize Fair Housing Act claims to Title VII claims, defendants' analysis confuses the employment context's "qualified individual with a disability" standard with the definition of disability under the FHA. Defendants' imported "qualifying" factors, including requiring that residents do not pose a danger to themselves[2], or whether residents health conditions make them "no longer able to live at the Residence" (Opp. at 19), find no support in the text of the FHA or its implementing regulations.

The version of the "qualified individual with a disability" standard that defendants attempt to apply here similar to the one commonly used in the employment discrimination context to determine if, with or without accommodations, an employee with a disability can perform the essential functions of his or her job. *See* 29 C.F.R. § 1630.2 (n)(1). However, no such "essential functions" analysis exists under the federal fair housing laws. In order to meet the definition of disability under the FHA, a resident need only demonstrate that he or she is:

> An individual who has, "A physical or mental impairment which substantially limits one or more of such person's major life activities, a record of having such impairment, [or is] being

---

[2] Although "danger to self" may constitute grounds for removal to a higher level of care in health care or other licensed facilities where the facility staff are responsible for providing care and supervision, as defendants have pointed out in their opposition, Redwood is an apartment complex and not a licensed facility, and it has neither the obligation to provide care and supervision nor the legal ability to inquire into residents' health conditions. Any such inquiries would constitute an intrusion on residents right to privacy.

REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH

5

regarded as having such an impairment."

42 U.S.C. § 3602(h); 24 C.F.R. § 100.201.

Here, all named plaintiffs and proposed disability class members are persons with a disability as defined above. Therefore, they are all "qualified" for the protections of the Fair Housing Act and other federal and state fair housing laws. *See also* 42 U.S.C. § 3602(I)(1) ("Any person ... who claims to have been injured by a discriminatory housing practice" has standing under the Fair Housing Act"); *Smith v. Pacific Properties and Dev't Corp.*, 358 F.3d at 1104 (applying broad standards for standing in disability discrimination case brought under Fair Housing Act). Defendants have invented additional "qualifications" for these claims, such as residents' capability of living at Redwood without disrupting the quiet enjoyment of other residents. And to the extent that such "capabilities" are linked to disabilities or perceived disabilities, they are unlawful terms and conditions of tenancy based on disability, in violation of 42 U.S.C. § 3604(f)(2).

Rather than citing from appropriate statutory and case law under the FHA, defendants have confused their own terms for occupancy at Redwood, some of which are discriminatory, with the requirements for disability discrimination claims under the FHA. Such circular reasoning is evidence that defendants are either unwilling or unable to comply with the requirements of the FHA without immediate intervention by the Court.

**2. Defendants' Admissions Show that Plaintiffs Have a Substantial Likelihood of Prevailing on Their Claim for Discriminatory Evictions and Discriminatory Terms and Conditions of Occupancy.**

As defendants state in their Opposition, they require residents to demonstrate that, "they are capable of providing for their own health care needs, with or without a caregiver, and do not create a danger to themselves." (Opp. at 15.) These terms echo those in the Redwood's lease agreement, which specifically requires that residents represent their capability of providing for their health care and personal care needs and that residents, "agree to promptly move out" of they cannot provide for their needs. *See* Bill Nye's Lease Agreement, attached to the declaration of Celestia Amberstone submitted with plaintiffs' motion, at page 3. In fact, defendants justify the eviction notices served

**REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH**

6

on at least six residents[3] on those residents' alleged failure to meet those requirements. (Opp. at 11-14.) No factual dispute exists regarding defendants' ongoing use of these policies. Defendants allege that there are no eviction notices pending, because, as of the date they responded to the plaintiffs' motion, all tenants were abiding by these terms and conditions. (Opp. at 15.) These terms and conditions, however, violate sections 3604(f)(1) and (2) of the FHA.

Numerous courts have invalidated similar occupancy conditions requiring tenants to be capable of tending to their own health care and other personal needs. *See Cason v. Rochester Housing Authority*, 748 F.Supp 1002, 1008-9 (W.D.N.Y 1990); *Niederhauser v. Independence Square Housing*, 4 Fair.-Fair Lending (Aspen Law & Bus.) P 16, 305.2-6 (N.D. Cal. 1998) (attached to plaintiffs' motion as exhibit 5 to the declaration of Liza Cristol-Deman; see also *United States v. Forest Dale, Inc.* 818 F.Supp. 954 (N.D. Tex. 1993).

