BRANCART & BRANCART
   Christopher Brancart (SBN 128475)
   Liza Cristol-Deman (SBN 190516)
Post Office Box 686
Pescadero, CA 94060
Tel:  (650) 879-0141
Fax:  (650) 879-1103
cbrancart@brancart.com
lcristoldeman@brancart.com

Attorneys for all Plaintiffs

PROTECTION & ADVOCACY, INC.
   Stuart Seaborn (SBN 198590)
100 Howe Ave. Suite 235N
Sacramento, CA 95825
Tel:  (916) 488-9950
Fax:  (916) 488-9960
stuart.seaborn@pai-ca.org

Attorneys for Ruby Duncan, Eva Northern,
and Class Plaintiffs Only

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREATER NAPA FAIR HOUSING CENTER, a California Not for Profit Corporation, doing business as FAIR HOUSING NAPA VALLEY, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>HARVEST REDWOOD RETIREMENT RESIDENCE, L.L.C., doing business as Redwood Retirement Residence; et al.<br><br>Defendants. | Case No. C 07-3652 PJH<br><br>DECLARATIONS OF MARIE BROMAN, NANCY NORTHERN, KATHRYN WINTER, AND SUSAN COLL IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS OPPOSITION TO PLAINTIFFS' MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION |

    Attached hereto are the following declarations filed in support of plaintiffs' reply to defendant's opposition to plaintiffs' motion for issuance of preliminary injunction:

    1.    Declaration of Marie Broman

    2.    Supplemental declaration of Nancy Northern

DECLARATIONS IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS OPPOSITION TO
PLAINTIFFS' MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION
– CASE NO. C 07-3652 PJH

1

3. Supplemental declaration of Kathryn Winter

4. Declaration of Susan Coll

Dated: September 12, 2007.

Respectfully submitted,

BRANCART & BRANCART

_[signature]_

Liza Cristol-Deman
Attorneys for Plaintiffs

DECLARATIONS IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS OPPOSITION TO PLAINTIFFS' MOTION FOR ISSUANCE OF PRELIMINARY INJUNCTION
– CASE NO. C 07-3652 PJH

# DECLARATION OF MARIE BROMAN

I, Marie Broman, declare as follows:

1. I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently to them.

2. I currently reside in apartment 212 at the Redwood Retirement Residence. I have been a tenant here since September 20, 2001.

3. The monthly rent is currently $2,290. The rental agreement I signed around the time that I moved in included an addendum that required a one-time "signing fee" of $975 that became non-refundable after 90 days.

4. I am 93 years old. I have a mobility impairment that severely limits my ability to ambulate. I use an electric wheelchair to get around.

5. In the fall of 2006, I saw a notice about a new meal tray policy at Redwood. The notice stated that residents must pay extra to eat their meals in their rooms, unless they have a short-term illness like the flu or are temporarily recovering from surgery or an injury. I think these charges unfairly penalize people with permanent disabilities who cannot use the dining room. I am concerned that, in the future, I might not be able to use the dining room and I would have to pay these extra charges.

6. I have never seen anything in writing from Redwood stating that the meal tray policy has been rescinded or revised.

7. At around the same time that I saw the new meal tray policy, I heard that some residents were being asked or ordered to move out of Redwood. I heard that the managers wanted them to move because they could not use the dining room, or could not take care of themselves. Word of these move-out notices spread throughout Redwood very quickly.

8. One resident who was told she needed to start looking for a new place was Ruby Duncan. I knew Mrs. Duncan and her daughter Lou Whitaker very well. Mrs. Duncan was mentally sharp until shortly before her death, especially considering her age. It was difficult, however, for her to use the dining room, so her health care aides

3

1 brought her meals from the dining room. When I heard that Mrs. Duncan was "on the
2 list" for eviction, I became very concerned about my own future at Redwood. Lou
3 Whitaker brought me brochures from the residences she visited when she was looking
4 for a new place for Mrs. Duncan, so I would be prepared in the event I was asked to
5 move.

6     9. I also have heard that the managers do not want walkers and wheelchairs
7 at the dining room tables. Redwood policy mandates that everyone who uses a walker
8 must leave it along the wall or windows rather than putting it nearby their table. I am
9 concerned that I might be asked to get out of my wheelchair to sit at the dining room
10 table, which would be a hardship for me.

11     10. Although I understood when I moved in that Redwood does not provide
12 health care services to its residents, I always thought I would be able to hire my own
13 help and stay in my own apartment at Redwood. I have health care aides help me 25
14 hours per week. I have wondered if my tenancy is in jeopardy merely because I need
15 the help of health care aides. I am concerned that the managers might not consider me
16 eligible for "independent living" if my disabilities worsen and I need my health care aides
17 to assist me for more hours.