The facts regarding the housing provider's policies in *Niederhauser* were remarkably similar to those that are undisputed in this case. In *Niederhauser* the policies tenants were given upon signing their lease agreements included the following language: (tenants must) (1) "be capable of tending to their needs independently . . . (2) be able to be self sufficient mentally and emotionally and be able to conduct their own affairs such as paying their own rent, hiring and terminating, if necessary, and supervising their own chore worker . . ." and that residents must "voluntarily terminate their tenancy if they have progressively deteriorating diseases." *Niederhauser,* 4 Fair-Fair Lending at 16,305.2. The defendants in *Niederhauser* argued that plaintiffs were never actually denied housing under these policies. *Id* at 16,305.6. However, the court ruled against the housing provider and granted plaintiffs' motion for summary judgment based on the fact that the residents faced the threat of application of the policies.

Like the defendants in *Niederhauser*, defendants here point to the fact that they do not have any eviction notices pending and that they are not currently enforcing their "meal tray policy." They even go so far as to note that they have recently accepted new residents with disabilities for tenancy

---

[3]Defendants admit to five eviction notices, but there is at least one more. Virginia Fritsch, who is not identified in defendants' opposition, was also served with an eviction notice in the Spring of 2007 containing language identical to the other notices. *See* the declaration of Susan Coll, filed herewith.

**REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH**

7

at Redwood, including a resident who uses a walker and one who has a 24-hour caregiver.[4]  Despite Defendants' apparent newfound openness to tenants with disabilities, the mere existence of these discriminatory policies opens the door for discrimination against these individuals at the whim of Redwood's management.  As in *Niederhauser*, the threat of application of these policies still exists.  Given the ongoing nature of this threat, the Court should enjoin defendants from maintaining these policies.

### 3. Defendants Admit that their Meal Tray Charges Were Intended to Identify People with Disabilities, in Violation of Section 3604 (f)(2).

There is no dispute that defendants distributed a meal tray policy in January 2007 that called for residents to pay $5 extra per meal if they had a meal tray brought to their apartment rather than eating in the communal dining room. (Opp. at 10.)  The written meal tray policy permitted free meal trays only in the case of a temporary illness, such as the flu; and, only if the resident was expected to make a full recovery; and, only for a maximum of three days.[5]

According to their opposition, defendants instituted the meal tray policy based in part on their belief that "some of the residents were getting meal trays because they were mentally disoriented and incapable of leaving their rooms, which indicated to [the manager] that they may not

---

[4] Even Defendants' acknowledgment in the terms of the lease agreement of residents' potential use of caregivers fails to render the lease terms lawful.  Many residents may need the use of assistive technology such as lifts, feeding devices, voice activated devices and other accommodations in order to attend to their personal and health care needs.  These individuals would have their rights to tenancy limited under Defendants' terms and conditions regardless of whether Defendants allow them to use the services of a caregiver.
Moreover, defendants' eviction notices demonstrate that residents who are dependent on others for their care are, in defendants' own words, not "independent living eligible" and subject to eviction.  How much help is too much to qualify as "independent living eligible?"  Defendants do not tell the Court, and nor do they tell their residents.  That determination is left to the sole discretion of the resident manager under the terms of the rental agreement.

[5] Although defendants now claim that they also made exceptions for those with "verified medical conditions" (Opp. at 11), the written meal tray policy did not specify that those with disabilities might qualify for an exception.  Whether defendants made such accommodations when requested is subject to dispute, although not by way of the motion at bar.  Exceptions to fees are required as a form of reasonable accommodation under section 3604(f)((3)(B). *See United States v. California Mobile Home Park Management Co.*, 29 F.3d 1413, 1416-17 (9th Cir. 1994).

REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH

8

be able to continue to live independently." (Opp. at 10.) This belief is not only paternalistic and rife with assumptions about people with disabilities, but also serves as clear evidence that disability was a motivating factor in defendants' decision to institute the meal tray policy. Moreover, even if the other reasons cited by defendants, including a concern for the health and safety of residents (Opp. at 23), are genuine, they will not defeat liability here. *See, e.g., Williams v. Matthews Co.*, 499 F.2d 819, 827 (8th Cir.), *cert. denied*, 419 U.S. 1021 (1974) (subjective good intent does not override discrimination); Gov't Code section 12955.8(a).

### 4. Defendants Admit That They Have Made Statements That Are Facially Discriminatory, in Violation of Section 3604(c).