18     11. I have heard the managers say that Redwood is an "independent living"
19 residence, and I have seen similar statements in advertisements and signs for
20 Redwood. Those of us who need help from home health care aides are concerned that
21 we might be asked to move out because we do not fit within the management's
22 definition of "independent living." Even residents who do not have disabilities worry
23 what will happen to them if, in the future, they become disabled and need help.

24     12. In the past, Redwood has included all sorts of residents over 55, including
25 residents with severe disabilities related to their age. The concept of "aging in place" is
26 appealing to me. I want to stay here in my home as long as my physicians and I agree
27 that it is appropriate for me to do so, even if I need help from private health care aides.
28

1 | I also want to live in an integrated community where people of all disabilities and
2 | abilities are welcome.
3 |     13.    I continue to worry that I will be asked to move out of Redwood because
4 | of my disabilities. It would be a financial, mental and physical hardship on me and my
5 | family if I have to move out and find another place to live. It also would be a hardship if
6 | Redwood served me with an unlawful detainer. Even with valid defenses, it would be
7 | difficult, costly, and stressful for me to fight Redwood in court over the unlawful
8 | detainer.
9 |     I declare under penalty of perjury that the foregoing is true and correct under the
10 | laws of the State of California and the United States of America.
11 |     Executed on September _7_, 2007, at Napa, California.

*Marie W. Broman*
Marie Broman

-3-

FROM : Nancy & Casey Northern      PHONE NO. :            Sep. 12 2007 04:28PM P2

## SUPPLEMENTAL DECLARATION OF NANCY NORTHERN

I, Nancy Northern, declare as follows:

1. I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently to them. This supplemental declaration is filed in support of plaintiffs' reply to defendants' opposition to motion for issuance of preliminary injunction motion.

2. I have reviewed defendants' opposition to plaintiffs' motion for issuance of preliminary injunction, and the declarations of David Hall, Denise Hall, Tom Ahrens, and Vanessa Batten.

3. I am the family member who has been principally responsible for helping my mother, Eva Northern, with her housing, finances, and medical issues as she has aged. I did not expect Redwood managers or staff to assume any responsibility for my mother's care, since I understood that they provide housing, not personal or medical care.

4. I hired private caregivers to attend to my mother several times a day. I have never seen the Personal Caregiver Rules of Conduct referenced by the defendants and was not aware that any such rules existed.

5. I visited my mother at Redwood regularly when she lived there. Based on my observations and interactions with my mother, I believed she was receiving the help she needed from the caregiver we hired. I knew that there was almost always more than one caregiver at Redwood, and that sometimes the caregivers had multiple clients. I still believed that my mother was functioning reasonably well at Redwood and receiving the assistance she needed.

6. David Hall states in his declaration that he told me that my mother was not getting "adequate care" from her personal caregiver. (David Hall Declaration at ¶ 14.) That is false. Neither David Hall nor anyone else at Redwood ever told me that my mother was not getting adequate care, or that she needed a higher level of care. At no time did the Halls or anyone else tell me that they thought my mother's caregivers were

FROM : Nancy & Casey Northern           PHONE NO.            Sep. 12 2007 04:29PM P3

1  incompetent, absent, or otherwise inadequate.

2      7.    Mr. Hall states that his wife sometimes delivered trays to my mother.
3  (David Hall Declaration at ¶ 19.) Denise Hall at one time mentioned to me that she
4  checked in on my mother, which I thought was surprising but sweet at the time. Mrs.
5  Hall did not mention to me that she had any opinions about my mother's mental health
6  or dementia.

7      8.    Mr. Hall states that my mother was incoherent and made irrational
8  complaints. (David Hall Declaration at ¶ 19.) The Halls never mentioned to me that they
9  were concerned that my mother was incoherent or complained a lot. My mother
10 complained frequently about many things, but that was not a symptom of dementia. It is
11 and always was part of her personality.

12     9.    My brother lives near Redwood and has stayed with her on occasion. I do
13 not understand why his weight, or his activities in my mother's apartment, (see David
14 Hall Declaration at ¶ 19) are at issue here. He was not my mother's care giver.

15     10.    Mr. Hall says my mother was never denied a meal tray. (David Hall
16 Declaration at ¶ 19.) I do not believe that is accurate. I drove to Redwood on New
17 Years Day because my mother was denied a meal tray. I do not believe the Halls were
18 there on that day.