Defendants have failed to rebut that they have made statements in the past indicating discrimination against people with disabilities. According to the declaration of Nancy Northern submitted with plaintiffs' motion, Holiday employee Tom Ahrens told her that Redwood is an "independent living facility," and that people who cannot eat their meals in the dining room "do not belong at Redwood," or words to that effect, and that Redwood was "not intended" for people who could not make it to the dining room. (Declaration of Nancy Northern, filed with plaintiffs' motion, at ¶ 13.) Mr. Ahrens submitted a declaration in support of defendants' opposition but failed to rebut Ms. Northern's allegations that he made such statements.

Defendants not only deny that those past statements run afoul of the fair housing laws, but also admit that they continue to make and publish discriminatory statements indicating that only "active" seniors who can live "independently" are welcome at Redwood. Those statements are neither isolated nor ambiguous; on the contrary, they appear in everything from advertisements, to rental agreements, to move out notices. *See, e.g.,* Redwood's current rental agreement (Redwood is "for persons who are capable of providing for their own health care and personal care needs." [Opp. at 3.]); Redwood's meal tray policy ("please keep in mind that the Redwood is a retirement community designed for active and independent seniors" [Exh. 6 to the declaration of Nancy Northern filed with plaintiffs' motion]); Redwood's print ads ("see how wonderful active, independent, retirement can be" [Exh. 4 to the Cristol-Deman Dec. filed with plaintiffs' motion]); and move out notices ("Redwood management feels that Bill [Nye] is no longer defined as independent living eligible." [Exh. 3 to the Amberstone Dec., filed with plaintiffs' motion].)

REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH

9

As these examples cited above demonstrate, Redwood has repeatedly used the terms "independent" and "active" to describe the types of residents who may live there. And, as defendants themselves acknowledge, the use of the word "independent" to describe the type of residents who are welcomed by a housing provider is patently unlawful. (Opp. at 24.) *Cason*, 748 F.Supp. 1002; Robert G. Schwemm and Michael Allen, "For the rest of their Lives: Seniors and the Fair Housing Act," 90 Iowa L. Rev. 121 at 169-171 (2004) (use of the terms "independent" and "active" violate the FHA when used to describe limitations on or exclusion of residents).

Defendants have argued that their use of these words is not per se unlawful, because Redwood rents to people with disabilities, and, thus, no discriminatory motive can be imputed to Redwood's use of the terms "independent" and "active." (Opp. at 24.) Defendants' argument reflects a misconception about the required showing under section 3604(c) of the FHA.

Unlike Title VII and the ADA, the Fair Housing Act contains a provision outlawing all discriminatory "notices, statements, and advertising" relating to housing. 42 U.S.C. section 3604(c). Such communications violate the FHA if they convey a preference or discrimination to an "ordinary" reader or listener. Section 3604(c) is essentially a "strict liability" standard, making statements that, on their face, reflect discriminatory preferences or limitations unlawful *regardless of intent*. *See, e.g., Blomgren v. Ogle*, 850 F.Supp. 1427, 1437-40 (E.D. Wash. 1993)(discriminatory statements in rules violate § 3604(c) even if they were not enforced); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 907-08 (2d Cir. 1993)(upholding damages awarded to plaintiffs based on their observation of defendants' discriminatory newspaper ads). Accordingly, use of such language, in the rental agreement and elsewhere, should be enjoined.

### 5. Redwood's Use of A Corporate Nurse to Interview Residents about Their Ability to Care for Themselves Violates the Fair Housing Act.

In their attempt to defend their discriminatory actions against certain Redwood residents with disabilities, defendants point out that they used a corporate nurse to interview each resident and obtain and obtain information about their personal care. (Opp. at 6; Ahrens Dec. ¶¶9-10). These inquiries undoubtedly uncovered information relating to residents' disabilities. Among the explanations defendants offer for these inquires into the protected health information of Redwood residents are Redwoods' attempt to determine if residents presented a danger to themselves and

whether residents were having their health and safety needs met or managed by their caregivers. *Id*.

As numerous cases illustrate, the Fair Housing Act prohibits housing providers from inquiring into residents disabilities or medical conditions and from asking residents to waive their rights to confidentiality of medical records or medical history. *See Niederhauser*, *4 Fair-Fair Lending* at 16,305.5; *Cason*, 748 F.Supp. at 1008-09. In *Cason*, the Court specifically addressed inquiries into residents' abilities to "live independently" and determined that any such inquiry violates the Fair Housing Act. Even if defendants claim that they are only making inquiries to determine whether any resident presents a "direct threat" to the health and safety of others, such inquiries must be limited to questions regarding whether the individual has engaged in prior acts that would constitute a direct threat and may not involve blanket questions about disability or medical conditions. *Niederhauser*, *4 Fair-Fair Lending* at 16,305.5. There is no indication that defendant directed its nurse to so limit her inquiry in order to comply with the Fair Housing Act and residents' rights to privacy.