19     11.    Mr. Hall is correct in paragraph 19 when he states that my mother
20 received a rent rebate of $300 per month for the meals she did not receive. However, I
21 did not "choose" to buy a freezer for food. I purchased a freezer and food because I
22 believed that my mother had been essentially cut off from the Redwood kitchen. Mr.
23 Ahrens did not give me the option of paying for meal trays. He told me that she would
24 have to go to the dining room, and that meal trays are only provided for three days for
25 short term illness. He wanted to know what was wrong with my mom and what sort of
26 medical condition was preventing her from going to the dining room. I told him about
27 her speech aphasia and how it affected her ability to communicate, making socializing
28 in the dining room difficult. Mr. Ahrens told me that Redwood was meant for

FROM : Nancy & Casey Northern    PHONE NO. :    Sep. 12 2007 04:29PM P4

1  independent people and wasn't an appropriate place for people who couldn't function
2  well enough to have meals in the dining room. I asked him what I was supposed to do if
3  she could not get meals from the dining room. He said that we [her family] could
4  provide our own meals for her. So I bought a freezer and food so my mother could eat.

5      12.    Mr. Hall states in his declaration at paragraph 19 that he discussed his
6  concerns about my mother's behavior with me and my siblings on a number of
7  occasions. That is false. I recall only two incidents that led to calls from Mr. Hall or Mrs.
8  Hall. I received one call after my mother asked the Halls about my brother, who had
9  been very sick. My mother feared that he had died. I assured the Halls that my brother
10 had been sick but was not dead. I received another call after the bathtub overflowed in
11 my mother's room.

12     13.    Mrs. Hall called me on March 14, 2007, the day that the bathtub
13 overflowed. She informed me that my mother's room had flooded. I already knew this
14 based on a call I had previously received from my mother's caregiver. Mrs. Hall did not
15 say that I needed to come to Redwood urgently. I received a second call later the same
16 morning from Mr. Hall, telling me that I needed to pick my mother up so that the carpet
17 could be pulled up. I could not come that day and told Mr. Hall why. While I was out,
18 Mr. Hall left me two very hostile messages on my answering machine. I called him back
19 and told him that I would come the next day. I also told him that I would have one of the
20 caregivers stay with her overnight.

21     14.    The next morning, I went to Redwood. I apologized for the trouble my
22 mother had caused. I told Mr. Hall that I understood that the caregiver had been gone
23 from my mother's room for less than an hour when my mother turned on the tub. Mr.
24 Hall went on and on about the damage to the carpet and that my mother had to move
25 out immediately. I agreed that we would pay for the damage to the carpet. Even so, he
26 wanted me to call movers and move my mother out of Redwood immediately and
27 permanently.

28     15.    Although we had not yet given notice to Redwood, I had previously made



1  arrangements to move my mother to Aegis, an assisted living facility. The date I had
2  planned to move her was in late March or early April. I was waiting for my sister to arrive
3  the week of March 19 to help me break the news to my mom, and to assist me in
4  making moving arrangements. My sister and I were talking regularly about the best
5  course of action. Caring for and contracting with her caregivers to provide her
6  increasing levels of care at Redwood was my mother's first choice. After the incident
7  with the carpet, and Mr. Hall's comments and demeanor during that incident, I felt I had
8  no choice but to move her to Aegis sooner than planned. I moved her to Aegis the day
9  after the flooding.
10         16.    When I told Mr. Hall that I was moving my mother to Aegis, I also told him
11 why: Having to provide her with meals was too much, the threat of eviction hanging
12 over our heads was too emotionally draining, and from the management's comments
13 and demeanor, the writing was on the wall. I made it very clear that I felt she was being
14 forced out.
15         17.    Mr. Hall asked me to sign a move out notification form. The reason for
16 moving out ("higher level of care") had already been typed in. But that was not my
17 reason for moving her out. I would have preferred, and she would have preferred to
18 stay at Redwood, even if we needed to hire someone to live with her full time. We felt
19 forced out.
20         18.    I find it very difficult to believe that my mother notified Mr. Hall that she
21 wanted to move out in March 2007. (David Hall dec. ¶ 14.) My mother was consistently
22 opposed to moving out of Redwood, even after her apartment flooded. My brother and I
23 had a very difficult time convincing her to move. We told her that she had to go until the
24 carpet was fixed. She complained to Mr. Hall that a resident upstairs had flooded her
25 apartment, and several adjoining units, too, but that resident was still a tenant. My
26 mother complained to Mr. Hall that she felt she was being forced out.
27         19.    I had relatively few conversations with the Halls about my mother. I did
28 initiate some casual conversations with the Halls when I came to visit my mother at

Redwood. I tried to give them some insights into my mother's expressive aphasia – a condition that interferes with her ability to express herself even though she knows what she wants to say.