### 6. Defendants Cannot Demonstrate that Their Policies Were Properly Intended to Exclude only those who Pose a Direct Threat.

Defendants start their discussion of their approach to residents with disabilities with an inflammatory account of a tragic incident involving the death of a resident, purportedly at the hands of her husband, who, according to defendants, was "delusional." (Opp. at 5.) However, this former resident is neither a plaintiff in the case nor a proposed class member. In addition, regardless of the veracity of defendants' allegations about the caregiver's response to the incident, the caregivers are not plaintiffs in this case and defendants' allegations about the conduct of the caregivers only serve to distract from the discussion of residents' rights under the FHA. Defendants are apparently using this incident as a justification for policies that limit the rights of residents with disabilities – effectively grouping all residents who require the services of caregivers (as well as all residents who have dementia) into the category of those who present a danger to other residents. None of the named plaintiffs or the residents who submitted declarations in support of plaintiffs' motion for preliminary injunction exhibited violent behaviors and plaintiffs are not asking defendants to ignore violent behavior by any tenant. Rather, plaintiffs are merely asking that defendants modify their policies so that they do not limit terms and conditions of tenancy based on disability.

Defendants' Opposition and its accompanying declarations describe multiple incidents where residents received eviction notices after displaying "irrational fears and behavior, inability to remember recent events, agitation and inappropriate and sometimes aggressive behavior" etc. (David Hall Dec. ¶ 13.) Defendants also describe situations where residents needs appeared to be unmet by personal caregivers as grounds for eviction. (Opp. at 12.) Despite the complex nature of the facts surrounding each eviction notice, each resident who received a notice had two things in common: (1) the conduct and/or behaviors they were alleged to display were directly related to their disability(s); and (2) such conduct did not rise to the level that would warrant their exclusion from the protections of the disability discrimination provisions of the Fair Housing Act.

Housing providers can only deny or refuse to make available a dwelling to an individual based on conduct or conditions resulting from a disability when the individual's tenancy would constitute a direct threat to the health and safety of other individuals or would result in substantial physical damage to the property of others. 42 U.S.C. § 3604(f)(9). This "direct threat" defense, however, rarely succeeds in defeating a claim of disability discrimination under the Fair Housing Act. The legislative history of this provision makes clear that it was not intended to permit housing to be denied based on the perception that people with disabilities pose a greater threat to the health and safety of others than people without disabilities. *See* Schwemm & Allen, "For the Rest of Their Lives: Seniors and the Fair Housing Act," 90 Iowa L. Rev. 121 (2004) at n 216 (citing H.R. Rep. No. 100-711 (1988), reprinted in U.S.C.C.A.N. 2173, 2179 ["Any claim that an individual's tenancy poses a direct threat and substantial risk of harm must be established on overt acts or current conduct. Generalized assumption, subjective fears, and speculation are insufficient to prove the requisite direct threat to others."])

In this case, none of the individuals who received eviction notices displayed conduct resulting in a direct threat to other residents. In addition, much of the conduct alleged in the eviction notices directly results from residents' disabilities. While some of the alleged conduct may have been impermissible under the lawful terms of the lease agreement,[6] plaintiffs' motion for preliminary injunction does not ask the court to enjoin defendants from taking action against tenants who violate

---

[6] Excluding those terms that unlawfully discriminate against residents with disabilities.

**REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH**

lawful conditions of tenancy, and plaintiffs would never request that the court prevent defendants' from taking action to prevent one resident from harming another. However, when a resident has behaviors directly resulting from disabilities, defendants must provide reasonable accommodations that would mitigate the conduct if doing so would prevent eviction.

### C. THE BALANCE OF HARDSHIPS TIP IN PLAINTIFFS' FAVOR, SINCE THE HARM ALLEGED BY DEFENDANTS IS PURELY SPECULATIVE.

Defendants argue that they have the "right to determine when a resident is incapable of continuing to live safely" at Redwood, and that the injunction plaintiffs seek would "harm[] and interfere[] with the right of a majority of Redwood residents to the safe and quiet enjoyment of their homes, which is jeopardized by residents whose families are unable or unwilling to meet their elderly parent's care and medical needs." (Opp. at 1-2.)