20. Mr. Ahrens states in his declaration at paragraph 9 that he directed a corporate nurse to talk with residents to determine if their care needs were being met. I was never informed that my mother would be or was questioned or examined by a nurse. I have never been informed of the nurse's opinions about my mother.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the State of California and the United States of America.

Executed on September 11, 2007 at El Sobrante, California.

*Nancy Northern*

**SUPPLEMENTAL DECLARATION OF KATHRYN J. WINTER**

I, Kathryn J. Winter, declare as follows:

1. I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently to them. This supplemental declaration is filed in support of plaintiffs' reply to defendants' opposition to motion for issuance of preliminary injunction.

2. I am the Executive the Director of Greater Napa Valley Fair Housing Center, doing business as Fair Housing Napa Valley.

3. Plaintiff Greater Napa Valley Fair Housing Center, doing business as Fair Housing Napa Valley ["FHNV"], is a non-profit agency with a mission to promote the eradication of housing discrimination throughout Napa County. We have contracts with the City and County of Napa to provide counseling and education to Napa residents regarding the fair housing laws. We also have a contract with HUD to provide these services within our geographic jurisdiction, which includes the City of Napa.

4. I reject defendants' claim that FHNV has done anything improper or unethical by entering Redwood property or contacting residents. FHNV staff has distributed notices and brochures informing Redwood residents of their housing rights, but this activity was part of FHNV's educational mission and was conducted in full compliance with California Civil Code section 1942.6. We had received the prior consent and invitation of a Redwood resident to come onto the property for the purpose of distributing our notice and brochure.

5. FHNV also has called some residents of Redwood during the course of our investigation and this litigation. We called people who had initiated contact by calling us first, either in the past, or in response to survey letters, and those whose names were provided to us by other residents as potential witnesses. I do not believe that we "cold called" anyone.

6. The effects of Redwood's continued use of discriminatory language like "active" and "independent" cannot be mitigated easily by FHNV. Redwood has so far

given no indication that it will cease using the words "active" and "independent." Rather, it is my understanding that they continue to defend such language. It is my concern that just as Redwood has misled their own residents about their housing rights by using these words, their actions will have a similar impact on the general public.

7. For example, Redwood has posted or disseminated advertising materials, including giant banners on Redwood Road, a major Napa roadway, stating that Redwood is for "active" and "independent" seniors. These ads misinform the public about the requirements of the fair housing laws, and further, they will embolden and encourage other housing providers to enact similarly discriminatory policies. But these ads have been observed by such a large number of people that it will be difficult and costly to devise an educational campaign to counteract the ads' effects.

8. FHNV has encountered a number of complications in trying to reach out to victims of Redwood's discriminatory housing practices. Redwood residents have seen or heard similar statements in so many different places – from Redwood's advertising materials, to their leases, and from the mouths of managers – that most of the residents believe these terms to be a true measure of who can and who cannot be a resident there. This makes the education process difficult.

9. We have interviewed many Redwood residents. Some residents have expressed fear that they will be asked or ordered to move out if they complain publicly, and report that other residents are too scared even to call us. Residents' fear makes it even more difficult to conduct our investigation and to counteract the effects of the discrimination. I feel that it is part of our agency's mission to participate in litigation such as this, especially where current residents are too frightened to speak for themselves.

10. Discriminatory statements and advertising like Redwoods' cause significant frustration to FHNV's mission. If Redwood is allowed to continue to make these statements and place words like "active" and "independent" in their advertising materials, FHNV will be forced to increase its efforts to educate the public and the costs

2

1 | we incur while doing so will grow correspondingly.

2 |     11.    We have already incurred significant costs, both financial costs and opportunity costs, in investigating and addressing discriminatory practices at Redwood. The number of complaints we received was extraordinary, and overwhelmed the staff and resources of our small agency. We have fallen behind on other work, including preparing and providing educational workshops for the community and preparing reports under the terms of our contracts. If Redwood can continue discriminating, I believe that we will have to divert even more of our resources to counteract and educate, and we will fall even farther behind on our agency's other important work.

    I declare under penalty of perjury that the foregoing is true and correct under the laws of the State of California and the United States of America.

    Executed on September 12, 2007 at Napa, California.