As described above, defendants' suggestion that plaintiffs and others like them threaten the health and safety of Redwood residents is utterly unfounded. The alleged "damage" to other Redwood residents is not only speculative; it is outrageous to claim that those residents are endangered by the presence of people with disabilities. *Housing Rights Center v. Sterling*, 274 F.Supp. at 1140 (defendants' claim that other tenants will flee if injunction is entered is speculative).

Defendants also claim that it would constitute a fundamental alteration of their business – in essence, changing their building to an assisted living facility or residential care home – if plaintiffs win. (Opp. at 22-23.) Defendants' use of terminology from the reasonable accommodation context is misplaced. Plaintiffs are not requesting that defendants provide any form of medical care, such as in an assisted living or residential care environment, as a reasonable accommodation. Instead, plaintiffs seek recognition that defendants are a housing provider that must not adopt policies that limit or exclude people with disabilities. To the extent that Redwood has been violating the law, an injunction might indeed change the way Redwood does business. But that change does not constitute a "fundamental alteration" of the sort that would excuse Redwood from compliance.

### D. THIS IS A LIVE CONTROVERSY: DEFENDANTS CONTINUE TO DISCRIMINATE AGAINST THEIR RESIDENTS BASED ON DISABILITY AND FUTURE HARM IS LIKELY.

Defendants' opposition contends that plaintiffs' claims are moot, because "Redwood no longer has a meal tray policy that requires payment, and management has issued no eviction notices

REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH

and has no plans to issue eviction notices." (Opp. at 17.) But the meal tray policy and evictions are not the only practices challenged here. Moreover, even if the cessation of defendants' discriminatory meal charges and evictions could be verified, plaintiffs' claims for injunctive relief are not moot.

In *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150 (9th Cir. 2006), the defendants claimed that plaintiffs' request for a preliminary injunction was moot, because defendants did not intend to use architectural plans in violation of a licensing agreement with plaintiffs in the future. The Ninth Circuit disagreed, noting that it is "exceedingly rare" that a defendant's voluntary termination of allegedly wrongful activity will moot a claim for injunctive relief. *Id.* at 1153. Such claims are mooted "only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*, quoting *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (per curiam) (internal quotation marks omitted).

Defendants' representations to the Court that they have discontinued the challenged practice, or will not make the same mistake again, does not meet this standard. On the contrary, defendants admit that they continue to use the terms and conditions of occupancy that plaintiffs contend are discriminatory, and that no evictions are pending because all current residents meet those terms and conditions. (Opp. at 15.) If this Court does not bar defendants from enforcing those discriminatory terms and conditions, there is little doubt that defendants will use the extraordinary discretion accorded to them under the lease agreement to force residents to move out in the future. This possibility of future harm, by definition, means that plaintiffs' claims are not moot. *See LGS Architects*, 434 F.3d at 1154; *Federal Trade Commission v. Affordable Media, LLC*, 179 F.3d 1228, 1237 (9th Cir.1999) ("an action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a possibility of recurrence, since otherwise the defendant's [sic] would be free to return to [their] old ways;" *Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir.2003) (holding that a § 1983 action challenging Alaska's campaign finance laws was not moot, even though the statutes in question had been repealed, because the State's voluntary cessation of its alleged wrongdoing did not foreclose the possibility of future reenactment).

///

///

**REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION – CASE NO. C 07-3652 PJH**

14

### III. CONCLUSION

Plaintiffs do not ask this Court to rule on any disputed facts or grant any special treatment to the putative class members. Plaintiffs seek changes to defendants' discriminatory policies and statements, and maintenance of the status quo for all disability-related eviction activity and move out notices. Plaintiffs' motion, and the concessions made in defendants' opposition, establish that this Court should issue a preliminary injunction barring defendants from:

1. Imposing terms and conditions of tenancy, including in their lease agreement and other documents, that require tenants to be "capable of providing for their own health care and personal care needs;"

2. Instituting any evictions or move out requests for people with disabilities or perceived disabilities;

2. Charging tenants for taking trays from the dining room to eat meals in their apartments;

3. Making inquiries into residents' disabilities or health conditions except as specifically permitted under the Fair Housing Act; and,

4. Communicating statements that convey a preference for residents who are "active" or independent," or other similar terms that indicate a preference for nondisabled residents.

Dated: September 12, 2007.

                              Respectfully submitted,

                              BRANCART & BRANCART
                              PROTECTION & ADVOCACY, INC.


                              /s/ Liza Cristol-Deman
                              Liza Cristol-Deman
                              Attorneys for Plaintiffs