*[signature]*
Kathryn J. Winter



## DECLARATION OF SUSAN COLL

I, Susan Coll, declare as follows:

1. I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently to them.

2. My husband, John Coll, and I were the co-managers of Redwood Retirement Residence from approximately June 2000 until January 2003. We became the managers in January 2003 and served in that capacity until August 2006. We were terminated after John had an accident in the company car, but the accident was not related to alcohol use.

3. Redwood Retirement Residence ("Redwood") is an apartment building designed for seniors over the age of 55. Our employer was Holiday Retirement Corporation ("Holiday"). Our immediate supervisor was a regional manager for Holiday who worked out of company headquarters in Salem, Oregon.

4. Most of our training was on-the-job. The previous managers of Redwood, Rex and Leslie, gave us some guidance about the job. Various Holiday employees from corporate headquarters also visited Redwood to provide us with guidance and training. We also received written instructions in the form of a Holiday employee manual and periodic correspondence about Holiday's policies from corporate headquarters. Holiday did not provide us with training regarding the fair housing laws or instruct us to attend any fair housing training on our own.

5. We were instructed by our predecessors and supervisors at Holiday that Redwood was an "independent living" facility for "active" seniors. We understood that residents must be able to get to the dining room and eat their meals there. We were instructed to rent only to residents who could be "independent."

6. In order to preserve the character of Redwood as an "independent living" facility, we were instructed to steer applicants to other housing if they could not meet Holiday's definition of "independent." Specifically, if someone who was interested in applying had difficulty ambulating during our tour of the facility, we were instructed to recommend that they look into assisted living facilities. Holiday was very insistent that

1  we maintain 100% occupancy, however, so we generally did not steer such people
2  away from Redwood if they would get private assistants. John and I welcomed
3  everyone with open arms and felt it should be our decision to decide whether to rent to
4  residents who could live in Redwood even if they had a disability -- after all, we were the
5  ones who would be called on if residents needed help.
6      7.    John and I always marketed Redwood to perspective tenants and their
7  families as if it would be their final home. We would also state that they could stay only
8  if they did not become a danger to themselves or anyone else.
9      8.    If a resident became disabled during their tenancy, my husband and I
10 would neither alert Holiday corporate headquarters nor take any action to evict them.
11 We cared about our residents and wanted them to be safe and happy. If a resident
12 seemed to be having difficulty, we would recommend that they hire their own private
13 help or increase the private care giver's hours. To us, Redwood was their home, and
14 they should not be penalized for something that was out of their control.
15     9.    In or around the summer of 2005, Holiday hired a new regional manager,
16 Tom Ahrens, who served as our direct supervisor. Mr. Ahrens was critical of our
17 management of Redwood, even though Redwood was 100% occupied during most of
18 the time we were managers. Mr. Ahrens commented frequently that we had too many
19 "really old" people living in Redwood. Mr. Ahrens encouraged us to rent to younger
20 seniors. He pointed out a number of residents who, in his opinion, should be asked to
21 move out. All of the residents whom he pointed out had disabilities.
22     10.   Holiday had a meal tray policy that we were supposed to enforce at
23 Redwood. The policy permitted residents to take their meals in their rooms if they had
24 a temporary illness or temporary disability for no more than three days. On the fourth
25 day that a resident wanted meals in his or her room, we were supposed to charge the
26 resident an extra fee. We did not charge anyone the extra fee during the time that we
27 were the managers. We did not feel that it was fair to charge residents extra fees for
28 meal trays, since their care givers picked up and returned the meals from the kitchen. I

- 2 -

have personally observed the kitchen staff getting ready for meal service and cleaning up after meal service on many occasions, and I do not believe that Redwood incurred any additional hardship or cost to permit these residents to have meals in their rooms. However, we received a letter or memo from corporate headquarters toward the end of our employment asking us to conform to the meal tray policy.

11. In my capacity as co-manager, I became well-acquainted with all of the Redwood residents. I was shocked to learn that the managers who took over, Dave and Denise Hall, asked or ordered several residents to move out shortly after my husband and I left Redwood. I personally saw two move out notices – one addressed to Bernice Thornton's family and one addressed to Virginia Fritsch's family. I do not believe these two residents or any others posed a danger to themselves or others justifying these move out notices. My heart clenched when I heard about these people being forced out for the sake of Redwood's policy.

12. Many Redwood residents have contacted me since I left Redwood. A number of them have told us that they are scared that they will be asked to move out. Some residents have said that they stay in their rooms as much as possible because they do not want management to notice that they are disabled, since their condition might lead to eviction.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the State of California and the United States of America.

Executed on September 7, 2007, at Napa, California.

*Susan Coll*
Susan Coll

- 3 -